No. 22-30320

# In the United States Court of Appeals for the Fifth Circuit

RONALD CHISOM; MARIE BOOKMAN, ALSO KNOWN AS GOVERNOR; URBAN LEAGUE OF LOUISIANA,

*Plaintiffs - Appellees*

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

*Intervenor Plaintiffs - Appellees*

v.

STATE OF LOUISIANA, EX REL, JEFF LANDRY, ATTORNEY GENERAL,

*Defendant - Appellant*

_____

On Appeal from the United States District Court
for the Eastern District of Louisiana
2:86-cv-4075

_____

### APPELLANT'S OPENING BRIEF

_____

JEFF LANDRY
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
909 Poydras Street, Suite 1850
New Orleans, LA 70112
Telephone: 225-938-0779

ELIZABETH MURRILL
Solicitor General

SHAE MCPHEE
Deputy Solicitor General
mcphees@ag.louisiana.gov

ANGELIQUE DUHON FREEL
CAREY T. JONES
LAURYN SUDDUTH
JEFFREY MICHAEL WALE
Assistant Attorneys General

*Counsel for Appellant*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following persons and entities, as described in the fourth sentence of 5th Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
|---|---|
| Marie Bookman<br><br>Ronald Chisom | Leah Aden of NAACP New York, NY<br><br>Alaizah Koorji of NAACP New York, NY<br><br>Ronald Wilson of Blake Jones Law Firm, L.L.C. New Orleans, LA<br><br>William Quigley New Orleans, LA |
| Bernette Johnson | Inemesit O'Boyle of Chehardy Sherman Williams, L.L.P. Metairie, LA<br><br>Nora Ahmed of American Civil Liberties Union New Orleans, LA<br><br>Jon Greenbaum of Lawyers' Committee for Civil Rights Under Law Washington, DC |
| United States of America | Peter Mansfield of U.S. Attorney's Office New Orleans, LA |

| | Erin Flynn of U.S. Department of Justice Washington, DC<br><br>Yael Bortnick of U.S. Department of Justice Washington, DC<br><br>Emily Brailey of U.S. Department of Justice Washington, DC |
|---|---|
| Urban League of Louisiana | Leah Aden of NAACP New York, NY<br><br>Alaizah Koorji of NAACP New York, NY<br><br>Michael de Leeuw of Cozen O'Connor, P.C. New York, NY<br><br>Ronald Wilson of Blake Jones Law Firm, L.L.C. New Orleans, LA<br><br>William Quigley New Orleans, LA |

| Appellants: | Counsel for Appellants: |
|---|---|
| State of Louisiana | Elizabeth Murrill of Office of the Attorney General Baton Rouge, LA<br><br>Angelique Freel of Louisiana Department of Justice Baton Rouge, LA |

| | Shae McPhee of Louisiana Department of Justice New Orleans, LA<br><br>Carey T. Jones of Louisiana Department of Justice Baton Rouge, LA<br><br>Lauryn Sudduth of Louisiana Department of Justice Baton Rouge, LA<br><br>Jeffrey Michael Wale of Louisiana Department of Justice Baton Rouge LA |
| --- | --- |

 */s/ Shae McPhee*

Shae McPhee

*Attorney for Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

The State of Louisiana, through the office of Attorney General Jeff Landry, respectfully submits that oral argument is likely to assist the Court. This litigation began in 1986. Understanding the long history of the case is essential to resolving the question of whether the district court abused its discretion when it recently declined to dissolve a consent judgment from 1992. Moreover, because the district court adopted an interpretation of the consent judgment that requires the State to seek its approval before redrawing the boundaries of District 7 of the Louisiana Supreme Court, the case implicates sensitive federalism issues. Oral argument will be helpful as the Court untangles the long history and considers the district court's broad assertion of continued authority over the State's judicial system.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................. v

TABLE OF AUTHORITIES ................................................. viii

JURISDICTIONAL STATEMENT ........................................... 1

STATEMENT OF THE ISSUES ............................................. 2

STATEMENT OF THE CASE ................................................ 4

STANDARD OF REVIEW .................................................. 22

SUMMARY OF THE ARGUMENT ......................................... 22

ARGUMENT .............................................................. 25

I. AFTER DECADES OF "SUBSTANTIAL COMPLIANCE," THE CONSENT JUDGMENT "HAS BEEN SATISFIED, RELEASED, OR DISCHARGED." ........ 25

    A.   Consent Judgments in Institutional Reform Cases Implicate Sensitive Federalism Concerns. .......................... 25

    B.   The District Court "Overread[] the Decree Extravagantly." ..................................................... 29

    C.   The State Demonstrated "Substantial Compliance" with the Consent Judgment's Terms. .............................. 33

    D.   The District Court Applied the Wrong Test. ................. 36

II. WIDESPREAD MALAPPORTIONMENT MAKES IT INEQUITABLE TO ENFORCE THE CONSENT JUDGMENT PROSPECTIVELY. ...................... 40

CONCLUSION ........................................................... 46

CERTIFICATE OF SERVICE.................................................................47

CERTIFICATE OF COMPLIANCE .......................................................48

# TABLE OF AUTHORITIES

**Cases**

*Ardoin v. Robinson,*
   142 S. Ct. 2892 (2022) ............................................................. 39

*Baker v. Carr,*
   369 U.S. 186 (1962) ................................................................. 44

*Baldwin v. Bd. of Sup'rs for Univ. of La. Sys.,*
   2014-0827 (La. 10/15/14), 156 So. 3d 33 ......................................... 29, 31

*Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89 v. Dowell,*
   498 U.S. 237 (1991) ........................................................ passim

*Chisom v. Roemer,*
   501 U.S. 380 (1991) .................................................................. 4

*Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.,*
   88 F.3d 347 (5th Cir. 1996) ........................................................ 26

*Dugue v. Levy,*
   114 La. 21,37 So. 995 (1904) ...................................................... 28

*Frew ex rel. Frew v. Hawkins,*
   540 U.S. 431 (2004) ......................................................... 25, 26, 45

*Frew v. Janek,*
   820 F.3d 715 (5th Cir. 2016) ............................................. 22, 26, 28, 36

*Frew v. Young,*
   No. 21-40028, 2022 WL 135126 (5th Cir. Jan. 13, 2022) ..................... 28

*Horne v. Flores,*
   557 U.S. 433 (2009) ........................................................ passim

*In re Off. of Chief Just., La. Supreme Ct.,*
   2012-1342 (La. 10/16/12), 101 So. 3d 9 ........................................... 12

*Interstate Cont. Corp. v. City of Dallas*,
  407 F.3d 708 (5th Cir. 2005) ............................................................. 28

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ............................................................................ 33

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) ......................................................................... 39

*Miller v. Johnson*,
  515 U.S. 900 (1995) ........................................................................... 40

*Milliken v. Bradley*,
  433 U.S. 267 (1977) ........................................................................... 27

*Nehmer v. U.S. Dept. of Veterans Affairs*,
  494 F.3d 846 (9th Cir. 2007) ............................................................ 11

*Perschall v. State*,
  96-0322 (La. 7/1/97), 697 So. 2d 240 .............................................. 6, 7, 8

*Pigford v. Veneman*,
  292 F.3d 918 (D.C. Cir. 2002) ........................................................... 34

