No. 22-30320

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

RONALD CHISOM; MARIE BOOKMAN, ALSO KNOWN AS GOVERNOR;
URBAN LEAGUE OF LOUISIANA,

Plaintiffs-Appellees

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

Intervenor Plaintiffs-Appellees

v.

STATE OF LOUISIANA, EX REL, JEFF LANDRY, ATTORNEY GENERAL,

Defendant-Appellant

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE

DUANE A. EVANS
  United States Attorney

PETER M. MANSFIELD (#28671)
  Assistant United States Attorney
  Chief, Civil Division
  650 Poydras Street, Suite 1600
  New Orleans, Louisiana  70130
  (504) 680-3047

KATHLEEN P. WOLFE
  Deputy Assistant Attorney General

ERIN H. FLYNN
YAEL BORTNICK
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-8271

**STATEMENT REGARDING ORAL ARGUMENT**

Given both the lengthy procedural history of the case and the nature of the issues presented in this appeal, the United States respectfully requests that this case be set for oral argument.

# TABLE OF CONTENTS

**PAGE**

STATEMENT REGARDING ORAL ARGUMENT

TABLE OF AUTHORITIES

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUE .............................................................................2

STATEMENT OF THE CASE ..............................................................................2

      1.     *The Initial Lawsuit And Resulting Consent Judgment* ........................2

      2.     *Litigation Related To Justice Johnson's Service On The Supreme Court* .....................................................................................4

      3.     *The State's Motion To Dissolve The Consent Decree* .........................6

SUMMARY OF ARGUMENT .............................................................................11

ARGUMENT

     THE DISTRICT COURT CORRECTLY DENIED THE STATE'S MOTION TO VACATE THE CONSENT JUDGEMENT ........................ 13

      A.    *Standard Of Review* .........................................................................13

      B.    *The State Has Not Satisfied The Consent Judgment* ...........................14

            1.     *The Purpose Of The Consent Judgment Is To Correct And Guard Against The Dilution Of Black Voting Strength In Orleans Parish* .......................................................15

            2.     *The State Did Not Show Substantial Compliance With The Consent Judgment's Purpose* .............................................18

**TABLE OF CONTENTS (continued):**                                    **PAGE**

3.    *The District Court's Consideration Of Factors Identified In A School Desegregation Case Was Not Error* ........................................................... 28

C.    *No Change In Law Or Fact Makes Continued Enforcement Of The Consent Judgment Inequitable* ................................................. 31

CONCLUSION .................................................................................. 37

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:**                                                                                   **PAGE**

*Alexander* v. *Britt*, 89 F.3d 194 (4th Cir. 1996)........................................................29

*Allen* v. *Alabama State Bd. of Educ.*, 164 F.3d 1347 (11th Cir. 1999),
    vacated by joint mot. of the parties, 216 F.3d 1263 (11th Cir. 2000) ..... 22-23

*Allen* v. *Louisiana*, 14 F.4th 366 (5th Cir. 2021)............................................ *passim*

*Alliance to End Repression* v. *City of Chicago*,
    237 F.3d 799 (7th Cir. 2001) .........................................................................29

*Baldwin* v. *Board of Supervisors for Univ. of La. Sys.*, 2014-0827,
    (La. 10/15/14), 156 So. 3d 33 ................................................................. 15, 17

*Board of Educ. of Okla. City Pub. Schs.* v. *Dowell*,
    498 U.S. 237 (1991).............................................................................. 9, 27-28

*Building & Constr. Trades Council of Phila. & Vicinity* (*BCTC*) v.
    *N.L.R.B.*, 64 F.3d 880 (3d Cir. 1995) ........................................ 20, 22, 24, 32

*Chisom* v. *Jindal*, 890 F. Supp. 2d 696 (E.D. La. 2012) ...................................... 5-6

*Chisom* v. *Roemer*, 501 U.S. 380 (1991) .......................................................2-3, 24

*Cooper* v. *Noble*, 33 F.3d 540 (5th Cir.),
    supplemented, 41 F.3d 212 (5th Cir. 1994)...................................... 14, 30-32

*Democratic Nat'l Comm.* v. *Republican Nat'l Comm.*,
    671 F. Supp. 2d 575 (D.N.J. 2009),
    aff'd, 673 F.3d 192 (3d Cir. 2012) ...............................................................21

*Evans* v. *Fenty*, 701 F. Supp. 2d 126 (D.D.C. 2010)...............................................18

*Freeman* v. *Pitts*, 503 U.S. 467 (1992)...................................................................29

*Frew* v. *Hawkins*, 540 U.S. 431 (2004) (*Frew I*)....................................... 15, 31, 36

**CASES (continued):** **PAGE**

*Frew* v. *Hawkins*, 401 F. Supp. 2d 619 (E.D. Tex. 2005),
  aff'd sub nom. *Frazar* v. *Ladd*, 457 F.3d 432 (5th Cir. 2006)......................30

*Frew* v. *Janek*, 780 F.3d 320 (5th Cir. 2015) (*Frew II*),
  cert. denied, 577 U.S. 1137 (2016)................................................... 13-14, 28

*Frew* v. *Janek*, 820 F.3d 715 (5th Cir. 2016) (*Frew III*) .................................. 14-15

*Frew* v. *Janek*, No. 3:93-CV-65,
  2015 WL 12979136 (E.D. Tex. Sept. 29, 2015) ...........................................18

*Horne* v. *Flores*, 557 U.S. 433 (2009)...................................................... 15, 18, 26

*Inmates of Suffolk Cnty. Jail* v. *Rufo*,
  12 F.3d 286 (1st Cir. 1993) (*Rufo II*)................................................. 18, 26, 30

*Jackson* v. *Georgia Dep't of Transp.*, 16 F.3d 1573 (11th Cir.),
  cert. denied, 513 U.S. 929 (1994)................................................................22

*Jackson* v. *Los Lunas Cmty. Program*, 880 F.3d 1176 (10th Cir. 2018)................29

*Jeff D.* v. *Otter*, 643 F.3d 278 (9th Cir. 2011) ................................................. 14, 19

*Johnson* v. *Heffron*, 88 F.3d 404 (6th Cir. 1996).....................................................30

*League of United Latin Am. Citizens, Dist. 19* (*LULAC*) v. *City of Boerne*,
  659 F.3d 421 (5th Cir. 2011) ........................................................... 14, 26-27

*Louisiana State Conf. of Nat'l Ass'n for Advancement of Colored People* v.
  *Louisiana*, 490 F. Supp. 3d 982 (M.D. La.),
  aff'd sub nom. *Allen* v. *Louisiana*, 14 F.4th 366 (5th Cir. 2021)..................24

*McCoy* v. *Chicago Heights Election Comm'n*,
  880 F.3d 411 (7th Cir. 2018) .................................................................. 35-36

*McDonald* v. *Carnahan*, 109 F.3d 1319 (8th Cir. 1997).........................................29

**CASES (continued):**                                                    **PAGE**

*National Ass'n for the Advancement of Colored People* v.
  *City of Thomasville*, 401 F. Supp. 2d 489 (M.D.N.C. 2005) .......................34

*N.L.R.B.* v. *Harris Teeter Supermarkets*,
  215 F.3d 32 (D.C. Cir. 2000) (*Harris Teeter*)................................. 21, 25, 29

*Peery* v. *City of Miami*, 977 F.3d 1061 (11th Cir. 2020)........................29