*Rodriguez v. Bexar County*,
  385 F.3d 853 (5th Cir. 2004) ............................................................ 44

*Rufo v. Inmates of Suffolk Cty. Jail*,
  502 U.S. 367 (1992) ................................................................... passim

*Ruiz v. United States*,
  243 F.3d 941 (5th Cir. 2001) .............................................................. 1

*Smith v. Sch. Bd. of Concordia Par.*,
  906 F.3d 327 (5th Cir. 2018) ............................................................ 25

*Trahan v. Coca Cola Bottling Co. United, Inc.*,
  2004-0100 (La. 3/2/05), 894 So. 2d 1096 ......................................... 29

*Walker v. U.S. Dep't of Hous. & Urb. Dev.*,
   912 F.2d 819 (5th Cir. 1990) ........................................................22, 30

*Wells v. Edwards*,
   347 F.Supp. 453 (M.D.La.1972) ...........................................................44

*Younger v. Harris*,
   401 U.S. 37 (1971) ................................................................................42

**Statutes**
28 U.S.C. § 1292(a)(1).................................................................................1

28 U.S.C. § 1331..........................................................................................1

52 U.S.C. § 10301 ........................................................................................1

La. Civ. Code art. 2045..............................................................................29

La. Civ. Code art. 2046..............................................................................29

La. Civ. Code art. 2050..............................................................................30

La. Civ. Code art. 3076..............................................................................29

**Other Authorities**
La. Report, Supreme Court, Malapportionment, Plan Statistics (2020),
   https://redist.legis.la.gov/2020_Files/Reports/Supreme%20Court/Repor
   t%20-%20Supreme%20Court%20-%20Malapportionment%20-
   %20Plan%20Statistics.pdf ..................................................................13

LABI, *LABI Judicial Modernization Project*, *Modernizing Judicial
   District Lines*, https://labi.org/wp-content/uploads/2021/10/Judicial-
   Realignment.pdf ..........................................................................13, 41

Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to
   Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295, 297
   (1987).....................................................................................................45

*Supreme Court (Act 776 of 1997 R.S. to nearest 2020 Census Block)*,
  https://redist.legis.la.gov/2020_Files/Reports/Supreme%20Court/Map
  %20-%20Supreme%20Court%20-%20Malapportionment.pdf ............ 14

## Rules

Fed. R. Civ. P. 60(b)(5) ....................................................................... passim

## Constitutional Provisions

La. Const. art. I, § 1 ................................................................................. 22

La. Const. Art. V § 6 ................................................................................... 9

La. Const. art. V, § 3 ................................................................................... 9

## JURISDICTIONAL STATEMENT

In 1986, Plaintiffs challenged the method by which voters elect justices to the Louisiana Supreme Court. ROA.1935. Because Plaintiffs brought their challenge under the Voting Rights Act of 1965—*see* 52 U.S.C. § 10301—the district court had jurisdiction under 28 U.S.C. § 1331.

In 1992, the parties signed a consent judgment that resolved the Plaintiffs' claims. *See* ROA.1935. Nearly thirty years later, the State of Louisiana moved the district court to dissolve the consent judgment. ROA.1429; *see* ROA.1934. The district court denied Louisiana's motion, perpetuating the consent judgment. ROA.1957. An order denying a request to dissolve a consent judgment is immediately appealable under 28 U.S.C. § 1292(a)(1). *See Ruiz v. United States*, 243 F.3d 941, 945 (5th Cir. 2001).

## STATEMENT OF THE ISSUES

(1)   Did the district court abuse its discretion by refusing to dissolve a thirty-year-old consent judgment that governs aspects of the redistricting of the Louisiana Supreme Court?

> a) Was the consent judgment "satisfied, released, or discharged" under Rule 60(b)(5) after the State satisfied each provision of the consent judgment and complied with its terms for thirty years?
>
> > 1. Did the district court err as a matter of law by interpreting the consent judgment to allow judicial supervision over state judicial redistricting beyond the certain specific remedies detailed in the consent judgment?
> >
> > 2. Did the district court err as a matter of law by supplanting this Court's "substantial compliance" standard with a standard it derived from a school desegregation case that does not discuss Rule 60(b)(5)?

b) In light of the current widespread malapportionment of the Louisiana Supreme Court districts, is applying the consent judgment prospectively "no longer equitable" under Rule 60(b)(5)?

**STATEMENT OF THE CASE**

## 1. Plaintiffs Brought this Case in 1986, which Resulted in a Consent Judgment in 1992.

In 1986, Louisiana elected its seven supreme court justices from six districts. *See* ROA.1935. Five of the districts elected a single justice each. The other district, which covered New Orleans, elected two "at-large" justices. *See* ROA.1935. A group of voters[1] challenged the legality of the multi-member district under Section 2 of the Voting Rights Act of 1965. They alleged that "the present method of electing two Justices to the Louisiana Supreme Court at-large from the New Orleans area impermissibly dilutes minority voting strength" in violation of § 2. *Chisom v. Roemer*, 501 U.S. 380, 385 (1991); *accord* ROA.1935.

The complaint kicked off an extensive legal battle. One of the initial questions of the lawsuit was whether § 2 even applied to judicial elections. After years of litigation, the United States Supreme Court eventually answered that question affirmatively in this case. *Chisom*, 501 U.S. at 404 (holding "that state judicial elections are included within the ambit of § 2.").

---

[1] Ronald Chisom; Marie Bookman; Walter Willard; Marc Morial; Henry A. Dillon, III; and the Louisiana Voter Registration/Education Crusade.

Rather than continuing to pour resources into defending the legality of the multi-member district, Defendants (a collection of state officials and Louisiana Supreme Court justices) agreed in 1992 to enter into a consent judgment resolving all of Plaintiffs' claims. *See* ROA.97–107. The consent judgment emphasized that "defendants do not agree with" Plaintiffs' contention that the multi-member district violated § 2. Defendants "only enter[ed] into this compromise agreement to resolve [the] extensive and costly litigation." ROA.98.

Although the parties continued to disagree about whether the multi-member district violated § 2, all the parties agreed that fulfilling the terms of the consent judgment would "ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act." ROA.98. The consent judgment provided a list of items for the Defendants to accomplish—which, all told, would amount to a "restructuring of the Supreme Court of Louisiana by federal court order." ROA.103; *see* ROA.99–102 (listing eight items).

Seven of the eight action items in the consent judgment required establishing the so-called "*Chisom* seat" on the Louisiana Supreme Court—which was meant to be an immediate, interim solution to the vote

dilution claim. *See Perschall v. State*, 96-0322 (La. 7/1/97), 697 So. 2d 240, 246. Specifically, the consent judgment required creating "one new Fourth Circuit Court of Appeal judicial position" based in Orleans Parish. ROA.99. Orleans Parish would elect a judge to fill the position. And then, according to the consent judgement, the Louisiana Supreme Court would "assign the judge elected to fill this new position immediately to the Louisiana Supreme Court." ROA.100. The seven then-current members of the court, along with the *Chisom* justice, would sit on random panels of seven when conducting the business of the court. ROA.100. The Fourth Circuit Court of Appeal judge would "participate and share equally in the cases, duties, and powers of the Louisiana Supreme Court." ROA.100.