*Robinson* v. *Ardoin*, No. CV 22-211,
  2022 WL 2012389 (M.D. La. June 6, 2022),
  cert. granted before judgment, 142 S. Ct. 2892 (2022)................................25

*Rufo* v. *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) (*Rufo I*)........... 10, 31-32

*Seven Elves, Inc.* v. *Eskenazi*, 635 F.2d 396 (5th Cir. 1981)....................14

*Shelby Cnty.* v. *Holder*, 570 U.S. 529 (2013) .............................................4

*Smith* v. *Hosemann*, No. 3:01-CV-855,
  2022 WL 2168960 (S.D. Miss. May 23, 2022)..............................................34

*Stone* v. *City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992),
  cert. denied, 506 U.S. 1081 (1993)..................................................36

*Sullivan* v. *Houston Indep. Sch. Dist.*, 475 F.2d 1071 (5th Cir.),
  cert. denied, 414 U.S. 1032 (1973)..................................................20

*Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1 (1971) .......................29

*Terrebonne Par. Branch NAACP* v. *Jindal*,
  274 F. Supp. 3d 395 (M.D. La. 2017),
  rev'd sub nom. *Fusilier* v. *Landry*, 936 F.3d 447 (5th Cir. 2020) ...............25

*Wells* v. *Edwards*, 347 F. Supp. 453 (M.D. La. 1972),
  aff'd, 409 U.S. 1095 (1973)................................................... 23, 33

*Youngblood* v. *Dalzell*, 925 F.2d 954 (6th Cir. 1991) ...........................19

**STATUTES:**                                                                                 **PAGE**

28 U.S.C. 1292(a)(1) .................................................................................2

28 U.S.C. 1331 ..........................................................................................1

Courts and Judicial Procedure, State Supreme Court-Redistricting,
    1997 La. Sess. Law Serv. Act 776 (H.B. 581) ....................................3-4, 23

La. Civ. Code Ann. Art. 2045 (1985) ......................................................15

La. Civ. Code Ann. Art. 2046 (1985) ......................................................15

**RULE:**

Fed. R. Civ. P. 60(b)(5) ..................................................................... 11, 31

**MISCELLANEOUS:**

*Ensure*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/ensure
    (last visited May 24, 2022) .............................................................16

*Ensure*, Oxford English Dictionary,
    https://www.oed.com/view/Entry/62745?rskey
    =dwRr7C&result=2&isAdvanced=false#eid
    (last visited May 24, 2022) .............................................................16

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————

No. 22-30320

RONALD CHISOM; MARIE BOOKMAN, ALSO KNOWN AS GOVERNOR;
URBAN LEAGUE OF LOUISIANA,

Plaintiffs-Appellees

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

Intervenor Plaintiffs-Appellees

v.

STATE OF LOUISIANA, EX REL, JEFF LANDRY, ATTORNEY GENERAL,

Defendant-Appellant

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

————————————

BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE

————————————

**JURISDICTIONAL STATEMENT**

This appeal is from the district court's denial of a motion to dissolve a

consent decree.  The district court had jurisdiction pursuant to 28 U.S.C. 1331.

The State of Louisiana filed a timely notice of appeal on May 25, 2022.

ROA.1958.[1]  This Court has jurisdiction pursuant to 28 U.S.C. 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in denying the State of

Louisiana's motion to dissolve the Consent Judgment on the current record in this

case.

## STATEMENT OF THE CASE

*1.     The Initial Lawsuit And Resulting Consent Judgment*

a.  Ronald Chisom, along with several other plaintiffs, sued the State of

Louisiana in 1986, alleging that the method of electing members to the Louisiana

Supreme Court violated Section 2 of the Voting Rights Act (VRA).  See ROA.464,

1935.  Specifically, plaintiffs alleged that the use of a multi-parish, multi-member

district in the New Orleans area to elect two justices diluted Black voting strength

when the remaining five justices on the Louisiana Supreme Court were elected

from single-member districts.  See *Chisom* v. *Roemer*, 501 U.S. 380, 384-385

(1991).  The United States intervened as a plaintiff.  *Id.* at 384.

After extensive litigation, including an appeal to the Supreme Court, the

parties entered a Consent Judgment in 1992 to "ensure that the system for electing

---

[1]  "ROA.____" refers to the page numbers of the Record on Appeal.
"Br. __" refers to page numbers in the State's opening brief.

- 3 -

the Louisiana Supreme Court is in compliance with Section 2 of the [VRA]."  See

ROA.1542; *Chisom* v. *Roemer*, *supra*.  Specifically, as an interim remedy, the

Consent Judgment required the State to:  (1) create a temporary eighth seat (the

*Chisom* seat) on the Louisiana Supreme Court; and (2) ensure that the justice

occupying that seat was an equal member of the Louisiana Supreme Court.

ROA.1542-1545.

Additionally, to guard against vote dilution going forward, the Consent

Judgment required the State to enact legislation which would provide for the

reapportionment of the seven districts (*i.e.*, seven seats) of the Louisiana Supreme

Court and create a single-member district that is majority Black in voting age

population and includes Orleans Parish in its entirety.  ROA.1542-1545.  See also

*Allen* v. *Louisiana*, 14 F.4th 366, 370 (5th Cir. 2021) (summarizing the Consent

Judgment).  The Consent Judgment mandates that "future Supreme Court elections

* * *  shall take place in the newly reapportioned districts."  ROA.1545.

The Louisiana legislature subsequently enacted Act 776, which

reapportioned the State into seven supreme court districts and provided that the

Louisiana Supreme Court shall be composed of one justice elected from each of

the seven districts.  See Courts and Judicial Procedure, State Supreme Court-

Redistricting, 1997 La. Sess. Law Serv. Act 776 (H.B. 581).  Act 776 expressly

provides that "[t]he legislature may redistrict the supreme court following the year

- 4 -

in which the population of this state is reported to the president of the United States for each decennial federal census." *Ibid.* The State submitted, and the United States Attorney General interposed no objection to, Act 776 under Section 5 of the VRA.[2] See ROA.1573-1574. Although the newly created District Seven did not include the entirety of Orleans Parish, the parties agreed that Act 776 "meets the intent of all parties," and the district court adopted Act 776 as an addendum to the Consent Judgment on the parties' joint motion. See ROA.1551-1557.

2.    *Litigation Related To Justice Johnson's Service On The Supreme Court*

Bernette Johnson was elected to the *Chisom* seat in 1994, and she won election as an associate justice from the newly created seventh district in 2000. See *Allen*, 14 F.4th at 370. In 2012, a dispute arose about whether to include Justice Johnson's service in the *Chisom* seat in calculating her tenure on the supreme court for purposes of determining who would be the next chief justice of the Louisiana Supreme Court. *Id.* at 370-371. Plaintiffs and Justice Johnson, who

---

[2] Until the Supreme Court's decision in *Shelby County* v. *Holder*, 570 U.S. 529 (2013), any change in voting standards, practices, or procedures in Louisiana could not take effect until the change was precleared by either the United States Attorney General or a three-judge district court upon the jurisdiction's showing that the change had neither the purpose nor the effect of discriminating against minority voters. See also ROA.1545-1547 (requiring the State to bring the election of supreme court justices into compliance with the VRA, including by seeking preclearance from the United States Department of Justice for "all changes affecting voting covered by Section 5 that are necessary to effectuate a full remedy and comply with this consent judgment").