The *Chisom* seat was not meant to be permanent. The eighth action item of the consent judgment required the State to enact legislation in 1998 to "provide[] for the reapportionment of the seven districts of the Louisiana Supreme Court." ROA.102. The legislation would "provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety." ROA.102. The reapportionment would become "effective on January 1, 2000." ROA.102.

Plaintiffs' constitutional and statutory claims were "dismissed

6

with prejudice." ROA.103. But the consent judgment said that "the Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished." ROA.104. All parties signed the consent judgment—including counsel for Plaintiffs and the United States Department of Justice, the Louisiana Governor, the Louisiana Attorney General, and Justices of the Louisiana Supreme Court. ROA.105–07. United States District Judge Charles Schwartz approved the consent judgment in August 1992. ROA.104.

## 2. Over the Past Three Decades, the State Fulfilled All of the Action Items in the Consent Judgment.

The State upheld its end of the deal. "In the 1992 Regular Legislative Session," the Louisiana legislature created the temporary *Chisom* seat through Act 512. *Perschall*, 697 So. 2d at 246 ("In short, [the legislature] created the '*Chisom* seat.'"). The first Black justice elected to fill the *Chisom* seat was Revius O. Ortique, Jr., in 1992. *See id.* at 246 n.7. And Justice Bernette Johnson was elected to fill the *Chisom* seat in 1994. *See* ROA.225.

In 1995, New Orleans attorney Clement Perschall, Jr., challenged the legality of Act 512, alleging that adding the *Chisom* seat to the Louisiana Supreme Court violated the Louisiana constitution (which

mandated a seven-member court). *See* ROA.116. In *Perschall v. State*, the Louisiana Supreme Court declared that Act 512 was "unconstitutional in its entirety." 697 So. 2d at 262. But the Louisiana Supreme Court acknowledged that "Act 512 does not exist in a vacuum." *Id.* at 260. The court held that the *Chisom* seat "remains intact under the *Chisom* Consent Judgment." *Id.* It "emphasize[d] that the court-approved settlement in *Chisom* . . . is not affected by" its decision that the *Chisom* seat was inconsistent with Louisiana law. *Id.*

In 1997, the State passed more legislation in compliance with the Consent Judgment. Act 776 created "seven single member districts," dissolved the *Chisom* seat, and created "District 7"—a majority-minority district covering most of Orleans Parish. ROA.171–77; *see* ROA.45–47. The legislation mandated that "any tenure" gained by a justice who served in the *Chisom* seat "shall be credited" to the justice if elected to fill the seat representing District 7. ROA.176. The law became effective on January 1, 1999.

The parties jointly moved the district court to modify the consent judgment to approve the reapportionment of Act 776, which was "not in strict conformity with the Consent Judgment, but which meets the intent

of all parties to this litigation for final resolution of the matter."[2] ROA.46. The district court approved the amendment to the consent judgment in early 2000. ROA.51.

Years went by. Justice Johnson was elected to represent District 7 in 2000 after the dissolution of the *Chisom* seat. ROA.58. And she was again elected in 2010.[3] ROA.58.

In 2012, Justice Johnson moved the district court for leave to intervene in this litigation and to reopen this case, which had been administratively closed. ROA.53; ROA.86. She alleged that some of her fellow justices on the Louisiana Supreme Court did not think her years of service in the *Chisom* seat should count towards her tenure for the purposes of becoming the court's chief justice. ROA.53; ROA.86. The then-current chief justice of the court was set to retire—ROA.54—and Louisiana law assigns the chief justice position to the "judge oldest in point of service on the supreme court." La. Const. Art. V § 6. The Louisiana Supreme Court *sua sponte* set the matter for consideration and

---

[2] The consent judgment of 1992 contemplated that Orleans Parish would not be divided in the legislation that created District 7. But the 1997 Act 776 divided Orleans Parish while retaining a majority-minority district. None of the parties had any objection to the deviation from the consent judgment. *See* ROA.45–50.

[3] Louisiana Supreme Court justices sit for ten-year terms. La. Const. art. V, § 3.

9

recused a number of justices from deciding the issue, including Justice Johnson. *See* ROA.178.

In federal district court, the State, through the office of Governor Bobby Jindal, took no position "on who should be the next Chief Justice of the Supreme Court of the State of Louisiana." ROA.1985. But the State argued that the issue was a matter of Louisiana law and that the district court lacked jurisdiction over the issue because "the final remedy" of the consent judgment had been accomplished. ROA.104; *see* ROA.1126; ROA.1128.

The NAACP Legal Defense and Educational Fund wrote an amicus brief on behalf of Justice Johnson. The NAACP contended that "[t]wo of the three remedies required by the Consent Judgment—namely, the interim *Chisom* seat, and the creation by reapportionment of the single-member, majority-Black Supreme Court district based in Orleans Parish—were effectuated by the end of the year 2000." ROA.842. But, according to the NAACP, "the third substantive requirement of the Consent Judgment—the full realization by Justice Johnson of each benefit, duty, and power that would attend a justice of her tenure, including, most notably her ascension to the position of Chief Justice—

has yet to be effectuated." ROA.842. Thus, in the NAACP's view, "the Consent Judgment remains in effect and enforceable by this Court, until such time as Justice Johnson's service on the Supreme Court has ended." ROA.842.

The district court ultimately determined that "[s]o long as the final remedy under a consent decree has not been achieved, the court entering the decree retains subject matter jurisdiction to interpret and enforce the decree's terms." ROA.1130 (citing *Nehmer v. U.S. Dept. of Veterans Affairs*, 494 F.3d 846, 856 (9th Cir. 2007)). The district court observed that "[t]here has been no affirmative ruling by this Court that the Consent Judgment has been completely satisfied and thus has been vacated or terminated, nor has there been any request that this be done." ROA.1131. Holding that the consent judgment required Justice Johnson to be credited with her time served in the *Chisom* seat, the district court concluded that the "'final remedy' in the Consent Judgment ha[d] not yet been implemented." ROA.1131. The district court ordered the Louisiana Supreme Court to elevate Justice Johnson to the position of chief justice upon the retirement of the then-current chief justice.

The State appealed the decision to this Court, but the entire

11

controversy was mooted when the Louisiana Supreme Court issued a decision holding that, under state law, Justice Johnson should be credited with her time serving on the Louisiana Supreme Court in the *Chisom* seat. *In re Off. of Chief Just., La. Supreme Ct.*, 2012-1342 (La. 10/16/12), 101 So. 3d 9, 21–22 ("[A]s between Justice Johnson and Justice Victory, Justice Johnson is presently most senior for purposes of succeeding to the office of chief justice."). The Court observed that "[b]ecause this matter is resolved wholly on the basis of an analysis of the Louisiana Constitution, ultimately, the consent decree is rendered irrelevant for purposes of this matter." *Id.* at 21.

Chief Justice Johnson served with distinction in her role until 2020, when she retired after more than twenty-five years on the Louisiana Supreme Court. The Supreme Court of Louisiana Historical Society celebrated her service with the naming of the Chief Justice Bernette Joshua Johnson Supreme Court Museum, which is located on the first floor of the courthouse. *See* ROA.1433. Another Black justice—Piper Griffin—was elected to the court to represent District 7 after Chief Justice Johnson's retirement. Justice Griffin's term will not end until 2030.