- 5 -

intervened in the case, see ROA.86-89, moved the district court to enforce the

Consent Judgment by issuing a declaratory judgment on the calculation of Justice

Johnson's tenure.  See ROA.53-85, 221-231; *Chisom* v. *Jindal*, 890 F. Supp. 2d

696, 708 (E.D. La. 2012).  The State moved to dismiss, arguing, *inter alia*, that the

court lacked jurisdiction over the dispute.  ROA.553-572.

The Consent Judgment provided that the court would "retain jurisdiction

over this case until the complete implementation of the final remedy has been

accomplished."  ROA.1547.  The State argued that the "final remedy" had been

accomplished in 2000 when Justice Johnson was elected to the court from the new

seventh district.  See *Chisom* v. *Jindal*, 890 F. Supp. 2d at 708.  Justice Johnson,

the *Chisom* plaintiffs, and the United States opposed the State's motion to dismiss,

"contending that the Consent Judgment called not only for the creation of a new

Supreme Court District, but also for the justice sitting in the seat created by the

Consent Judgment to be considered equal in all respects to the other justices of the

Supreme Court, including seniority and tenure."  *Id.* at 709.  Because the district

court found that the Consent Judgment called for Justice Johnson's service in the

*Chisom* seat to be credited to her for all purposes under Louisiana law, it agreed

with plaintiffs and the United States that the "final remedy" had not yet been

implemented.  *Id.* at 711.  The court granted the motions to enforce the Consent

- 6 -

Judgment and denied the State's motion to dismiss.[3]  *Id.* at 728.  Justice Johnson

served as chief justice until her retirement in 2020.  See *Allen*, 14 F.4th at 374 &

n.12.

3.     *The State's Motion To Dissolve The Consent Decree*

      a.  In 2019, a different group of plaintiffs sued the State in the Middle

District of Louisiana under Section 2 of the VRA, seeking the creation of a second

Black opportunity supreme court district to remedy alleged vote dilution.  See

*Allen*, 14 F.4th at 369.  The district court certified an interlocutory appeal to this

Court to decide "[w]hether the Eastern District [of Louisiana] has exclusive

subject-matter jurisdiction over all matters involving Louisiana Supreme Court

districts under the [*Chisom* decree]."  *Ibid.* (alterations in original).  This Court

held that the Eastern District did not, explaining that the Consent Judgment "aimed

to remedy alleged vote dilution in one supreme court district, not to reform the

whole system."  *Id.* at 374.  In dicta, the Court also questioned the State's

underlying assumption that the Consent Judgment remained in force but did not

decide that question.  *Ibid.*

---

[3]  The State initially appealed this decision to this Court, see ROA.1165, but moved to dismiss the appeal after the Louisiana Supreme Court issued an opinion crediting Justice Johnson for her time served in the *Chisom* seat.  See ROA.1355; Br. 11-12.

b.  Following this Court's decision in *Allen*, and on the eve of a redistricting session, the State moved in the district court in this case under Federal Rule of Civil Procedure 60(b)(5) to dissolve the Consent Judgment.  See ROA.1429-1435.  The State argued that the court should terminate the Consent Judgment because, once Justice Johnson became chief justice and retired, having received equal emoluments as all other justices, the final remedy had been implemented and the judgment satisfied.  ROA.1443-1444.  The State also argued that the seven supreme court districts are malapportioned because of the Consent Judgment and that applying the judgment is thus no longer equitable.  ROA.1446-1448.  In support of its motion, the State submitted (1) this Court's decision in *Allen* (ROA.1450-1465); (2) a PowerPoint entitled "Redistricting In Louisiana" (ROA.1466-1539); (3) a copy of the Consent Judgment, as amended by the parties' joint motion to incorporate Act 776 into the judgment (ROA.1540-1557, 1573-1574); and (4) the official commissions of the justices who have been elected to the *Chisom* seat and the seventh district, along with "Election Results Report[s]" (ROA.1558-1572, 1575-1583).[4]

---

[4]  In addition to Justice Johnson, two other justices have been elected to either the *Chisom* seat or the new seventh district:  Justice Revius O. Ortique Jr., who served from 1992-1994, and Justice Piper D. Griffin, who was elected in 2020 following Justice Johnson's retirement.  See ROA.1432-1434.

Plaintiffs (ROA.1721-1744), the United States (ROA.1755-1776), and Justice Johnson (ROA.1752-1753) opposed the motion. In opposing the motion, the United States argued that the State could not establish that it had satisfied the Consent Judgment "unless and until it demonstrates that any new plan meets the decree's fundamental requirement of ensuring compliance with Section 2 of the [VRA]." ROA.1763. The United States also argued that concerns as to the current district configurations were not a sufficient basis to grant relief from the Consent Judgment because the Judgment does not prevent the State from redistricting so long as any new plan preserves the rights of Black voters in Orleans Parish to be free from impermissible vote dilution. ROA.1763.

c. Following a hearing, the district court denied the State's motion. ROA.1934. To begin, the court turned to contract principles governing consent decrees and found that the purpose of the Consent Judgment is "to ensure compliance with Section 2 of the [VRA]" and to "correct[] and guard[] against the dilution of Black voting power in Orleans Parish." ROA.1940-1941. In addition to certain specific remedies, the court found that the Consent Judgment's "unambiguous language contemplates future compliance." ROA.1942. With that purpose in mind, the court held that the State had not met its burden under Rule 60(b)(5) to show either that the Consent Judgment had been satisfied or that applying it was no longer equitable. ROA.1943.

i. As for whether the State had satisfied the Consent Judgment, the court noted the scarcity of case law on the applicable legal standard, see ROA.1943 & n.50, but stated that the Supreme Court repeatedly has recognized that it is a "flexible standard."  The district court looked to the two-part test the Supreme Court articulated in *Board of Education of Oklahoma City Public Schools* v. *Dowell*, 498 U.S. 237 (1991), a school desegregation case, for guidance and determined that it should assess (1) whether the State had complied in good faith with the Consent Judgment and (2) whether the vestiges of past discrimination had been eliminated to the extent practicable.  ROA.1943-1953.  The court found neither met here.

First, the court determined that the State had not shown that it had "complied with the Consent Judgment in good faith."  ROA.1947.  The court concluded that the State had not shown, at this time, that it is committed to maintaining a Black opportunity district.  ROA.1949.  The State's inconsistent compliance to date did not indicate good faith, the court explained, because the State had actively opposed terms of the Consent Judgment earlier in this case with respect to Justice Johnson's tenure, and the State continued to argue in litigation that Section 2 of the VRA does not reach judicial elections, despite the Supreme Court's holding to the contrary.  ROA.1949.  Nor did the court find the State's prospects for future compliance satisfactory given the State's refusal at the Rule 60(b) hearing to

commit to maintaining a Black opportunity district in the Orleans Parish area.
ROA.1948-1949.

Second, the court held that the State had not met its burden to show that the
vestiges of past discrimination had been eliminated because, "the only evidence the
[State] has offered" was the fact that Black justices were elected to the seat created
as a result of this lawsuit. ROA.1952. The court found that evidence alone was
insufficient. ROA.1953. It further observed that the State had not addressed
whether the conditions that would support a vote-dilution claim persist in
Louisiana. ROA.1951-1952.

ii. The district court separately found that the State had not shown that
continued enforcement of the Consent Judgment is no longer equitable. The court
applied the two-part test from *Rufo* v. *Inmates of Suffolk County Jail*, 502 U.S. 367
(1992) (*Rufo I*), which requires the party seeking relief from a judgment to show
(1) a significant change in fact or law that makes compliance with the judgment
unworkable, substantially more onerous, or detrimental to the public interest, and
(2) the proposed modification is suitably tailored to the changed circumstance.
ROA.1953-1954.