**3. By 2020, the State Supreme Court Districts Became Significantly Malapportioned.**

Thanks in part to the consent judgment in this case, Louisiana legislators did not redistrict the Louisiana Supreme Court after receiving census data in 2010—even though they were generally "dissatisfied" with the redistricting process. *See* LABI, *LABI Judicial Modernization Project*, *Modernizing Judicial District Lines*, https://labi.org/wp-content/uploads/2021/10/Judicial-Realignment.pdf ("[C]onsent decrees creating majority-minority districts within our current statutorily created districts have added to the confusion.").

In 2020, Louisiana's Supreme Court districts remained substantially malapportioned. The Louisiana Legislature published this chart[4] shortly after the Census Bureau released its redistricting data:

---

[4] La. Report, Supreme Court, Malapportionment, Plan Statistics (2020), https://redist.legis.la.gov/2020_Files/Reports/Supreme%20Court/Report%20-%20Supreme%20Court%20-%20Malapportionment%20-%20Plan%20Statistics.pdf.

**Plan Statistics**



**Plan: Supreme Court (Act 776 of 1997 R.S. to nearest 2020**

| Districts: | # of Members | Actual Population | Ideal Population | Absolute Deviation | Relative Deviation |
|---|---|---|---|---|---|
| District 1 | 1 | 752,775 | 665,393 | 87,382 | 13.132% |
| District 2 | 1 | 638,062 | 665,393 | -27,331 | -4.107% |
| District 3 | 1 | 733,573 | 665,393 | 68,180 | 10.247% |
| District 4 | 1 | 586,849 | 665,393 | -78,544 | -11.804% |
| District 5 | 1 | 838,610 | 665,393 | 173,217 | 26.032% |
| District 6 | 1 | 631,334 | 665,393 | -34,059 | -5.119% |
| District 7 | 1 | 476,554 | 665,393 | -188,839 | -28.380% |
| **Grand Total:** | **7** | **4,657,757** | **4,657,751** | | |

According to the data, District 7 is 28.380% under the ideal population. In other words, a vote in District 7 counts 1.4 times more than it would in an ideal district. District 5 (the Baton Rouge area), by contrast, wields only .79 of an ideal district's vote weight. That means a person living in Orleans has nearly twice the voting power of a person living in Baton Rouge when selecting a supreme court justice. The Louisiana Supreme Court districts are reproduced here[5] for the Court's convenience:

---

[5] *Supreme Court (Act 776 of 1997 R.S. to nearest 2020 Census Block)*, https://redist.legis.la.gov/2020_Files/Reports/Supreme%20Court/Map%20-%20Supreme%20Court%20-%20Malapportionment.pdf.



**Supreme Court (Act 776 of 1997 R.S. to nearest 2020 Census Block)**



### 4. This Court Recently Cast Doubt on the Continuing Vitality of the Consent Judgment in *Allen v. Louisiana.*

In 2019, new litigation about the Louisiana Supreme Court sprang up in the Middle District of Louisiana. *See Allen v. Louisiana*, 14 F.4th 366, 369 (5th Cir. 2021). A set of plaintiffs from the Baton Rouge area alleged that Louisiana's demography could support two majority-black districts. *See id.*

The State contended that the district court in the Middle District

lacked jurisdiction because the consent judgment in this case—which springs from the Eastern District of Louisiana—controlled the entire map from which Louisiana Supreme Court justices are elected. Fearing a situation in which the Middle District might draw one map for the Louisiana Supreme Court that conflicts with the Eastern District's map in *Chisom*, the State contended that the Middle District case should be dismissed. The Middle District denied the State's motion to dismiss, concluding it had jurisdiction over the case. But the Middle District certified the question for appeal to this Court.

In *Allen v. Louisiana*, this Court affirmed, flatly rejecting the State's position that the *Chisom* consent judgment vests "the Eastern District with exclusive jurisdiction over all future elections in all seven Louisiana Supreme Court districts." *Id.* at 372–73 (cleaned up). According to *Allen*, that "overreads the decree extravagantly," and the State's position was inconsistent with "'the inherent limitation upon federal judicial authority' that 'federal-court decrees must directly address and relate to the constitutional violation itself.'" *Id.* (quoting *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 247 (1991)). Because "the *Chisom* decree aimed to remedy alleged vote dilution in one

supreme court district, not to reform the whole system," the Court determined that the Middle District had jurisdiction to entertain the Baton Rouge plaintiffs' claims. *Id.* at 374.

The *Allen* court observed yet another "more fundamental" problem with the State's argument: "Louisiana assumes the three-decades-old *Chisom* decree is still in force, yet fails to explain why." *Id.* (cleaned up). The State's argument that the *Chisom* consent judgment was still in force merely because the Eastern District never officially declared it was relinquishing jurisdiction over the case was "weak sauce." *Id.* The *Allen* court emphasized that the district court's jurisdiction lapsed once the "final remedy" was implemented. Because "Justice Johnson became Chief Justice and has now retired," the *Allen* court said that "one might think the decree's final remedy has been implemented. But Louisiana has evidently never asked the Eastern District to vacate the decree." *Id.*

## 5. After Decades of Compliance, the State Moved to Dissolve the Consent Judgment, but the District Court Denied Relief.

In 2021, in light of this Court's opinion in *Allen*, the State moved the district court under Federal Rule of Civil Procedure 60(b)(5) for an order in this case declaring (1) the "final remedy has been implemented"; (2) the consent judgment "is no longer binding on the State"; and (3) the

consent judgment is "[t]erminat[ed] and [d]issolv[ed]." ROA.1148. The State explained that the consent judgment "has accomplished what it intended to accomplish[] and the final remedy has been implemented." ROA.1431. The State listed its compliance with the consent judgment over the past thirty years—including "the creation of a single member district that is majority black in voting age population"; "legislation that provided for reapportionment of the seven districts of the Louisiana Supreme Court"; the election of multiple Black justices; and the recent retirement of Chief Justice Johnson, who was the last justice to sit in the *Chisom* seat. ROA.1431–33.

Because there were no more action items left for the State to fulfill, the State explained the consent judgment should be dissolved because it "has been satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5); ROA.1443–44. Additionally, the State posited that "applying it prospectively is no longer equitable"—Fed. R. Civ. P. 60(b)(5)—because the consent judgment hinders the Louisiana legislature from redistricting the supreme court and "stark malapportionment" made elections unfair for voters around the State. ROA.1447.

Plaintiffs, the USDOJ, and now-retired Chief Justice Johnson each

filed an opposition to the State's motion to dissolve the consent judgment. *See* ROA.1721–44 (Plaintiffs' opposition); ROA.1752–54 (Johnson opposition); ROA.1755–77 (USDOJ opposition). Although they *agreed* the State fulfilled the action items of the consent judgment and had complied with its requirements for thirty years—*see* ROA.1737–38 n.13—Plaintiffs contended that "the State presents no evidence that the 'final remedy' of the consent decree has been fulfilled." ROA.1730. According to Plaintiffs, the purpose of the consent judgment was to prevent the State from committing Section 2 violations, and the State failed to show it would not commit some new Section 2 violation if the district court lifted the consent judgment. ROA.1731–32; ROA.1737 ("[T]here are significant indicia that Section 2 violations could recur in the absence of the Consent Decree."). And, because *Allen*'s discussion of the consent judgment was dicta, the district court could safely discount it. ROA.1736–38. To the extent that malapportionment is a problem, Plaintiffs offered to help the State draw a new map that would both cure the malapportionment and retain the majority-minority district. ROA.1738–43.