The court rejected the State's arguments that the differences in population
among the State's supreme court districts qualified as a changed circumstance.
ROA.1954-1955. The court stated that, despite regularly being malapportioned,

the only time the State had redrawn its supreme court districts in the last 100 years was in 1997, and only then because of the Consent Judgment entered in this case. See ROA.1954-1955. The court also found that the continued enforcement of the Consent Judgment would not be detrimental to the public interest. ROA.1955. The court explained that the Consent Judgment does not prohibit the State from redistricting the six other supreme court districts as it sees fit or changing the boundaries of the seventh district with court approval. ROA.1956. Even if the State had demonstrated a significant change in fact, the court determined that modification, rather than termination, would be more appropriate. ROA.1956-1957.

d. The State filed a timely notice of appeal. ROA.1958.

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in denying the State's motion to vacate the Consent Judgment. As relevant here, Rule 60(b)(5) permits a party to obtain relief from a judgment if either (1) "the judgment has been satisfied, released, or discharged" or (2) "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The State showed neither here.

First, the court did not err in holding that the State has not satisfied the Consent Judgment. The State had the burden to demonstrate it has substantially complied with the Consent Judgment and implemented a durable remedy to guard

- 12 -

against impermissible vote dilution in Orleans Parish. The only evidence the State put forth that it has accomplished that objective is the fact that Black justices were elected to the seat created as a result of this lawsuit. But this evidence simply demonstrates the Consent Judgment is likely working, not that the State has implemented a durable remedy. Given that the State has not redistricted since entry of the Consent Judgment, and, in fact, has challenged specific provisions of the Consent Judgment each time they surfaced, the district court appropriately declined to assume the State's compliance from the mere passage of time. The court did not abuse its discretion in denying the State's motion where the State sought to terminate the decree in anticipation of reapportionment but refused to present the court with either a proposed new plan or other concrete evidence indicating that any new plan would comport with Section 2 of the VRA.

Nor did the court err in relying, in part, on a school desegregation case to determine whether the State had satisfied the Consent Judgment. Although school desegregation has a unique legal history, this Court has recognized that the standard for termination in desegregation cases may be of some applicability. And multiple courts of appeals have found that the principles in desegregation cases shed light on the broad inquiry a district court must undertake in assessing whether to grant relief pursuant to Rule 60(b)(5). The court's consideration of a desegregation case was thus not an abuse of discretion.

- 13 -

Second, the court did not abuse its discretion in separately holding that the State did not show that applying the Consent Judgment was no longer equitable based on malapportionment.  Changed factual circumstances alone are not sufficient grounds for relief from a judgment.  Rather, to meet its burden, the State had to prove that (1) it made a reasonable attempt to comply with the Consent Judgment but (2) malapportionment makes the prospective application of the Consent Judgment unworkable, substantially more onerous, or detrimental to the public interest.  The State showed neither.  Even assuming malapportionment were a significant change, the Consent Judgment expressly permits the State to reapportion its supreme court districts to address this change.  Yet the State has not redrawn the other six supreme court districts or sought court approval for any proposed modifications to the seventh district.  Simply put, the State offered the district court no sound basis to warrant relief from the Consent Judgment.

## ARGUMENT

## THE DISTRICT COURT CORRECTLY DENIED THE STATE'S MOTION TO VACATE THE CONSENT JUDGMENT

### A.   *Standard Of Review*

This Court reviews a district court's denial of a Rule 60(b)(5) motion for abuse of discretion, and reviews its underlying legal conclusions de novo.  *Frew* v. *Janek*, 780 F.3d 320, 326 (5th Cir. 2015) (*Frew II*), cert. denied, 577 U.S. 1137 (2016).  For the district court to have abused its discretion, "[i]t is not enough that

- 14 -

the granting of relief might have been permissible, or even warranted—denial must have been so *unwarranted* as to constitute an abuse of discretion." *Cooper* v. *Noble*, 33 F.3d 540, 544 (5th Cir.) (alteration in original) (quoting *Seven Elves, Inc.* v. *Eskenazi*, 635 F.2d 396, 402 (5th Cir. 1981)), supplemented, 41 F.3d 212 (5th Cir. 1994). "The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely." *League of United Latin Am. Citizens, Dist. 19* (*LULAC*) v. *City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011).

B.      *The State Has Not Satisfied The Consent Judgment*

      The district court properly rejected the State's argument that it satisfied the Consent Judgment for purposes of Rule 60(b)(5) relief. Consent decrees are construed according to principles of contract law. *Allen* v. *Louisiana*, 14 F.4th 366, 371 (5th Cir. 2021). A moving party is entitled to relief for having satisfied the judgment where it demonstrates "substantial compliance." *Frew II*, 780 F.3d at 327, 330-332; see also *Jeff D.* v. *Otter*, 643 F.3d 278, 283 (9th Cir. 2011) (holding that because consent decrees are construed as contracts, the doctrine of substantial compliance applies). The doctrine of "substantial compliance" contemplates whether "deviations from a contract's provisions * * * severely impair the contractual provision's purpose." *Frew* v. *Janek*, 820 F.3d 715, 721 (5th Cir.

- 15 -

2016) (*Frew III*) (citation omitted).  Thus, "a critical question in [the] Rule 60(b)(5) inquiry is whether the objective of the [challenged decree]  *  *  *  has been achieved."  *Horne* v. *Flores*, 557 U.S. 433, 450 (2009) (citing *Frew* v. *Hawkins*, 540 U.S. 431, 442 (2004) (*Frew I*)).

> 1.    *The Purpose Of The Consent Judgment Is To Correct And Guard Against The Dilution Of Black Voting Strength In Orleans Parish*

To interpret a contract, a court must determine "the common intent of the parties," starting with the words of the contract so long as they are clear and lead to no absurdities.  La. Civ. Code Ann. Arts. 2045, 2046 (1985).  See also *Allen*, 14 F.4th at 371.  The court must construe the contract "as a whole" and interpret each provision "in light of the other provisions."  *Allen*, 14 F.4th at 371 (quoting *Baldwin* v. *Board of Supervisors for Univ. of La. Sys.*, 2014-0827, p. 7 (La. 10/15/14), 156 So. 3d 33, 38).

Applying these principles, it is clear that the Consent Judgment, as a whole, "was specifically aimed at correcting and guarding against the dilution of Black voting power in Orleans Parish."  ROA.1941.  See also *Allen*, 14 F.4th at 374 (recognizing that the "*Chisom* decree aimed to remedy alleged vote dilution" in what is now District Seven).  As the district court explained, the purpose of the Consent Judgment was "to *ensure* black voters in the Parish of Orleans have an equal opportunity to participate in the political process and to elect candidates of their choice."  ROA.1941, quoting ROA.1546.  The word "ensure" indicates that

the parties intended to make certain that there would be an equal opportunity to elect going forward. ROA.1942 (citing *Ensure*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ensure (last visited May 24, 2022); *Ensure*, Oxford English Dictionary, https://www.oed.com/view/Entry/62745?rskey =dwRr7C&result=2&isAdvanced=false#eid (last visited May 24, 2022)). The unambiguous language of the Consent Judgment, which mandates that "*future* Supreme Court elections" take place within any newly redrawn districts, confirms that the parties intended the Judgment to apply prospectively. ROA.1941-1942, quoting ROA.1545.