The district court held a hearing on the matter in March 2022. ROA.2015–55. When the State's lawyer tried to discuss this Court's

opinion in *Allen*, the district court cut him off saying, "[d]on't go down that road." ROA.2021. The district court opined that *Allen*'s dicta was irrelevant. ROA.2021–22.

The district court questioned the State's lawyer about why the legislature did not simply draw a new map and then come to the district court to ask permission to implement it: "I think if the legislature did preserve the electability of an African-American candidate in this district that the parties would agree to that." ROA.2028. The State's lawyer explained that all of the recent bills in the legislature—"HB 738, SB 288, SB 307, SB 308, and SB 309"—have "preserve[d] New Orleans in a minority district."[6] ROA.2028. Emphasizing the need to lift the "federal finger" from the legislature, the State's lawyer posited: "Control can be returned to the State because everything in this Consent Decree has been done and accomplished, and there's no reason to try to influence the legislature to enact any particular district." ROA.2028. The district court took the matter under advisement. ROA.2054.

In May 2022, the district court issued an opinion declining to

---

[6] Each of these bills equalized the population of the Louisiana Supreme Court's districts. None left District 7 substantially underpopulated, as it is now.

dissolve the consent judgment. ROA.1934–57. The district court found that the "purpose of the Consent Judgment" was "to ensure compliance with Section 2 of the Voting Rights Act." ROA.1940. Rather than look to jurisprudence interpreting Rule 60(b)(5)—which the district court acknowledged governs the dissolution of consent judgments, ROA.1938— the district court imported a test from a school desegregation case that the district court admitted does "not specifically rely on Rule 60(b)(5)." ROA.1943 (discussing *Bd. of Educ. of Okla. City Pub. Schs., Indep. Sch. Dist. No. 89 v. Dowell*, 498 U.S. 237, 247–48 (1991)). Under that test, the district court concluded that it would not lift the consent judgment because the Attorney General had failed to show that the State would not commit a new Section 2 violation.

Finally, the district court found that the State had failed to show that applying the consent judgment prospectively would no longer be equitable. ROA.1953. According to the district court, there was no "pressing obligation" to reapportion the districts. ROA.1955. And, in any event, "[i]f the State desires to adjust the boundaries of District Seven, it is free to work with the other parties and present a joint proposed modification of the Consent Judgment." ROA.1956.

The State filed a notice of appeal. ROA.1958. The State asks this Court to reverse and dissolve the consent judgment.

## STANDARD OF REVIEW

This Court reviews "a district court's decision to grant or deny relief pursuant to Rule 60(b) for abuse of discretion." *Frew v. Janek*, 820 F.3d 715, 719 (5th Cir. 2016). But "review of the denial of Rule 60(b)(5) relief should generally be somewhat closer in the context of institutional injunctions against states due to federalism concerns." *Horne v. Flores*, 557 U.S. 433, 451 (2009) (internal quotation marks omitted). The Court "review[s] *de novo* any questions of law underlying the district court's decision." *Janek*, 820 F.3d at 719 (internal quotation marks omitted). A "district court's interpretation of the terms of a consent decree . . . is reviewed de novo." *Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 912 F.2d 819, 825 (5th Cir. 1990); *accord Allen*, 14 F.4th at 370.

## SUMMARY OF THE ARGUMENT

In theory, only authorized state representatives should hold the pen when drawing the Louisiana Supreme Court's districts. *See* La. Const. art. I, § 1 ("All government, of right, originates with the people, [and] is founded on their will alone."). In practice, however, Louisiana's voters

have not enjoyed their sovereign right to have their chosen representatives draw the districts of the Louisiana Supreme Court for the past thirty years. Under the district court's interpretation of the consent judgment, Plaintiffs, the United States Department of Justice, and a federal court can continue to interpose themselves into the process. Thus, in contradiction to state law, multiple hands grasp and guide the redistricting pen.

Consent judgments are not meant to last forever. *Allen*, 14 F.4th at 373. The time has come to return the sovereign redistricting power to Louisiana. The State has complied with the consent judgment for thirty years. It has enacted two rounds of legislation, which (1) dismantled the two-member district that was the subject of this litigation and (2) created a majority-minority district. Black justices have served on the court for decades. As the most senior member of the court, Justice Bernette Joshua Johnson eventually became its Chief Justice. After Chief Justice Johnson retired, another Black justice—Piper Griffin—ascended to the bench to begin a ten-year term in 2020. After decades of compliance, there is zero reason to think that the State will create another two-member district. Indeed, every piece of legislation filed in the 2022 Extraordinary and

Regular Sessions of the Louisiana legislature maintained not only seven districts, but also an evenly apportioned majority-minority district.

Despite a lack of any dispute between the parties that the State has fulfilled the "action items" of the consent judgment, the district court denied the State's motion to dissolve the consent judgment under the first and third clauses of Rule 60(b)(5). That was an abuse of discretion.

Terminating the consent judgment is warranted under the first clause because, after thirty years of compliance and the fulfillment of each of the consent judgment's action items, judgment "has been satisfied, released, or discharged." Fed. R. Civ. P. 60(b)(5); *Allen*, 14 F.4th at 374 ("[O]ne might think the [*Chisom*] decree's final remedy has been implemented."). The Supreme Court has expressed concerns that consent judgments in institutional reform litigation can violate federalism principles unless power is returned to the State "promptly" after the terms of the agreement are satisfied. *Horne*, 557 U.S. at 447. The district court erred as a matter of law when it interpreted the consent judgment as giving it power to retain jurisdiction and enforce remedies even beyond the "certain specific remedies" detailed in the consent judgment. ROA.1941–42.

Terminating the consent judgment under the third clause of Rule 60(b)(5) is also warranted because returning the redistricting pen to the State's representatives is in the public interest. The consent judgment has hindered the State from redistricting for twenty years, and extreme malapportionment makes "applying [the consent judgment] prospectively [] no longer equitable." Fed. R. Civ. P. 60(b)(5).

## ARGUMENT

### I. AFTER DECADES OF "SUBSTANTIAL COMPLIANCE," THE CONSENT JUDGMENT "HAS BEEN SATISFIED, RELEASED, OR DISCHARGED."

#### A. Consent Judgments in Institutional Reform Cases Implicate Sensitive Federalism Concerns.

Consent judgments are "hybrid creatures, part contract and part judicial decree." *Allen*, 14 F.4th at 371 (quoting *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018)). A consent judgment "embodies an agreement of the parties" and is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (quoting *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 378 (1992)). Federal courts interpret consent judgments according to principles of contract law from the State in which the dispute arises. *Allen*, 14 F.4th at 371 (citing *Clardy Mfg. Co. v. Marine Midland Bus. Loans Inc.*, 88 F.3d

25

347, 352 (5th Cir. 1996)).

When a consent judgment arises from "institutional reform" litigation, "Rule 60(b)(5) serves a particularly important function." *Horne*, 557 U.S. at 447. These cases "often raise sensitive federalism concerns" because "[s]uch litigation commonly involves areas of core state responsibility." *Id.*; *see Janek*, 820 F.3d at 721 ("[T]his Court must take heed of the Supreme Court's admonition that the continued enforcement of the consent decree poses legitimate federalism concerns."); *Hawkins*, 540 U.S. at 441; *Rufo*, 502 U.S. at 381.