The State argues (Br. 30-32, quoting ROA.1941-1942) that it was "a serious misstep" for the court to conclude that the Consent Judgment "contemplates future compliance" beyond the "certain specific remedies" it contains. Many of the Consent Judgment's "action items" sought to achieve interim relief, including by creating a temporary eighth seat on the Louisiana Supreme Court that would allow for the immediate election of a justice from Orleans Parish without cutting short the term of any sitting justice. Yet the text of the Consent Judgment demonstrates that its broader purpose was to ensure that, going forward, Black voters in Orleans Parish would have an equal opportunity to elect candidates of their choice, in compliance with the VRA. For example, the Judgment orders, adjudges, and decrees that the relief contained therein "will ensure that the system for electing the

Louisiana Supreme Court is in compliance with Section 2 of the [VRA]."
ROA.1542. And in discussing who is the prevailing party, the Consent Judgment
reiterates its purpose to have Louisiana Supreme Court elections "comply with the
[VRA]" and "to ensure black voters in the Parish of Orleans have an equal
opportunity to participate in the political process and to elect candidates of their
choice." ROA.1546.

Indeed, the State told this Court as recently as last year that it was "clear
from the text of the [Consent Judgment] itself" that it "constitutes a permanent
injunction" and "mandates that *all future* elections" for the Orleans-based seventh
district take place within the boundaries "contemplated by the [Consent
Judgment]." See Louisiana Br. at 14, *Allen* v. *Louisiana*, *supra* (No. 20-30734).[5]
The State similarly recognized in its briefing below in this case that the Consent
Judgment's "goal was straightforward: [to] ensure that Louisiana's citizens were
selecting their Supreme Court Justices in a way that avoided diluting the voting
power of minority communities." ROA.1446. See also ROA.1814 (recognizing
that the Consent Judgment was designed to ensure compliance with Section 2 of

---

[5] The State argued that the Consent Judgment "constitutes a continuing
injunction with respect to [all] seven Louisiana Supreme Court districts," not just
District Seven. See *Allen*, 14 F.4th at 371-373. But this Court rejected that broad
reading, explaining that the Consent Judgment "was tailored to remedy" the vote
dilution in Orleans Parish and "had nothing to do with the other districts" or "how
they are to be apportioned." *Ibid.* In any event, the Consent Judgment clearly
contemplates future compliance as applied to Black voters in Orleans Parish.

the VRA). The district court did not abuse its discretion in recognizing what the State previously thought clear: the Consent Judgment was intended to correct and prospectively guard against minority vote dilution in Orleans Parish.

      2.    *The State Did Not Show Substantial Compliance With The Consent Judgment's Purpose*

    a. To be sure, if the State establishes that "a durable remedy has been implemented, continued enforcement of the [judgment] is not only unnecessary, but improper." *Horne*, 557 U.S. at 450. While *Horne* leaves unanswered what it means to have a "durable remedy," lower courts have held that, at a minimum, it is one that "gives the [c]ourt confidence that defendants will not resume their violations of plaintiffs' constitutional rights once judicial oversight ends." *Frew* v. *Janek*, No. 3:93-CV-65, 2015 WL 12979136, at *3 (E.D. Tex. Sept. 29, 2015) (alteration in original) (quoting *Evans* v. *Fenty*, 701 F. Supp. 2d 126, 171 (D.D.C. 2010)). See also *Inmates of Suffolk Cnty. Jail* v. *Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) (*Rufo II*) (holding on remand from the Supreme Court that before vacating a consent decree, a district court must satisfy itself that "there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted").

    Here, the State did not put forth sufficient evidence to give the district court confidence that the State has implemented a durable remedy. The State did not present the district court with either a proposed new plan or other concrete

evidence indicating that any new plan would comport with the State's obligation under the Consent Judgment to guard against impermissible vote dilution in Orleans Parish.  Not only did the State fail to present any evidence at the hearing on its Rule 60(b)(5) motion, the State flatly refused to commit to maintaining a Black opportunity district in Orleans Parish or to confirm whether one would be required under Section 2 of the VRA should the court dissolve the Consent Judgment.  See ROA.2024-2025.  On this record, the district court reasonably found that the State had not shown that "there is little or no likelihood the original violation will not be repeated when the Consent Judgment is lifted."  ROA.1948.

The fact that the court also found that the State had "effectuat[ed] each of the action items in the [C]onsent [J]udgment" (see Br. 32) did not compel a different conclusion under Rule 60(b)(5).  Although action items are clearly relevant to compliance, the court must also determine "whether the larger purposes of the decree[] have been served."  *Otter*, 643 F.3d at 288.  Thus, besides evaluating the State's performance of the Consent Judgment's specific terms, it was proper for the court to "also consider the more general goals of the [Judgment] which the terms were designed to accomplish."  See *Youngblood* v. *Dalzell*, 925 F.2d 954, 960 (6th Cir. 1991).

In similar circumstances, this Court held that a district court did not abuse its discretion in declining to vacate an injunction even though the defendant had

"promulgat[ed] new regulations that literally comply with the conditions set out in the injunction." *Sullivan* v. *Houston Indep. Sch. Dist.*, 475 F.2d 1071, 1078 (5th Cir.), cert. denied, 414 U.S. 1032 (1973). This Court explained that the "original injunction dealt not only with the promulgation of regulations, but also with their enforcement." *Ibid.* Therefore, this Court found that the injunction had not been satisfied because the defendant had failed to show that the new rules would be constitutionally applied in the future if the court vacated the injunction. *Ibid.* Similarly here, even though the district court found that the State "has complied with the terms of the Consent Judgment by enacting Act 512 to create the temporary *Chisom* seat and Act 776 to create the current District Seven," the court lacked a basis to conclude that the State would continue to guard against vote dilution given that it presented no evidence showing that a new plan would comply with Section 2 and continue to meet the Consent Judgment's objectives. See ROA.1948.

Nor does the fact that 30 years have elapsed since entry of the Consent Judgment demonstrate that the State has implemented a durable remedy. See Br. 24. The "mere passage of time and temporary compliance" do not provide a basis for relief. *Building & Constr. Trades Council of Phila. & Vicinity* (*BCTC*) v. *N.L.R.B.*, 64 F.3d 880, 889 (3d Cir. 1995). The only evidence that the State provided to demonstrate that it had satisfied the Consent Judgment was the official

commissions of three Black justices who were elected to the *Chisom* or seventh

district seats. See ROA.1558-1572, 1575-1583; Br. 33-35. But the election of

these justices may be "a reflection of the effectiveness of the * * * consent order

rather than a result of good intentions." *N.L.R.B.* v. *Harris Teeter Supermarkets*,

215 F.3d 32, 36-37 (D.C. Cir. 2000) (*Harris Teeter*). See also *Democratic Nat'l*

*Comm.* v. *Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 601 (D.N.J. 2009)

(recognizing that "there is no way of knowing" whether past compliance was

"because the Decree itself has deterred [noncompliant] behavior"), aff'd, 673 F.3d

192 (3d Cir. 2012). The State has not identified a durable remedy apart from the

Consent Judgment that demonstrates that it will not dilute the voting strength of

Black voters in Orleans Parish.