Consent judgments "bind state and local officials to the policy preferences of their predecessors" and interfere with "their designated legislative and executive powers." *Horne*, 557 U.S. at 447 (internal citations omitted). "[O]utdated consent decrees" make it difficult for state officials "to respond to the priorities and concerns of their constituents" and thus inhibit democratic principles of republican government. *Id.* at 449. For this reason, federal courts should take a "flexible approach" when deciding whether to modify or terminate a consent judgment. *Id.*

Consent judgments in institutional reform cases are not meant to operate in perpetuity, and a federal court can lose jurisdiction over a

consent judgment even if the court has not expressly relinquished control. *Allen*, 14 F.4th at 373 (rejecting as "wrong" and baffling" the argument that a consent judgment is "binding upon Louisiana in perpetuity unless and until the Eastern District says otherwise" (cleaned up)). Federal courts should ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" when the circumstances warrant. *Horne*, 557 U.S. at 450.

"A critical question" for determining if it is appropriate to dissolve a consent judgment under Rule 60(b)(5) "is whether the objective of the . . . declaratory judgment order . . . has been achieved." *Id.* "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Id.* (citing *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). When deciding whether to terminate a consent judgment, courts should be mindful of "the inherent limitation upon federal judicial authority" that prohibits courts from issuing remedies that do not "directly address and relate to" the violation of federal law the consent judgment meant to address. *Allen*, 14 F.4th at 373 (citations omitted).

This Court has observed that "case law interpreting prong 1" of

Rule 60(b)(5) "is limited." *Janek*, 820 F.3d at 721. But the court has "recently clarified" that a defendant "can obtain relief under prong 1 by demonstrating 'substantial compliance'" with a consent judgment. *Id.*; *accord Frew v. Young*, No. 21-40028, 2022 WL 135126, at *3 (5th Cir. Jan. 13, 2022); *see Dugue v. Levy*, 114 La. 21, 23, 37 So. 995, 996 (1904) ("A substantial performance of the contract is all that [Louisiana] law requires." (internal quotation marks omitted)).

"Substantial compliance excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose." *Janek*, 820 F.3d at 721. If a defendant seeks to terminate a consent judgment, it bears the burden of showing substantial compliance. *Id.* (internal quotation marks omitted); *accord Interstate Cont. Corp. v. City of Dallas*, 407 F.3d 708, 727 (5th Cir. 2005). But, of course, the Court "must take heed" of the sensitive federalism concerns embedded in the calculus of whether to dissolve a judgment. *Id.*

In sum, when deciding whether to dissolve a consent judgment under the first prong of Rule 60(b)(5), the Court should, in accordance with Louisiana contract law, consider whether the object of the consent judgment has been achieved and whether the State has substantially

28

complied with its terms. Substantial compliance is not perfect compliance. Because this case involves redistricting the State's highest judicial tribunal, it implicates the most sensitive federalism concerns. Responsibility for redistricting should be returned to State officials promptly.

### B. The District Court "Overread[] the Decree Extravagantly."

"Under Louisiana law, courts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities." *Allen*, 14 F.4th at 371 (citing La. Civ. Code arts. 2045, 2046). "When a contract resolves a lawsuit, it 'extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication.'" *Id.* (quoting *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100, p. 15 (La. 3/2/05), 894 So. 2d 1096, 1107). Importantly, "[a] compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express." La. Civ. Code art. 3076. And "a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Baldwin v. Bd. of Sup'rs for Univ. of La. Sys.*, 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33,

29

38 (citing La. Civ. Code art. 2050).

When determining the purpose and object of the consent judgment, the district court failed to adhere to these principles and misinterpreted the parties' agreement. The interpretation of the terms of a consent judgment is a question of law, so this Court reviews the district court's conclusions on that issue de novo. *Walker*, 912 F.2d at 825.

According to the district court, the consent judgment's purpose was broadly to "ensure compliance with Section 2 of the Voting Rights Act." ROA.1940. And "[t]he Consent Judgment was specifically aimed at correcting and guarding against the dilution of Black voting power in Orleans Parish." ROA.1941. Because the consent judgment uses the word "ensure," the district court concluded that the consent judgment "contemplates future compliance" even beyond the "certain specific remedies" detailed in the consent judgment. ROA.1941–42. That was a serious misstep.

The district court failed to adhere to the rule that it should consider "each provision" of the contract in light of the other provisions. *Baldwin*, 156 So. 3d at 38 ("[O]ne provision of a contract should not be construed separately at the expense of disregarding other provisions."). The consent

judgment is emphatic that the Defendants joining the agreement "do not agree" that the multi-member district with two at-large justices violated Section 2 of the Voting Rights Act. ROA.98. Defendants entered "into this compromise to resolve extensive and costly litigation." ROA.98. Remarkably, when discussing the purpose of the consent judgment, the district court *excluded* Defendants' position from the preamble with an ellipsis and an alteration:

> The Chisom plaintiffs and the United States contend that the provisions contained in Act No. 512 (1992) and in this Consent Judgment are necessary to bring the system for electing the Louisiana Supreme Court into compliance with Section 2. . . . *[The Defendants]* believe that the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act.

ROA.1941 (emphasis added). Ignoring words in the consent judgment is surely not the best way to seek the parties' "common intent." *Allen*, 14 F.4th at 371. Because of this omission, the district court incorrectly concluded that Defendants, as a general matter, agreed to "ensure compliance with Section 2 of the Voting Rights Act." ROA.1940.

If the district court had considered all the provisions of the preamble of the consent judgment, it could only have concluded that the object of the consent judgment was to end the litigation and to remedy

the alleged vote dilution claim from 1986—*i.e.*, the multi-member district with two at-large justices. All of the parties agreed in 1992 that, by effectuating each of the action items in the consent judgment, the specific alleged violation would be cured and the "final remedy [would be] accomplished." ROA.104; *see* ROA.98 (stating Plaintiffs and the USDOJ believed the provisions of the consent judgment would "bring the system for electing the Louisiana Supreme Court into compliance with Section 2"); ROA.98 (stating Defendants believed "the relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2").

Put another way, the district court failed to read "the decree in light of the 1986 lawsuit it settled." *Allen*, 14 F.4th at 372. As this Court has explained, the *Chisom* plaintiffs alleged that having two "at-large" justices elected from one district diluted their vote in violation of Section 2. *Id.* "The *Chisom* decree sought to remedy that alleged defect by creating the interim *Chisom* seat and the present-day District 7." *Id.* (cleaned up). The district court "overread[] the decree extravagantly" by concluding that agreement's purpose was to ensure that the State never commits any kind of Section 2 violation in any future elections. *Id.* at 373.

The district court's position that it retains jurisdiction over the case to remedy potential Section 2 violations beyond the terms of the consent judgment is, in the words of the *Allen* court, "weak sauce." *Id.* at 374. The district court could not have approved a consent judgment that purported to cure any potential Section 2 violation that could possibly arise. Doing so would exceed "the inherent limitation upon" its authority to issue remedies that do not "directly address and relate to" a specific violation of federal law. *Id.* at 373 (citations omitted). "District courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees," and are "instead constrained by the terms of the decree and related order." *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)); *see* ROA.1131.