More importantly, because the State has not redrawn its supreme court

districts during the past 30 years apart from that redistricting which occurred under

Act 776 as part of the Consent Judgment, this Court should not simply assume

compliance from the passage of time. See *Harris Teeter*, 215 F.3d at 36 (holding

that "compliance over an extended period of time is not in and of itself sufficient to

warrant relief"). Courts of appeals have routinely rejected motions for relief from

consent decrees in similar situations. For example, in *BCTC*, the Third Circuit

held that it could not "assume" lawful compliance with a consent decree that

prohibited certain forms of boycotting where the plaintiff—an association of labor

unions—had admitted that the unions had not engaged in any picketing for most of the last six years. 64 F.3d at 890. The Court found there was, therefore, "no background upon which any findings could be made that would show that [the plaintiff] has in fact learned how to picket without treading on the prohibitions * * * contained both in the law and the various negotiated consent decrees." *Ibid.*

Likewise, in *Allen* v. *Alabama State Board of Education*, the board entered a consent decree in 1985 that required that any future teacher certification examinations avoid a discriminatory impact. 164 F.3d 1347, 1349 (11th Cir. 1999), vacated by joint mot. of the parties, 216 F.3d 1263 (11th Cir. 2000).[6] But rather than formulate a new, non-discriminatory test after the decree was entered, the board suspended teacher certification examinations altogether until 1995, when the Alabama legislature directed the board to select a new test. *Id.* at 1349-1350. The board then moved to vacate the consent decree, arguing that it had fully complied and that, "if it wants to now reinstate testing, it should not be forced to fashion tests consistent with the provisions of the consent decree." *Id.* at 1351.

---

[6] Although *Allen* is no longer binding precedent because it was vacated as a result of the parties' settlement, see 216 F.3d 1263 (11th Cir. 2000), its approach is still useful as persuasive authority. See, *e.g.*, *Jackson* v. *Georgia Dep't of Transp.*, 16 F.3d 1573, 1578 n.7 (11th Cir.), cert. denied, 513 U.S. 929 (1994).

- 23 -

The Eleventh Circuit affirmed the district court's denial of the board's motion as premature. *Allen*, 164 F.3d at 1351. Because "future testing requirements went to the heart of the consent decree," the Eleventh Circuit explained, it was proper for the district court to require the board to submit the new test which it planned to use or other evidence to show it had made a "good-faith effort" to comply with the consent decree's provisions. *Id.* at 1351-1352.

The State's motion to vacate the Consent Judgment is likewise premature. Although the Consent Judgment expressly allows the State to redistrict, the State chose for decades to leave in place the boundaries established by the Consent Judgment.[7] The State now seeks to dissolve the Consent Judgment in order to redistrict, but, as in *Allen*, the State has not provided the court with a new map or any other indication of what it plans to do next. Ensuring that Black voters in Orleans Parish have an equal opportunity to elect a candidate of their choice in compliance with Section 2 of the VRA lays at the heart of the Consent Judgment. Because the State has not previously demonstrated that it would fulfill this obligation when redistricting, the mere passage of time cannot form the basis for

---

[7] Pursuant to the Consent Judgment, the "legislature may redistrict the supreme court following the year in which the population of this state is reported to the president of the United States for each decennial federal census." See Courts and Judicial Procedure, State Supreme Court-Redistricting, 1997 La. Sess. Law Serv. Act 776 (H.B. 581). Nothing in federal or state law, however, requires the State to take such action. See *Wells* v. *Edwards*, 347 F. Supp. 453, 454 (M.D. La. 1972), aff'd, 409 U.S. 1095 (1973).

Rule 60(b)(5) relief. See *BCTC*, 64 F.3d at 890. Until the State presents the court

with a new plan or other concrete evidence demonstrating that a new plan would

comport with Section 2 of the VRA, it cannot show a good-faith effort to comply

with the Consent Judgment.

b. Moreover, despite the State's assertions (Br. 35) that the evidence

demonstrates "[30] years of substantial compliance with the terms of the [C]onsent

[J]udgment," the district court did not abuse its discretion in concluding, based on

the record before it, that the State's commitment to the Judgment's objectives has

been reluctant at best. See ROA.1947-1950. For instance, while the State now

points (Br. 34-35) to Justice Johnson's service as chief justice as evidence that the

final remedy has been implemented, when actually confronted with Justice

Johnson's motion to enforce the Consent Judgment, the State resisted the motion.

ROA.722-742; ROA.1949. Remarkably, notwithstanding the Supreme Court's

decision in this *very* case that expressly held otherwise, the State continues to

argue that Section 2 should not apply to judicial elections. See ROA.1949;

*Louisiana State Conf. of Nat'l Ass'n for Advancement of Colored People* v.

*Louisiana*, 490 F. Supp. 3d 982, 1023 (M.D. La.) (rejecting the State's argument

under "*Chisom v. Roemer*'s direct holding"), aff'd sub nom. *Allen* v. *Louisiana*,

*supra*; *Chisom* v. *Roemer*, 501 U.S. 380, 404 (1991) (holding that Section 2 of the

VRA applies to such elections). See also Br. 44 n.8. The district court's

consideration of these facts in assessing the State's good faith compliance was not error.

Additionally, as the United States pointed out to the district court below, *see* ROA.1766-1767, looking at the State's actions more broadly over the past 30 years further demonstrates that the State has not shown "a clean record of compliance." See *Harris Teeter*, 215 F.3d at 37 (finding the existence of related litigation relevant). Federal courts have repeatedly found that Louisiana has a "long *and ongoing* history of voting-related discrimination," including "using certain electoral systems that have the effect of diluting the black vote." See *Robinson* v. *Ardoin*, No. CV 22-211, 2022 WL 2012389, at *54-55 (M.D. La. June 6, 2022) (emphasis added) (quoting *Terrebonne Par. Branch NAACP* v. *Jindal*, 274 F. Supp. 3d 395, 439 (M.D. La. 2017), rev'd sub nom. *Fusilier* v. *Landry*, 936 F.3d 447 (5th Cir. 2020)), cert. granted before judgment, 142 S. Ct. 2892 (2022). Indeed from 1990 until the Supreme Court decided *Shelby County* in 2013, the United States Attorney General issued 79 objection letters to voting changes in Louisiana. *Id.* at *53. And the State is currently defending against a Section 2 vote-dilution lawsuit in the Middle District of Louisiana that, like this case, concerns supreme court districts. See *Allen* v. *Louisiana*, *supra*.

In light of the foregoing, the district court did not abuse its discretion in finding that the State failed to demonstrate that it had implemented a durable

remedy.  See *Horne*, 557 U.S. at 450; *Rufo II*, 12 F.3d at 292 (holding it

appropriate to consider "present attitudes toward the reforms mandated by the

decree" in assessing a Rule 60(b)(5) motion (citation omitted)).

c.  Finally, even assuming the State brought its motion for relief in good

faith, the court did not err in denying the motion where the State put forth only an

insufficient record to meet its burden.  The only evidence the State cited of its

compliance was the fact that Justice Johnson was elected, became chief justice, and

was succeeded by another Black justice.  ROA.1949.  The court concluded that this

evidence demonstrated "the efficacy of the Consent Judgment," but it did not show

that the State was "committed to maintaining a Black opportunity district."