## C. The State Demonstrated "Substantial Compliance" with the Consent Judgment's Terms.

Armed with a proper understanding of the object and purpose of the consent judgment, the Court can consider whether the State has fulfilled that purpose and complied with the consent judgment's terms. Rather than detailing again the long history of the State's compliance in this case, the State will refer the Court above to subsection 2 of the Statement

33

of the Case. From that history, it is clear that consent judgment's purpose has been fulfilled over the past three decades and the State has "substantially complied" with the terms of the agreement.

The NAACP put it best in 2012 when it explained that the consent judgment has three substantive requirements: (1) creation of the interim *Chisom* seat, (2) "the creation of the single-member, majority-Black Supreme Court district based in Orleans Parish"—now District 7; and (3) "the full realization by Justice Johnson of each benefit, duty, and power that would attend a justice of her tenure, including, most notably her ascension to the position of Chief Justice." ROA.842. Because the first two substantive components were completed by 2000, according to the NAACP, "the Consent Judgment remains in effect and enforceable by this Court, until such time as Justice Johnson's service on the Supreme Court has ended." ROA.842.

This Court observed in *Allen* that "Justice Johnson became Chief Justice and has now retired." 14 F.4th at 374. And so, along the lines of the NAACP's reasoning from 2012, the *Allen* court said "[i]n light of those developments, one might think the decree's final remedy has been implemented." *Id.* That is especially true because Justice Griffin

ascended to the Louisiana Supreme Court in 2020 to begin a ten-year term. Plaintiffs do not, and cannot, deny any of these judicially noticeable facts.

Evidence of thirty years of substantial compliance with the terms of the consent judgment is sufficient to satisfy Defendants' burden under the first prong of Rule 60(b)(5). When moving the district court to dissolve the judgment, the State's lawyers included as evidence of its compliance the official commissions of Justice Ortique, Chief Justice Johnson, and Justice Griffin. ROA.1558–83.

By any metric, the remedy is sufficiently "durable." *Horne*, 557 U.S. at 450. There is no suggestion that the State intends to return to the two-member, at-large district that was the subject of this costly litigation. On the contrary, at a hearing before the district court, the State's lawyer noted that all the recent bills to redistrict the Louisiana Supreme Court have "preserve[d] New Orleans in a minority district." ROA.2028 (discussing "HB 738, SB 288, SB 307, SB 308, and SB 309").

Because the consent judgment governs the district of Louisiana's highest tribunal, it implicates sensitive federalism concerns. Consent judgments are not meant to operate in perpetuity. *Allen*, 14 F.4th at 373.

The district court's conclusion that it should retain jurisdiction over the case until some undefined point in the future fails to acknowledge the Supreme Court's command that power should be "returned promptly to the State and its officials." *Horne*, 557 U.S. at 450.

### D. The District Court Applied the Wrong Test.

Misinterpreting the consent judgment's purpose was not the only legal error the district committed. It also failed to apply the "substantial compliance" standard as required by this Court's precedent. *See Janek*, 820 F.3d at 721. Instead, it imported a test from a school segregation case—*Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*—which the district court expressly acknowledged did not discuss Rule 60(b)(5). ROA.1943. Applying the wrong test was legal error that this Court reviews de novo. *Frew*, 820 F.3d at 719. The State emphasizes that the Court should not adopt this test because, as shown below, it makes little sense in light of the parties' agreement as embodied by the consent judgment.

*Dowell* says federal courts should not dissolve a consent decree in a school desegregation case until a school board shows it "complied in good faith" with the decree and "the vestiges of past discrimination ha[ve] been eliminated to the extent practicable." ROA.1943 (quoting *Dowell*, 498

U.S. at 248–50). The district concluded that the State could not meet either prong of the *Dowell* test.

According to the district court, the State cannot show good faith compliance unless it can prove there is "relatively little or no likelihood that the original violation will promptly be repeated." ROA.1948. The district court acknowledged that "the State has complied with the terms of the Consent Judgment by enacting Act 512 to create the temporary *Chisom* seat and Act 776 to create the current District Seven." ROA.1948. But it faulted the State for failing to prove "there is little or no likelihood the original violation will not be repeated when the Consent Judgment is lifted." ROA.1948. The district court also found that the State had not shown that the vestiges of past discrimination have been eliminated to the extent practicable because the Attorney General "did not adequately address" factors about whether Plaintiffs have a vote dilution claim under the Voting Rights Act. ROA.1952.

The district court erred by applying the *Dowell* test, but even if this Court is inclined to use it, the district court abused its discretion by declining to dissolve the consent judgment. As discussed, the "original violation" in this case was *not* some nebulous or hypothetical Section 2

37

violation that might occur in the future. Even *Dowell* emphasizes that "federal-court decrees must directly address and relate to the constitutional violation itself" and "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not . . . flow" from the alleged violation. *Dowell*, 498 U.S. at 247; *accord Rufo*, 502 U.S. at 389 ("Federal courts may not order States or local governments, over their objection, to undertake a course of conduct not tailored to curing a constitutional violation that has been adjudicated.").

The "original violation" in this case was the two-member district that Plaintiffs alleged diluted their vote in violation of Section 2. After thirty years, there is absolutely no reason to think that the State will repeat the alleged original violation when the consent judgment is lifted. All of the recent bills in the legislature have included at least seven districts and preserve the majority-minority district. ROA.2028. Thus, the State satisfied its burden to show good faith compliance under the district court's test.

Moreover, the district court's requirement that the State "adequately address" the factors about whether Plaintiffs have a Section 2 claim makes no sense in light of the agreement in the consent judgment.

The parties entered into the consent judgment because they all agreed that, by fulfilling the action items, there would be no more Section 2 violation. ROA.98. And the State upheld its end of the deal and completed each one of the action items over the past three decades. The State never agreed that there was a Section 2 violation in the first place. It does violence to the parties' agreement to force the State to prove that, not only did it fulfill the terms of the agreement, but also that fulfilling the terms of the agreement in fact cured Plaintiffs' alleged-but-never-adjudicated injury.

Moreover, the district court's conclusion that it can use the parties' limited agreement in the consent judgment to hold the redistricting pen and thereby ensure that the State commits no other future Section 2 violations unrelated to the 1986 allegations is nothing short of usurpation of the State's authority by federal fiat. The Louisiana legislature is bound by federal law, including Section 2.[7] There is no need for judicial

---

[7] The State notes that the Supreme Court has recently granted certiorari in two cases that are likely to have a large impact on redistricting cases involving alleged violations of Section 2 of the Voting Rights Act—including a case from Louisiana. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) ("[T]he underlying question here is whether a second majority-minority congressional district (out of seven total districts in Alabama) is required by the Voting Rights Act and not prohibited by the Equal Protection Clause."); *Ardoin v. Robinson*, 142 S. Ct. 2892 (2022) (granting certiorari before judgment and holding the case in abeyance

supervision to ensure future compliance. If the State ever does commit a new violation of federal law, and there is no reason to think it will, Plaintiffs can of course bring a new lawsuit.

At bottom, the district court overread the consent judgment, used the wrong legal test, and then misapplied its own *Dowell* test. Because of the federalism concerns presented by federal control over the State's judicial redistricting system, this Court "close[ly]" reviews the district court's use of its discretion. *Horne*, 557 U.S. at 451. The Court should conclude the district court abused its discretion by declining to dissolve the consent judgment under the first prong of Rule 60(b)(5).