ROA.1949.  Because the State did not present actual evidence to show that it has

implemented a durable remedy—*e.g.*, a new map, along with evidence that its

redistricting plan comports with Section 2—the court did not abuse its discretion in

denying relief "at this time."  ROA.1949.

Presented with similar evidence in *LULAC*, this Court found that "the

paucity of the record" was "an insufficient basis for the district court to determine

that modification was warranted."  659 F.3d at 438.  Like here, the parties in

*LULAC* had entered a consent decree to "alleviate the impermissible dilution of the

votes of a protected class."  *Ibid.*  The record for Rule 60(b)(5) relief in that case

consisted only of a joint motion that included allegations related to one minority

candidate for office. *Id.* at 438-439. The Court found that the submission did not warrant relief where the parties failed to "include additional facts in their joint motion to modify the consent decree, to file a summary of facts relied upon in the motion, and to file supporting affidavits and other pertinent documents." *Id.* at 439. This Court remanded the case to the district court to "permit supplemental filings and conduct proceedings, as necessary, to develop a sufficient record in order to decide whether  *  *  *  modification of the consent decree is appropriate." *Id.* at 439-440.

Likewise here, the district court's order denying the State's motion will not "condemn [the State]  *  *  *  to judicial tutelage for the indefinite future." See *Board of Educ. of Okla. City Pub. Schs. v. Dowell*, 498 U.S. 237, 249 (1991). Once the State presents actual evidence to demonstrate that it has substantially complied with the objectives of the Consent Judgment—*i.e.*, that it will guard against impermissible vote dilution by ensuring the existence of a Black opportunity district anchored in Orleans Parish—relief may be warranted. On the current record, however, the State has not demonstrated that it has implemented a durable remedy, let alone that it is committed to the Consent Judgment's objectives. See ROA.1952-1953 (finding the State's evidence, "[a]s it now stands," insufficient to meet its burden). Accordingly, the district court did not abuse its discretion in rejecting the State's first asserted basis for Rule 60(b) relief.

- 28 -

3.    *The District Court's Consideration Of Factors Identified In A School*
      *Desegregation Case Was Not Error*

a.  In analyzing the State's argument that it had satisfied the Consent

Judgment, the district court considered the two-part test developed in *Board of*

*Education of Oklahoma City Public Schools* v. *Dowell*, *supra*, a school

desegregation case, for whether to "dissolv[e] a . . . decree." ROA.1943

(alterations in original) (quoting *Dowell*, 498 U.S. at 248). Specifically, the court

considered (1) whether "the State has complied with the Consent Judgment in good

faith", see ROA.1947, and (2) whether "the vestiges of past discrimination have

been eliminated to the extent practicable"—*i.e.*, "whether the purpose of the

[C]onsent [Judgment] has been fulfilled", see ROA.1950 (internal quotation marks

and citation omitted). This was not error.

Despite the State's protestations (Br. 36), *Dowell*'s two-part test is

compatible with the "substantial compliance" standard, discussed above, for

analyzing whether a judgment has been satisfied for purpose of Rule 60(b)(5)

relief. In the same case in which this Court first applied the "substantial

compliance standard," see *Frew II*, 780 F.3d at 330, it also recognized that—

although possibly limited by "school desegregation's unique legal history"—the

standard used by the Supreme Court in school desegregation cases may have some

"applicability," see *id.* at 329 n.37. The Supreme Court has also observed that "a

school desegregation case does not differ fundamentally from other cases

involving the framing of equitable remedies to repair the denial of a constitutional right." *Freeman* v. *Pitts*, 503 U.S. 467, 487 (1992) (quoting *Swann* v. *Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971)).  And, in assessing Rule 60(b) motions, multiple courts of appeals have found that the principles in desegregation cases shed light on the broad inquiry a district court must undertake when determining whether a moving party actually implemented a durable remedy. See, *e.g.*, *Peery* v. *City of Miami*, 977 F.3d 1061, 1075 (11th Cir. 2020); *Jackson* v. *Los Lunas Cmty. Program*, 880 F.3d 1176, 1200 (10th Cir. 2018); *Alliance to End Repression* v. *City of Chicago*, 237 F.3d 799, 801 (7th Cir. 2001); *Harris Teeter*, 215 F.3d at 36; *McDonald* v. *Carnahan*, 109 F.3d 1319, 1321 (8th Cir. 1997); *Alexander* v. *Britt*, 89 F.3d 194, 197 (4th Cir. 1996).  The district court did not abuse its discretion in likewise considering the two-part test from *Dowell* to determine whether the State had met its burden to dissolve the Consent Judgment. See ROA.1943-1953.

b.  The State also incorrectly argues (Br. 37-40) that even if this Court applies the *Dowell* test, the district court abused its discretion in denying the State's motion to vacate the Consent Judgment.  According to the State (Br. 37-39), it has "satisfied its burden to show good faith compliance" because there is no reason to believe it will create another multi-member district in the future.  But the State's argument relies on the flawed premise that the purpose of the Consent

Judgment was simply to eliminate the multi-member district. As already discussed, see pp. 14-17, *supra*, the district court properly found that the Consent Judgment's purpose was to correct and prospectively guard against minority vote dilution in Orleans Parish. The State has not shown it has substantially achieved this objective.

The State also argues (Br. 39-40) that there is "no need for judicial supervision to ensure future compliance" because it is bound by federal law. Regardless of the standard the district court used to assess the State's Rule 60(b) motion, it "was correct in considering not only what defendants had done up to the present, but also future prospects." *Johnson* v. *Heffron*, 88 F.3d 404, 406 (6th Cir. 1996). See also *Rufo II*, 12 F.3d at 292 (holding that before terminating a consent decree, a court should "be satisfied that there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted"). Nor is a Rule 60(b) motion "a vehicle by which Defendants may disregard the voluntary obligations contained in the Consent Decree." *Frew* v. *Hawkins*, 401 F. Supp. 2d 619, 636 (E.D. Tex. 2005), aff'd sub nom. *Frazar* v. *Ladd*, 457 F.3d 432 (5th Cir. 2006). Judicial supervision is precisely what the State agreed to when it entered the Consent Judgment "in order to save [itself] the time, expense, and inevitable risk of litigation." See *Cooper*, 33 F.3d at 545 (internal quotation marks and citation omitted). To be sure, "when the objects of the decree have been

attained," the Consent Judgment should be terminated but "the decree should be enforced according to its terms" until that time.  See *Frew I*, 540 U.S. at 442.

The State has not met its burden, on this record, to show that it has substantially complied with the purpose of the Consent Judgment—to correct and guard against vote dilution in Orleans Parish.  Quite the opposite, the State took the position at the motion hearing that vacating the Consent Judgment would permit it to eliminate the opportunity district in Orleans Parish.  See ROA.2024-2025.  On this record, the district court correctly held that the Consent Judgment has not been satisfied.  This Court should affirm the district court's denial of the State's Rule 60(b)(5) motion on this ground.

C.    *No Change In Law Or Fact Makes Continued Enforcement Of The Consent Judgment Inequitable*

The State separately argues (Br. 40-46) that it is entitled to relief from the Consent Judgment under Rule 60(b)(5) because applying it prospectively is no longer equitable.  See Fed. R. Civ. P. 60(b)(5).  A court has discretion to modify a judgment when "significant changes in factual conditions make a consent judgment unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest."  *Cooper*, 33 F.3d at 544 (citing *Rufo* v. *Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992) (*Rufo I*)).  Changed factual circumstances alone, however, are not "sufficient grounds for relief from a

judgment." *Ibid.* Rather, the moving party must have made "a reasonable effort to comply with the decree." *Rufo I*, 502 U.S. at 385.