## II. WIDESPREAD MALAPPORTIONMENT MAKES IT INEQUITABLE TO ENFORCE THE CONSENT JUDGMENT PROSPECTIVELY.

Even at the best of times, "[e]lectoral districting is a most difficult subject for legislatures." *Miller v. Johnson*, 515 U.S. 900, 915 (1995). The district court's interpretation of the consent judgment makes the redistricting process harder than necessary because it requires input from several unauthorized parties—including Plaintiffs, the USDOJ, and the federal district court. As a result, the state legislature has not

---

pending the Court's decision in *Merrill*).

redrawn the Louisiana Supreme Court districts in more than twenty years. *See* LABI, *LABI Judicial Modernization Project*, *Modernizing Judicial District Lines*, https://labi.org/wp-content/uploads/2021/10/Judicial-Realignment.pdf (discussing effect of *Chisom* consent judgment on Louisiana Legislature's redistricting efforts). Every recent (failed) piece of legislation that would have addressed this issue maintained a majority-minority district in the Orleans area and balanced the population.

The Louisiana Legislature's inaction has worked out very well for Plaintiffs: Population shifts over the past two decades have significantly shrunk the population of the majority-minority district and swelled some of the other six districts. *See* ROA.1526 (noting that the majority-minority district is 28.28 percent less populated than it should be). The malapportionment gives people in the majority-minority district extra voting power compared to voters in other districts—nearly twice the weight of the vote of citizens of some other regions of the state.

Plaintiffs, the USDOJ, and the district court each expressed a willingness to work with the State to wield its sovereign power to draw a new map that would both fix the malapportionment and preserve the

majority-minority district. ROA.2041. (USDOJ lawyer: "[A]bsolutely, we are ready and willing to work with the State."); ROA.2044 (Plaintiffs' lawyer: "We are, like the DOJ, open to conversation. We're open to seeing legislation."); ROA.2040 (District court: "And I'm glad to hear you say that you-all are willing to -- interested in talking to the State about how [malapportionment] might be resolved and to protect the interests of the plaintiffs."). While surely well-intentioned, these offers to help guide the redistricting pen are offensive to the State's sovereignty, democratic principles of republican government, and "Our Federalism." *Younger v. Harris*, 401 U.S. 37, 44 (1971) ("[T]he National Government, anxious though it may be to vindicate and protect federal rights and federal interests, [should] always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States."). State officials need to redistrict the Louisiana Supreme Court to fix malapportionment—but they want to perform this sovereign function in accordance with Louisiana law, not the confines of a federal consent decree. ROA.2054 (expressing a desire to lift the "federal finger" from the legislature).

In light of the widespread malapportionment, and three decades of compliance with the consent judgment , the State moved the district court

to dissolve the consent judgment under the third clause of Rule 60(b)(5), which allows federal courts to dissolve or modify a consent judgment when it is not longer equitable or in the public interest to do so. When considering this issue, the district court applied the flexible two-part test from the Supreme Court's decision in *Rufo*. Under the third clause of Rule 60(b)(5), a party seeking to terminate or modify a consent judgment must show (1) "a significant change either in factual conditions or in law" that "make compliance with the decree substantially more onerous [or] . . . unworkable because of unforeseen obstacles[,] . . . or when enforcement of the decree without modification would be detrimental to the public interest"; and (2) "the proposed modification is suitably tailored to the changed circumstance." ROA.1954 (quoting *Rufo*, 502 U.S. at 383–84).

The district court denied relief. ROA.1935–37. The district court observed that the consent judgment allows redistricting in light of population changes. ROA.1956 ("The Consent Judgment, by its very terms, thus allows the State to reapportion the supreme court districts, so long as it complies with the Consent Judgment."). But it included a caveat: "If the State desires to adjust the boundaries of District Seven," then it must "work with the other parties and present a joint proposed

modification of the Consent Judgment." ROA.1956. The district court further noted that there was no legal requirement to correct malapportionment.[8] ROA.1955. And, because malapportionment is less severe now than it was in 2010, and the supreme court's districts have been malapportioned for lengthy periods of time in the past, the district court found there is no "significant change in factual conditions that makes compliance with the decree substantially more onerous." ROA.1955.

The district court's refusal to return power to State officials, who are concerned about malapportionment, is a remarkable validation of the many commentators who have "written about the perniciousness of consent decrees." *Allen*, 14 F.4th at 375 (Oldham, J., concurring) (collecting cases). Perhaps the district court is correct that previous officials have not shown much concern for malapportionment in the past. But, now that officials want to address that problem, they are inhibited by the consent judgment here. *See Horne*, 557 U.S. at 449 (Consent

---

[8] As the district court recognized, the one-person, one-vote requirement of *Baker v. Carr*, 369 U.S. 186 (1962), does not apply to judicial elections. *See Wells v. Edwards*, 347 F.Supp. 453, 454 (M.D.La.1972). Applying Section 2 to judicial elections—as the Supreme Court mandated in *Chisom*, 501 U.S. at 404—makes little sense, however, without the one-person, one-vote requirement. *See Rodriguez v. Bexar County*, 385 F.3d 853, 859 at n. 3 (5th Cir. 2004).

decrees may improperly "bind state and local officials to the policy preferences of their predecessors."); *Hawkins*, 540 U.S. at 441 ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers."); Michael W. McConnell, *Why Hold Elections? Using Consent Decrees to Insulate Policies from Political Change*, 1987 U. Chi. Legal F. 295, 297 (1987) ("To the extent that consent decrees insulate today's policy decisions from review and modification by tomorrow's political processes, they violate the democratic structure of government.").

Thirty years of compliance with the consent judgment, widespread malapportionment, and Louisiana officials' concern for correcting malapportionment are each significant changes in fact or law that warrant dissolution of the judgment under the third prong of Rule 60(b)(5). As discussed, consent judgments are not meant to last forever. And control over the redistricting process of the State's highest tribunal implicates sensitive federalism concerns. Thus, dissolution of the consent judgment is in the public interest and it is the only equitable solution

under the *Rufo* test. The district court abused its discretion by concluding otherwise.

## CONCLUSION

The State respectfully asks the Court to reverse the district court and dissolve the thirty-year-old consent judgment.

Very respectfully submitted,

JEFF LANDRY                          ELIZABETH MURRILL
Attorney General of Louisiana        Solicitor General

OFFICE OF THE ATTORNEY GENERAL       */s/ Shae McPhee*
909 Poydras Street, Suite 1850       SHAE MCPHEE
New Orleans, LA 70112                Deputy Solicitor General
Telephone: 225-938-0779              mcphees@ag.louisiana.gov

                                     ANGELIQUE DUHON FREEL
                                     CAREY T. JONES
                                     LAURYN SUDDUTH
                                     JEFFREY MICHAEL WALE
*Counsel for Appellant*              Assistant Attorneys General

## CERTIFICATE OF SERVICE

I certify that on August 24, 2022, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Shae McPhee*
Shae McPhee
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that:

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains **8,584** words, exclusive of parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016, Century Schoolbook, 14-point font.

*/s/ Shae McPhee*
Shae McPhee
Attorney for Appellant

August 24, 2022

48