1. The State has not met its burden to establish a significant change in factual conditions warranting termination of the Consent Judgment. On appeal, the State points (Br. 45) to three factual changes that it argues warrant dissolution: "[t]hirty years of compliance with the [C]onsent [J]udgment"; "widespread malapportionment"; and "Louisiana officials' concern for correcting malapportionment." To meet its burden under *Rufo*, the State must show (1) "that those changes affect compliance with, or the workability or enforcement of, the final judgment," and (2) "that those changes occurred despite the [State's] reasonable efforts to comply with the judgment." *Cooper*, 33 F.3d at 544. The State has shown neither.

First, as previously discussed, see pp. 20-23, *supra*, the "mere passage of time" does not provide a basis for relief. See *BCTC*, 64 F.3d at 889. This is especially so where the district court found that the State lacks a proven track record regarding its commitment to achieving the purposes of the Consent Judgment. See pp. 21-23, *supra*.

Second, the unequal population across districts is not a significant change that makes the Consent Judgment unworkable, compliance more onerous, or enforcement detrimental to the public interest. See *Rufo I*, 502 U.S. at 384.

- 33 -

Neither federal nor state law requires equal population in judicial election districts. See *Wells* v. *Edwards*, 347 F. Supp. 453, 454 (M.D. La. 1972) (dismissing the plaintiff's claim despite evidence of "considerable" population deviations among supreme court districts), aff'd, 409 U.S. 1095 (1973).  Indeed, despite regularly having unequal populations, the only time the State has redrawn its supreme court districts in the last 100 years was in 1997, and only then because the Consent Judgment entered in this case required the State to do so.  See ROA.1954-1955. Accordingly, the court has not had an opportunity to see how the State would redistrict outside of the Consent Judgment.

Third, even if the State's desire to require population equality is a significant change in factual conditions, the State has not shown that this change affects its ability to comply with the Consent Judgment.  The Consent Judgment does not preclude the State from addressing population differences nor does it allow the parties to "guide the redistricting pen."  See Br. 42.  Quite the opposite, the Consent Judgment explicitly allows the State legislature to redraw its supreme court districts; it simply requires that the State not dilute the voting strength of Black voters in Orleans Parish.  See ROA.1551-1557 (adopting Act 776 as an addendum to the Consent Judgment).  See also ROA.1957 (recognizing that "the State is free to reapportion the remaining six supreme court districts on its own, and to propose a modification of District Seven's boundaries"); *Allen*, 14 F.4th at

373 (rejecting the argument that the Consent Judgment froze the seven supreme

court districts as they were redrawn by Act 776).

In any event, it was not an abuse of discretion for the district court here to

deny the State relief from the Consent Judgment based on the State's alleged

concern over population inequality among judicial districts.  The State did not

present the court with any evidence that showed either that any proposed plan

would comply with the State's obligation under the Consent Judgment to guard

against impermissible vote dilution in Orleans Parish or that a change in

circumstances (*i.e.*, demographic changes) makes that obligation unworkable.

Numerous district courts have reasonably sought such evidence in similar

circumstances.  For example, in *National Ass'n for the Advancement of Colored*

*People* v. *City of Thomasville*, the defendants moved for relief from an agreed-

upon remedy *after* the city adopted a new method of election for the city council.

401 F. Supp. 2d 489, 492-493 (M.D.N.C. 2005).  The defendants put forth an

extensive factual record, including voter registration data, election return results,

demographic data, and an expert analysis of racially polarized voting.  See *id.* at

493-495.  The court concluded that the proposed method of election likely would

not dilute minority voting strength and granted the motion to terminate the consent

judgment.  *Id.* at 503-504.  See also *Smith* v. *Hosemann*, No. 3:01-CV-855, 2022

WL 2168960, at *1-4 (S.D. Miss. May 23, 2022) (moving to vacate a court-

ordered redistricting plan *after* the State passed a new congressional redistricting statute on the basis that the plan satisfied all federal constitutional and statutory requirements).  Once the State presents similar proof in this case, or evidence of a significant change in factual circumstances, modification may be warranted.  But, "[a]s it now stands," the State has not met its burden.  See ROA.1952-1953.

2.  The State's argument (Br. 45) that generalized "federalism concerns" make "dissolution of the [C]onsent [J]udgment  *  *  *  in the public interest" does not require a different result.  The Seventh Circuit recently upheld a district court's interpretation of a consent decree in a similar case, finding that it did not violate federalism principles for plaintiffs and the court to have a role in redistricting.  See *McCoy* v. *Chicago Heights Election Comm'n*, 880 F.3d 411, 414-415 (7th Cir. 2018).  There, a class of Black plaintiffs filed suit in 1987, alleging dilution of their voting opportunity in violation of Section 2 of the VRA.  In 2010, the court entered a new consent decree, which established a seven-ward map and contained a provision requiring the City to reapportion the wards as the population changed. *Id.* at 413.  Following the 2010 Census, the City passed an ordinance approving a redrawn ward map and filed a motion in the district court seeking approval.  *Ibid.* The Seventh Circuit affirmed the district court's interpretation of the consent decree to provide the City the "sole responsibility" to put forth a reapportioned map.  *Id.* at 415.  The Court recognized, however, that consistent with principles of

federalism, the plaintiffs nevertheless still had "a role in the process":  they could "challenge the map and point out its weaknesses to the court."  *Ibid.*

Similarly here, the fact that the Consent Judgment contemplates a comparable role for plaintiffs and the court does not entitle the State to relief.  See *Stone* v. *City & Cnty. of San Francisco*, 968 F.2d 850, 861 n.20 (9th Cir. 1992) (collecting cases holding that "federalism concerns do not prevent a federal court from enforcing a consent decree to which state officials have consented"), cert. denied, 506 U.S. 1081 (1993).  Once "the objects of the decree have been attained," modification or termination may be warranted.  See *Frew I*, 540 U.S. at 442.  Until that time, however, the State must comply with the Consent Judgment. Because the State has not shown, at this point, that continued enforcement would be inequitable, this Court should affirm the district court's separate denial of the State's Rule 60(b)(5) motion on this ground.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order

denying the State's motion to vacate the Consent Judgment.

Respectfully submitted,

DUANE A. EVANS                          KATHLEEN P. WOLFE
  United States Attorney                   Deputy Assistant Attorney General

PETER M. MANSFIELD (#28671)            s/ Yael Bortnick
  Assistant United States Attorney     ERIN H. FLYNN
  Chief, Civil Division                YAEL BORTNICK
  650 Poydras Street, Suite 1600         Attorneys
  New Orleans, Louisiana  70130          U.S. Department of Justice
  (504) 680-3047                         Civil Rights Division
                                         Appellate Section
                                         Ben Franklin Station
                                         P.O. Box 14403
                                         Washington, D.C.  20044-4403
                                         (202) 616-8271

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2022, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS INTERVENOR-APPELLEE with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Yael Bortnick

YAEL BORTNICK

 Attorney

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

(1) This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 8512 words according to the word processing program used to prepare the brief.

(2) This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019, in 14-point Times New Roman font.

s/ Yael Bortnick
YAEL BORTNICK
Attorney

Date:  October 24, 2022