No. 22-30320

# In the United States Court of Appeals for the Fifth Circuit

RONALD CHISOM; MARIE BOOKMAN, ALSO KNOWN AS GOVERNOR; URBAN LEAGUE OF LOUISIANA,

*Plaintiffs - Appellees*

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

*Intervenor Plaintiffs - Appellees*

v.

STATE OF LOUISIANA, EX REL, JEFF LANDRY, ATTORNEY GENERAL,

*Defendant - Appellant*

———————————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
2:86-cv-4075

———————————————

## PETITION FOR REHEARING EN BANC

———————————————

JEFF LANDRY
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: 225-999-6864


*Counsel for Defendant-Appellant*

ELIZABETH MURRILL
Solicitor General

SHAE MCPHEE
Deputy Solicitor General

MORGAN BRUNGARD
Assistant Solicitor General
BrungardM@ag.louisiana.gov

ANGELIQUE DUHON FREEL
CAREY T. JONES
JEFFREY MICHAEL WALE
Assistant Attorneys General

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, movants, as governmental parties, need not furnish a certificate of interested persons.

*/s/ Morgan Brungard*
MORGAN BRUNGARD
*Attorney for Defendant-Appellant*

## INTRODUCTION AND RULE 35(b)(1) STATEMENT

This is an exceptionally important case about federalism. Thirty years ago, the parties settled the case and entered a consent judgment to conserve resources. Disclaiming any liability, the State agreed to create and maintain a majority-Black State Supreme Court district anchored in Orleans Parish.[1] The State has done that for thirty years, and these proceedings have ensured that the Louisiana Supreme Court has had at least one Black Justice since 1992 through at least 2030. Given the State's meticulous—and uncontested—adherence to the consent judgment, the State asked the federal-court system to dissolve the judgment and trust that the State will continue to abide by its obligations under all applicable law.

In a 2-1 decision, a panel of this Court refused the State's request and transgressed Supreme Court and Fifth Circuit precedent on two independent issues.

Most palpably flawed is the majority's decision to transform an already-thirty-year old Voting Rights Act consent judgment into one that

---

[1] In the language of the Louisiana Civil Code, the State's agreement is a "resolutory" obligation that "may be immediately enforced but will come to an end when the uncertain event occurs." La. Civ. Code Ann. art. 1767.

will persist in perpetuity, unless the State conjures up a way to prove a negative—that no future plaintiff will ever be able to convince a federal district judge that Louisiana's current majority-Black Supreme Court voting district runs afoul of Section 2. Federal "consent decrees are 'not intended to operate in perpetuity,'" *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (*Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991)). Instead, federal courts are constitutionally obliged to ensure that authority is "'returned *promptly* to the State and its officials,'" once compliance "has been achieved." *Horne v. Flores*, 557 U.S. 433, 450 (2009). Once that occurs, "continued enforcement of the [federal injunction] is not only unnecessary, but improper." *Id.*

The majority's opinion contravenes these bedrock principles and thereby blesses a *de facto* perpetual injunction with no conceivable end date. As Judge Englehardt properly recognized in dissent, the majority's opinion "will prevent the Consent Judgment from ever being satisfied." *Chisom v. Louisiana ex rel. Landry*, No. 22-30320, 2023 WL 7007306, at *18 (5th Cir. Oct. 25, 2023) (Englehardt, J., dissenting).

Similarly problematic is the majority's decision to ignore circuit precedent regarding the appropriate Rule 60(b)(5) standard. Rule 60(b)(5) allows a court to grant relief from a consent decree if the terms have been satisfied. This Court "consult[s] the contract law of the relevant state" to interpret consent decrees and has held Louisiana contact law is the "relevant" law for this consent judgment. *Allen v. Louisiana*, 14 F.4th 366, 371–72 (5th Cir. 2021); *accord Frew v. Janek* (*Frew I*), 780 F.3d 320, 330 (5th Cir. 2015) (applying Texas law to consent decree); *Frew v. Janek* (*Frew II*), 820 F.3d 715 (5th Cir. 2016) (same).

Flouting *Allen* and *Frew I* and *II*, the majority erroneously grabs onto the inapposite *Dowell* decision, a non-Rule-60(b) case that establishes the standard for dissolving desegregation decrees: (1) "whether the [School] Board had complied in good faith with the desegregation decree since it was entered" and (2) "whether the vestiges of past discrimination had been eliminated to the extent practicable." 498 U.S. at 249–50. Doing so directly conflicts with *Allen* and *Frew I* and *II* and profoundly stacks the deck against a State that has scrupulously complied with the consent decree for over three decades.

Finally, the majority's conclusion that prospective and perpetual adherence to the Voting Rights Act is the consent judgment's "final remedy" cannot be squared with *Allen*'s reasoning on that very question. 14 F.4th at 374. Although *Allen*'s observation is dicta, it is well-reasoned and directly applicable to this four-decade-long litigation. The majority's cursory dismissal of *Allen*, and the whiplash that has resulted from it, also counsel in favor of en banc correction.

At bottom, these grievous errors (individually and collectively) trounce all notions of federalism and separation of powers that vest the people of Louisiana, through their elected representatives, with authority to establish their voting districts. "All government, of right, originates with the people, [and] is founded on their will alone," La. Const. art. I, § 1, which underscores the profound imposition that the consent judgment has had, and will continue to have, on the right of Louisianans to exercise their sovereignty. And all without *any* evidence that the State ever violated its obligations under federal law.

The majority's opinion squarely conflicts with multiple decisions of this Court, including *Guajardo*, *Frew I* and *II*, and *Allen*. Rehearing is therefore necessary to "secure [and] maintain uniformity of the [C]ourt's

decisions," and is further warranted due to the "exceptional importance"

of the issues presented. Fed. R. App. P. 35.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................ii

INTRODUCTION AND RULE 35(b)(1) STATEMENT......................... iii

TABLE OF CONTENTS ..........................................................................viii

TABLE OF AUTHORITIES....................................................................ix

STATEMENT OF THE ISSUES..............................................................1

PROCEEDINGS, DISPOSITION, AND FACTUAL BACKGROUND.....2

ARGUMENT .........................................................................................5

   I.  Requiring Prospective Compliance Transforms the Consent Judgment into a Perpetual Injunction that Contravenes Unbroken Supreme Court and Fifth Circuit Precedent. ..........5

   II. Replacing State Law with *Dowell* to Measure Whether the Consent Judgment Has Been "Satisfied, Released, or Discharged" Conflicts with this Court's Decisions in *Allen* and *Frew*.......................................................................................7

   III. Requiring Prospective Compliance Is an Exceptionally Important Question Because It Defeats all Notions of Federalism and Separation of Powers. ...................................................12

CONCLUSION ......................................................................................15

CERTIFICATE OF SERVICE.................................................................16

CERTIFICATE OF COMPLIANCE........................................................17

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Britt*,
    89 F.3d 194 (4th Cir. 1996).......................................................... 11

*Allen v. Ala. State Bd. of Educ.*,
    164 F.3d 1347 (11th Cir. 1999), *vacated*, 216 F.3d 1263 (11th Cir. 2000)......................................................................................... 11

*Allen v. Louisiana*,
    14 F.4th 366 (5th Cir. 2021) .................................................. passim

*Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018) ................................................................. 8

*Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*,
    498 U.S. 237 (1991)............................................................... passim

*Chapman v. Meier*,
    420 U.S. 1 (1975) ...................................................................... 12

*Chisom v. Edwards*,
    342 F.R.D. 1 (E.D. La. 2022) ....................................................... 4

*Chisom v. Louisiana ex rel. Landry*,
    No. 22-30320, 2023 WL 7007306 (5th Cir. Oct. 25, 2023) ........... passim

*Chisom v. Roemer*,
    501 U.S. 380 (1991)...................................................................... 2

*Dugue v. Levy*,
    114 La. 21, 37 So. 995 (1904)....................................................... 8

*Frew ex. rel. Frew v. Hawkins*,
    540 U.S. 431 (2004)..................................................................... 13

*Frew v. Janek* (*Frew I*),
   780 F.3d 320 (5th Cir. 2015)........................................................ passim

*Frew v. Janek* (*Frew II*),
   820 F.3d 715 (5th Cir. 2016).................................................... v, 7, 13

*Guajardo v. Tex. Dep't of Crim. Just.*,
   363 F.3d 392 (5th Cir. 2004)................................................... iv, vi, 5

*Horne v. Flores*,
   557 U.S. 433 (2009)............................................................ iv, 5, 13, 14

*In re Off. of Chief Just., La. Supreme Ct.*,
   2012-1342 (La.10/16/12), 101 So. 3d 9 ........................................... 3

*Inmates of Suffolk Cnty. Jail v. Rufo*,
   12 F.3d 286 (1st Cir. 1993) ....................................................... 11, 13

*Jeff D. v. Otter*,
   643 F.3d 278 (9th Cir. 2011)........................................................ 11

*Johnson v. Heffron*,
   88 F.3d 404 (6th Cir. 1996)................................................... i, 3, 4, 11

*Lucille Ladies' Ready-To-Wear v. Glens Falls Ins. Co.*,
   168 La. 696 (1929) .................................................................... 8

*McDonald v. Carnahan*;
   109 F.3d 1319 (8th Cir. 1997).......................................................... 11

*Miller v. Johnson*,
   515 U.S. 900 (1995).................................................................. 12

*Moore v. Tangipahoa Par. Sch. Bd.*,
   836 F.3d 503 (5th Cir. 2016).......................................................... 10

*Perschall v. Louisiana*,
   96-0322 (La. 7/1/97), 697 So. 2d 240 .............................................. 3

*Syndicate 1036 v. Compass Mins. La., Inc.*,
  83 F.4th 986 (5th Cir. 2023) ............................................................ 8, 9

*Transier v. Barnes Bldg., LLC*,
  14-1256 (La. App. 3 Cir. 6/10/15) 166 So. 3d 1249 ................................ 8

*Wainwright v. Goode*,
  464 U.S. 78 (1983) ............................................................................... 8

*Youngblood v. Dalzell*,
  925 F.2d 954 (6th Cir. 1991) ............................................................... 11

**Statutes**

La. Civ. Code Ann. art. 1767 ............................................................... iii

**Rules**

Fed. R. App. P. 35 ......................................................................... vii, 14

Fed. R. Civ. P. 60(b)(5) ..................................................................... v, 9

**Constitutional Provisions**

La. Const. art. I, § 1 .......................................................................... vi

## STATEMENT OF THE ISSUES

1.  Did the majority err by allowing the thirty-year-old *Chisom* consent judgment to remain in perpetual effect by requiring the State to show prospectice compliance with Section 2 of the Voting Rights Act?

2.  Did the majority contravene this Court's precedent by supplanting the entire body of Louisiana contract law with the non-Rule-60(b) standard for dissolving school desegregation decrees from *Dowell*, 498 U.S. 237 (1991), to measure the State's satisfaction of the consent judgment under Rule 65(b)?

## PROCEEDINGS, DISPOSITION, AND         FACTUAL BACKGROUND

In 1986, Louisiana's Supreme Court District 7 elected two "at-large" justices while the other six districts elected a single justice. *See* ROA.1935. Plaintiffs filed a complaint in the Eastern District of Louisiana, alleging District 7 violated Section 2. The complaint kicked off an extensive legal battle, eventually reaching the Supreme Court. *See Chisom v. Roemer*, 501 U.S. 380 (1991).

On remand, Defendants sought to conserve resources and, in 1992, agreed to a consent judgment resolving Plaintiffs' claims. *See* ROA.97–107. The consent judgment reflected the parties' disagreement about the State's liability, emphasizing that "defendants do not agree" that District 7 violates Section 2. ROA.98. The agreement instead provided only that fulfilling its terms would "ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2." ROA.98. In exchange for Defendants' agreement to undertake eight actions, ROA.99–102 (listing eight items), Plaintiffs agreed to dismiss their claims "with prejudice," ROA.103. The consent judgment also provided that "the Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished." ROA.104.

2

The State upheld its end of the deal. In 1992, the Louisiana legislature created the temporary *Chisom* seat, and Revius O. Ortique, Jr., was elected as the first Black justice to fill that seat. *Perschall v. Louisiana*, 96-0322 (La. 7/1/97), 697 So. 2d 240, 246 & n.9. In 1994, Justice Bernette Johnson was elected to fill the *Chisom* seat. *See* ROA.225.

Years went by. In 2000, Justice Johnson was elected to represent District 7 after the dissolution of the *Chisom* seat. ROA.58. She was re-elected in 2010. ROA.58. She later became the chief justice after more litigation. *See In re Off. of Chief Just., La. Supreme Ct.*, 2012-1342 (La.10/16/12), 101 So. 3d 9, 21–22. She served with distinction in that role until 2020, when she retired after serving for more than twenty-five years. Another Black justice—Piper Griffin—was then elected to the court to represent District 7. Justice Griffin's term runs until 2030.

In 2019, new litigation about the Louisiana Supreme Court sprang up in the Middle District of Louisiana. *See Allen*, 14 F.4th 366. A set of plaintiffs from the Baton Rouge area alleged that Louisiana's demography could support two majority-Black districts. *See id.*

3

On appeal, the *Allen* Court rejected the State's position that the consent judgment vests "the Eastern District with exclusive jurisdiction over [Louisiana Supreme Court elections]." *Id.* at 372–73 (cleaned up). The *Allen* Court also observed a "more fundamental" problem: "Louisiana assumes the three-decades-old *Chisom* decree is still in force, yet fails to explain why." *Id.* (cleaned up). Because "Justice Johnson became Chief Justice and has now retired," the *Allen* Court said that "one might think the decree's final remedy has been implemented. But Louisiana has evidently never asked the Eastern District to vacate the decree." *Id.*

The State took this Court's hint and, in late 2021, moved the Eastern District to dissolve the consent decree. ROA.1148. The district court denied the State's motion. In its view, the consent decree was entered "to ensure compliance with Section 2 of the Voting Rights Act," and the State had not carried its burden of demonstrating compliance "in good faith." *Chisom v. Edwards*, 342 F.R.D. 1, 8, 11 (E.D. La. 2022). Good-faith compliance, according to the district court, would require a guarantee from the State "that there will continue to be a Black opportunity district in Orleans Parish in the future." *Id.* at 12. The district court further held that, because "[t]he State is under no pressing

obligation to reapportion the supreme court districts," continuing to apply the consent judgment indefinitely would remain equitable. *Id*. at 16.

The State appealed, and the panel majority affirmed over Judge Englehardt's dissent. The majority interpreted that "the Consent Judgment's final remedy is the State's prospective compliance with Section 2 of the VRA." *Chisom v. Louisiana ex rel. Landry*, No. 22-30320, 2023 WL 7007306, at *6 (5th Cir. Oct. 25, 2023). The majority also viewed the "goal" to be "to 'ensure' that the Louisiana Supreme Court's election methods comply with the VRA." *Id.*

## ARGUMENT

### I. REQUIRING PROSPECTIVE COMPLIANCE TRANSFORMS THE CONSENT JUDGMENT INTO A PERPETUAL INJUNCTION THAT CONTRAVENES UNBROKEN SUPREME COURT AND FIFTH CIRCUIT PRECEDENT.

Unbroken circuit precedent is unambiguous: "Institutional consent decrees are 'not intended to operate in perpetuity.'" *Guajardo v*, 363 F.3d at 394 (5th Cir. 2004) (quoting *Dowell*, 498 U.S. at 248). This is so because they "bind state and local officials to the policy preferences of their predecessors" and hinder "their designated legislative and executive powers." *Horne*, 557 U.S. at 447 (internal citations omitted). "[O]utdated

consent decrees" in particular hamper the ability of state officials "to respond to the priorities and concerns of their constituents." *Id*. at 449. Indeed, this Court, while interpreting *this very consent decree*, has described as "both wrong and baffling" and "weak sauce" the notion that it "is binding upon [Louisiana] *in perpetuity* unless and until [the Eastern District] says otherwise." *Allen*, 14 F.4th at 373–74 (emphasis in original).

By holding that the consent judgment's "final remedy is the State's prospective compliance with Section 2 of the" Voting Rights Act, *Chisom*, 2023 WL 7007306, at *6, the majority converted the consent decree into one that admits to "no feasible end to judicial control," *id.* at *18 (Englehardt, J., dissenting). The only way in which the State could end the consent decree is to "remedy some undefined future imaginary breach, policed by a federal judge." *Id.* (Englehardt, J., dissenting). But because "these parties will never agree" that the chance of a future Section 2 violation is zero, "this disagreement will prevent the Consent Judgment from ever being satisfied." *Id.* (Englehardt, J., dissenting).

In other words, so long as the State is tasked with proving a prospective negative—*i.e.*, no future Section 2 non-compliance—its

Supreme Court redistricting efforts will never escape from the auspices of federal-court oversight. The majority's opinion has ossified the *Chisom* consent judgment into a perpetual federal check on the State. Doing so runs afoul of binding precedent and justifies en banc review.

## II. REPLACING STATE LAW WITH *DOWELL* TO MEASURE WHETHER THE CONSENT JUDGMENT HAS BEEN "SATISFIED, RELEASED, OR DISCHARGED" CONFLICTS WITH THIS COURT'S DECISIONS IN *ALLEN* AND *FREW*.

This Court applies state law to interpret consent judgments. *See Allen*, 14 F.4th at 371 ("We consult the contract law of the relevant state, here Louisiana."); *Frew I*, 780 F.3d at 330, 328 n.28 (applying "Texas law" and stating "we have previously applied Texas law in cases involving consent decrees"); *Frew II*, 820 F.3d at 724 (applying "principle[s] of Texas contract interpretation" to consent decree).

In direct conflict with *Allen*, *Frew I*,  and *Frew II*, the majority opts to apply federal common law over state law, supplanting the entire body of Louisiana contract law with the standard for dissolving desegregation decrees from *Dowell*. *Chisom*, 2023 WL 7007306, at *8–9. The majority starts off right—"Louisiana contract law recognizes the concept of substantial performance"—but then rejects substantial compliance because it "rarely" applies "outside of the context of construction law." *Id.*

at *8 (citing *Transier v. Barnes Bldg., LLC*, 14-1256 (La. App. 3 Cir. 6/10/15) 166 So. 3d 1249, 1260). With substantial compliance out of the way, the majority applies "*Dowell* to the instant case." *Id.* And just like that, the entire body of Louisiana contract law is out the window.

It is inappropriate for the majority to rely on *Transier*, a lone decision from a Louisiana court of appeal, to reject substantial compliance when the Louisiana Supreme Court has said otherwise. *See Animal Sci. Prod., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) ("If the relevant state law is established by a decision of 'the State's highest court,' that decision is 'binding on the federal courts.'" (quoting *Wainwright v. Goode*, 464 U.S. 78, 84 (1983) (per curiam)). "To determine Louisiana law this Court should first look to final decisions of the Louisiana Supreme Court." *Syndicate 1036 v. Compass Mins. La., Inc.*, 83 F.4th 986, 990 (5th Cir. 2023)

For more than 100 years, the Louisiana Supreme Court has held that "substantial performance of the contract is all that [Louisiana] law requires." *Dugue v. Levy*, 114 La. 21, 23, 37 So. 995, 996 (1904); *accord Lucille Ladies' Ready-To-Wear v. Glens Falls Ins. Co.*, 168 La. 696, 697, 699 (1929) (applying substantial compliance to insurance contract). The

majority's circumvention of those consistent holdings is thus untenable. *See QBE Syndicate*, 83 F.4th at 992 n.3 (disregarding "state appellate court decisions" when "the highest court of the state would decide otherwise").

Even if substantial compliance were not the correct Louisiana contract law (which it is), the majority's duty under *Allen* was to "consult the contract laws" of Louisiana, 14 F.4th at 371, find the correct state law standard for when a contract has been "satisfied, released, or discharged," Fed. R. Civ. P. 60(b)(5), and apply it. Doing otherwise contravenes circuit and Supreme Court precedent.

Despite the clarity of *Allen*'s and *Frew*'s command to apply *state* law, the majority applies *federal* common law desegregation standards from *Dowell*. *Chisom*, 2023 WL 7007306, at *8. The majority recognizes that it breaks new ground by "explicitly" applying *Dowell* "in this context." *Id.*

*Dowell* has nothing to do with Rule 60(b). Neither *Dowell* nor any Supreme Court or Fifth Circuit case applying *Dowell* involves Rule 60(b) because school boards traditionally do not use that rule to dissolve

desegregation decrees.[2] Post-*Dowell*, it appears this Court has reviewed a Rule 60(b) motion in a desegregation case only once, and it was used not to dissolve a desegregation decree but to "seek[] relief from [an] order appointing" a chief desegregation implementation officer. *Moore v. Tangipahoa Par. Sch. Bd.*, 836 F.3d 503, 504 (5th Cir. 2016).

*Dowell's* unique "unitary status" practice has led this Court to doubt *Dowell's* validity outside of that *sui generis* context. "Owing to school desegregation's unique legal history, the consent decree modification standards articulated in *Freeman* and similar cases"—*i.e.*, *Dowell*—"may be of limited applicability" in non-desegregation cases. *Frew I*, 780 F.3d at 330 n.37 (noting this Court has "cited *Freeman* almost exclusively in . . . school desegregation cases"). *Frew I* expressly declined to apply a case as "inapposite" because it "rested on two school

---

[2] *See Dowell*, 498 U.S. at 241 ("Motion to Close Case"); *Freeman v. Pitts*, 503 U.S. 467, 473 (1992) ("motion for final dismissal of the litigation"); *Missouri v. Jenkins*, 515 U.S. 70, 80 (1995) (seeking "partial unitary status"); *Borel ex rel AL v. Sch. Bd. Saint Martin Par.*, 44 F.4th 307, 311 (5th Cir. 2022) (reviewing "denial of [the board's] motion for unitary status"); *Moore v. Tangipahoa Par. Sch. Bd.*, 921 F.3d 545, 546 (5th Cir. 2019) (reviewing "grant [of] 'provisional' unitary status"); *United States v. Fletcher ex rel. Fletcher*, 805 F.3d 596, 598, 601 (5th Cir. 2015) (stating "the [School] District moved for unitary status" and reviewing "order denying unitary status"); *Anderson v. Sch. Bd. of Madison Cnty.*, 517 F.3d 292, 294 (5th Cir. 2008) (reviewing "motion for full unitary status"); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 715–16 (2007) (explaining desegregation decree was dissolved "after finding" of "unitary status").

desegregation cases, which present unique issues in consent decree jurisprudence" and whose "persuasiveness is limited" beyond that context. *Id.* at 329–30.

Insofar as *Dowell* applies, the majority revolutionizes it by adding a *forward*-looking third step—"*Dowell*'s good faith inquiry examines both past compliance and 'future prospects'" and requires "that the original . . . violation will [not] promptly be repeated when the decree is lifted." *Chisom*, 2023 WL 7007306, at *9. None of the cases cited by the majority supports adding that requirement.[3] In sum, by supplanting Louisiana contract law with *Dowell*, the majority's decision contravenes *Allen* and *Frew I* and *II* and should be reviewed en banc.

---

[3] *See Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 288, 290, 292 (1st Cir. 1993) ("[W]e neither adopt nor reject" the standard "that it is unlikely that the original violations will soon be resumed if the decree were discontinued."); *Johnson v. Heffron*, 88 F.3d 404, 406 (6th Cir. 1996) (citing the First Circuit's *Rufo* decision, not *Dowell*, for "future prospects" language); *Youngblood v. Dalzell*, 925 F.2d 954, 956, 960 (6th Cir. 1991) (remanding to consider "similarly" to *Dowell* "whether to terminate its jurisdiction over the case in light of the specific terms of the consent decree"); *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011) (found by *Frew I*, 780 F.3d at 329 to be "inapposite" to non-desegregation cases); *Alexander v. Britt*, 89 F.3d 194, 200 (4th Cir. 1996) (suggesting "*Dowell* standard may well be inapplicable to consent decrees" but declining to "definitively resolve the question" because "even if the *Dowell* standard applied," it was not satisfied); *Allen v. Ala. State Bd. of Educ.*, 164 F.3d 1347, 1350 (11th Cir. 1999), *vacated*, 216 F.3d 1263 (11th Cir. 2000); *McDonald v. Carnahan*; 109 F.3d 1319, 1321 (8th Cir. 1997) (acknowledging First Circuit's requirement in *Rufo* that "violation is unlikely to be repeated" is "dicta" and citing *Dowell* as "consider[ing] *past* compliance" (emphasis added)). To the extent *Dowell* applies here, the full Court should take a close look at making prospective compliance a part of *Dowell* in this circuit.

## III. REQUIRING PROSPECTIVE COMPLIANCE IS AN EXCEPTIONALLY IMPORTANT QUESTION BECAUSE IT DEFEATS ALL NOTIONS OF FEDERALISM AND SEPARATION OF POWERS.

Requiring the State to show prospective compliance when there is no past violation in need of a remedy is an exceptionally flawed answer to an exceptionally important federalism question. Recall what this case involves: the voting-district boundaries of Louisiana's highest judicial tribunal. Scores of cases establish that federalism and separation-of-powers concerns reach their apex when federal courts interfere with these core state political functions. *See, e.g.*, *Miller v. Johnson*, 515 U.S. 900, 915 (1995) ("Federal-court review of districting legislation represents a serious intrusion on the most vital of local functions. It is well settled that 'reapportionment is primarily the duty and responsibility of the State.'" (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)).

Judge Engelhardt, writing in dissent, alone recognizes the stakes. He rightly observes that, although "the people of Louisiana, through their state Constitution, have placed authority in their elected representatives to draw up lawful and compliant Supreme Court election districts, they have been deprived of that governance for over thirty years—again, with

no end in sight." *Chisom*, 2023 WL 7007306, at *20 (Englehardt, J., dissenting). In his view, "[t]o perpetuate this Consent Judgment prospectively, void of any demonstrable VRA violation, is an unwarranted affront to self-governance"; for that reason, "[f]ederalism demands a different result." *Id.*

Judge Engelhardt has it right.[4] Where, as here, a consent judgment emerges from "institutional reform" litigation, "sensitive federalism concerns" are both ubiquitous and critically important. *Horne*, 557 U.S. at 448. This is so because "[s]uch litigation commonly involves areas of core state responsibility." *Id.*[5] For this reason, federal courts must ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Id.* at 450. Indeed, once compliance has been achieved—as it has been here—"continued enforcement of the [consent judgment] is not only unnecessary, but *improper*." *Id.* (emphasis added).

---

[4] So too does Judge Oldham, who in his *Allen* concurrence highlighted "the perniciousness of consent decrees." 14 F.4th at 375 & n.* (Oldham, J., concurring) ("If not limited to reasonable and necessary implementations of federal law, remedies outlined in consent decrees involving state officeholders may improperly deprive future officials of their designated legislative and executive powers." (quoting, *inter alia*, *Frew ex. rel. Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

[5] *Accord Frew*, 540 U.S. at 441; *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 382 (1992); *Frew II*, 820 F.3d at 721.

Recall also the facts of *Horne*: Arizona took the case to trial, was found to be violating federal law, never appealed that finding, and the Supreme Court *still* required a flexible approach focused on returning state control "as soon as a violation of federal law has been remedied." *See id.* at 441, 450–51. Contrast that with the situation here: there is no violation to remedy because the State expressly disclaimed any violation, the court never found one, and Plaintiffs' claims were dismissed with prejudice. Hence there never was a "violation of federal law" to remedy, and any opportunity for finding one expired *decades ago* when Plaintiffs' claims were dismissed with prejudice. *See id.* at 451.

The majority's refusal to abide by *Horne*'s principles represents "nearly unchecked judicial authority over fundamental[] political activity." *Chisom*, 2023 WL 7007306, at *14 (Englehardt, J., dissenting). This, in turn, strikes at the heart of what our notions of representative democracy are supposed to enshrine. For this reason, the questions this petition raises, premised on the majority's many legal errors, ascend to the level of "exceptional importance" and warrant the full Court's attention. Fed. R. App. P. 35(b).

## CONCLUSION

For these reasons, the Court should grant the State's petition to rehear this case en banc.

|  | Very respectfully submitted, |
|---|---|

JEFF LANDRY
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 94005
Baton Rouge, LA 70804
Telephone: 225-999-6864



*Counsel for Defendant-Appellant*

ELIZABETH MURRILL
Solicitor General

SHAE MCPHEE
Deputy Solicitor General

*/s/ Morgan Brungard*
MORGAN BRUNGARD
Assistant Solicitor General
BrungardM@ag.louisiana.gov

ANGELIQUE DUHON FREEL
CAREY T. JONES
JEFFREY MICHAEL WALE
Assistant Attorneys General

**CERTIFICATE OF SERVICE**

I certify that on November 6, 2023, I filed this petition for rehearing en banc with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Morgan Brungard*
MORGAN BRUNGARD
*Attorney for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,744 words, excluding the parts of the brief exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

/s/ Morgan Brungard
MORGAN BRUNGARD
*Attorney for Defendant-Appellant*

November 8, 2023

17

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 25, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30320

_____

RONALD CHISOM; MARIE BOOKMAN, *also known as* GOVERNOR;
URBAN LEAGUE OF LOUISIANA,

*Plaintiffs—Appellees,*

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

*Intervenor Plaintiffs—Appellees,*

*versus*

STATE OF LOUISIANA, *ex rel. Jeff Landry, Attorney General,*

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:86-CV-4075

_____

Before WIENER, STEWART, and ENGELHARDT, *Circuit Judges.*

JACQUES L. WIENER, JR., *Circuit Judge*:

Defendant-Appellant State of Louisiana, ex rel. Jeff Landry ("the State"), seeks to dissolve a consent decree that pertains to the method of selecting justices for the Louisiana Supreme Court. The State attempts to

dissolve the consent judgment under the first and third clauses of Rule 60(b)(5) of the Federal Rules of Civil Procedure. The State contends that the judgment has been satisfied, released, or discharged because the State has substantially complied with the decree for more than thirty years and the decree was intended to terminate at a defined milestone. The State further contends that it is no longer equitable to enforce the consent judgment prospectively because of widespread malapportionment in Louisiana's supreme court election districts. The district court denied the State's motion to dissolve, holding that the State had failed to meet the evidentiary burdens associated with the first and third clauses of Rule 60(b)(5). For the following reasons, we AFFIRM.

## I.    FACTS AND PROCEEDINGS

This case arises from the complex and controversial history concerning Black voter dilution in the state of Louisiana. On September 19, 1986, Ronald Chisom, Marie Bookman, Walter Willard, Marc Morial, Henry Dillon, III, and the Louisiana Voter Registration/Education Crusade filed a class action against the State of Louisiana and various state officials in their official capacities. Those plaintiffs challenged the method of selecting Louisiana Supreme Court justices, alleging that the former First Supreme Court District violated Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301 ("the VRA"), by diluting Black votes in Louisiana.[1] At the time, the

---

[1] *See Allen v. Milligan*, 143 S. Ct. 1487, 1507 (2023) ("Section 2 prohibits States from imposing any standard, practice, or procedure ... in a manner which results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color . . . [w]hat

No. 22-30320

First Supreme Court District was a multi-parish, multi-member district that included Orleans Parish, which had a majority-minority population, as well as three majority-white parishes: Jefferson, St. Bernard, and Plaquemines Parishes.

The plaintiffs' election district challenge spawned six years of litigation which included multiple appeals to the Fifth Circuit and the U.S. Supreme Court. One of the initial questions was whether Section 2 applied to state judicial elections, which the United States Supreme Court answered in the affirmative in its 1991 decision, *Chisom v. Roemer*.[2] Following more contentious litigation regarding Section 2, the parties entered into a consent judgment to resolve their claims ("the Consent Judgment"). The Consent Judgment emphasized that the "defendants do not agree with" the plaintiffs' contention that the multi-member district violated Section 2. Rather, the State explained that it "only enter[ed] into this compromise agreement to resolve [the] extensive and costly litigation."

The Consent Judgment's stated purpose is to "ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act," using a combination of temporary and long-term action items. The Consent Judgment directs the Louisiana Legislature to

---

that means, § 2 goes on to explain, is that the political processes in the State must be equally open, such that minority voters do not "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.") (internal quotations and citations omitted).

[2] 501 U.S. 380, 385 (1991).

reapportion the seven districts of the Louisiana Supreme Court to create one new supreme court district that is majority Black in voting age population and that includes all of Orleans Parish. The Consent Judgment also specifies that the justice for this new district will be elected once a vacancy occurs in the former First Supreme Court District. Additionally, the Consent Judgment establishes a temporary eighth seat on the Louisiana Supreme Court ("the Chisom Seat"), to be occupied by a Louisiana Fourth Circuit Court of Appeal judge until such vacancy occurred.

The Consent Judgment was signed by Judge Charles Schwartz, Jr. of the Eastern District of Louisiana and took effect on the enactment of legislation that codified the Consent Decree's terms on August 21, 1992. That year, the Louisiana Legislature enacted Act 776, which reapportioned Louisiana into seven voting districts and mandated that the Louisiana Supreme Court be comprised of one justice from each of those districts.[3] The new majority Black district—known as District Seven—encompasses most but not all of Orleans Parish. An addendum reflecting this caveat was added to the Consent Judgment in January 2000 by agreement of the parties. The Louisiana Legislature also enacted Act 512, which created the temporary Chisom Seat on the Louisiana Supreme Court.[4] On January 1, 1993, Revius Oliver Ortique, Jr. became the first ever Black justice to serve on the Louisiana Supreme Court, as well as the first justice elected to the Chisom

---

[3] La. Sess. Law Serv. Act 776 (H.B. 581) (1992).

[4] La. Sess. Law Serv. Act 512 (S.B. 1255) (1992).

Seat. The following year, Bernette Johnson was elected to the Chisom Seat, and in 2000, she was elected as the first associate justice from the new District Seven.

In 2012, litigation arose regarding whether Justice Johnson's service in the Chisom Seat could be credited toward chief justice tenure.[5] United States District Judge Susie Morgan, who had recently succeeded Judge Schwartz in supervising the Consent Judgment, ruled that the language of the Consent Judgment contemplated that Justice Johnson's Chisom Seat service would count toward chief justice tenure.[6] Judge Morgan also addressed whether the federal court had continuing jurisdiction over the Consent Judgment.[7] She ruled in the affirmative, explaining that the Consent Judgment in this case "provide[s] the Court with a sufficient jurisdictional basis to resolve the dispute pending before it."[8] She further held that the federal court retained jurisdiction until the "final remedy [of the of the Consent Judgment] is implemented."[9] Justice Johnson became the Louisiana Supreme Court's first Black chief justice on February 1, 2013, and served with distinction in that role until December 2020.[10] Following Chief Justice Johnson's retirement, Piper D. Griffin, who is also a Black woman, was

---

[5] *Chisom v. Jindal*, 890 F. Supp. 2d 696 (E.D. La. 2012).

[6] *Id.* at 711-18.

[7] *Id.* at 711.

[8] *Id.*

[9] *Id.*

[10] *Id.*

elected by the voters of District Seven to serve a ten-year term as an associate justice.

In 2019, a different group of plaintiffs filed suit in the Middle District of Louisiana with the goal of creating a second majority-minority supreme court district.[11] The Middle District of Louisiana certified an interlocutory appeal to this circuit to decide whether the Eastern District of Louisiana has exclusive subject matter jurisdiction over all matters contemplated by the Consent Decree.[12] In *Anthony Allen, et al. v. State of Louisiana, et al.*, this court held that the Eastern District did not enjoy exclusive jurisdiction over election-districting matters contemplated by the Consent Decree.[13] We explained that the Consent Judgment "aimed to remedy alleged vote dilution in one supreme court district, not to reform the whole system."[14] In dicta, this court stated that it was unsure that the Consent Judgment was still in force because its final remedy might have been implemented when Johnson became Chief Justice of the Louisiana Supreme Court.[15] We declined to answer that question, however, noting that "Louisiana has evidently never asked the Eastern District to vacate the decree."[16]

---

[11] *Allen v. Louisiana*, 14 F.4th 366, 368 (5th Cir. 2021).

[12] *Id.*

[13] *Id.*

[14] *Id.* at 374.

[15] *Id.*

[16] *Id.*

No. 22-30320

## II.   PROCEEDINGS BELOW

On December 2, 2021, the State filed a motion to dissolve the Consent Judgment under Federal Rule of Civil Procedure 60(b)(5), asserting that the Consent Judgment had been satisfied, released, or discharged and that applying the Consent Judgment prospectively was no longer equitable. The State alleged that this court's opinion in *Allen* "ma[de] clear that the Consent Decree has accomplished its objectives." The State contended that the Consent Judgment's final remedy was satisfied in 2020 when Justice Johnson retired as Chief Justice of the Louisiana Supreme Court.

The State also asserted that the Consent Judgment had increased malapportionment in the seven supreme court districts and had stymied the Louisiana Legislature's efforts to remedy that issue. It claimed that "the Louisiana Legislature is currently preparing to redraw Louisiana's political districts" and that "[t]he boundaries of the seven Supreme Court districts that resulted from the Consent Decree can no longer be maintained while adhering to traditional redistricting principles." The State also contended that, as a result of the Consent Judgment, "the voting strength of voters in one district is considerably greater than the voting strength of voters in another district in violation of the one man, one vote principle."

In support of its motion, the State attached the following exhibits: this circuit's opinion in *Allen*; the Consent Judgment in its original and amended forms; the Secretary of State election rolls for Justice Ortique, Chief Justice Johnson, and Justice Griffin; a September 2021 presentation entitled

No. 22-30320

"Redistricting in Louisiana;" and a letter from the Department of Justice regarding Act 776.

Plaintiffs-Appellees Ronald Chisom, Marie Bookman, and the Urban League of Louisiana (collectively, "the Chisom Plaintiffs") and Intervenor Plaintiffs-Appellees United States of America and Bernette Johnson, filed oppositions to the motion to dissolve. The Chisom Plaintiffs and Intervenor Plaintiffs-Appellees contended that the motion to dissolve should be denied because the State had not carried its evidentiary burden to show that the fundamental purpose of the Consent Judgment had been satisfied or that changed circumstances warranted dissolution. The Chisom Plaintiffs also took issue with the fact that the State had sought dissolution absent any guarantees that no additional VRA or constitutional violations would occur. Referencing "Louisiana's long history of discrimination in the judicial branch," the Chisom Plaintiffs asserted that the State sought to "wipe this slate clean with the stroke of a pen and without any assurance that a new, undisclosed map will not snatch away Black Louisianans['] hard-won opportunity to participate in these elections equally."

On May 24, 2022, the district court issued an order and reasons denying the State's motion to dissolve the Consent Judgment.[17] The district court evaluated the State's motion under the first and third clauses of Rule 60(b)(5) and held that the State had failed to meet its burden of proof under both theories. For the first clause, which states that a Consent Judgment may

---

[17] *Chisom v. Edwards*, 342 F.R.D. 1, 6 (E.D. La. 2022).

be dissolved when "the judgment has been satisfied, released, or discharged," the court looked to the U.S. Supreme Court's opinion in *Board of Education of Oklahoma City Public Schools, Independent School District No. 89 v. Dowell*.[18] That decision established the so-called *Dowell* standard, which asks "whether the [State] had complied in good faith with the . . . decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."[19] The court applied *Dowell* and concluded that the State's motion failed under both prongs. The court emphasized that the Consent Judgment "reiterates its purpose is 'to *ensure* black voters in the Parish of Orleans have an equal opportunity to participate in the political process and to elect candidates of their choice.'"

The district court then evaluated the third clause of Rule 60(b)(5), which states that a consent judgment may be dissolved when "applying it prospectively is no longer equitable."[20] For this clause, the court evaluated whether the State had demonstrated a "significant change in factual conditions" which would warrant termination of the consent judgment. The court looked to *Rufo v. Inmates of Suffolk County Jail*, in which the U.S. Supreme Court devised a two-part test to evaluate whether applying a consent decree prospectively is equitable.[21] Applying *Rufo*, the district court

---

[18] 498 U.S. 237, 250 (1991).

[19] *Id.*

[20] Fed. R. Civ. P. 60(b)(5).

[21] 502 U.S. 367, 391–92 (1992).

observed that the "severe malapportionment" identified by the State did not constitute a "significant change" under step one of *Rufo*. The court explained that malapportionment throughout Louisiana's supreme court districts is not a new problem and that "District Seven in particular has become less malapportioned, shifting from approximately 32.3% underpopulation after the 2010 census to approximately 28.4% underpopulation today." The court further noted that the State had not shown that continued enforcement of the Consent Judgment would be detrimental to the public interest. The court observed that the Supreme Court had held that juridical districts are not representative districts and therefore do not need to be equally apportioned, and it concluded that the Consent Judgment does not prevent the Louisiana legislature from reapportioning Louisiana's supreme court districts. The State timely appealed.

### III.   STANDARD OF REVIEW

We review a district court's denial of a motion to vacate or modify a judgment under Rule 60(b)(5) for abuse of discretion.[22] In this circuit, "the district court's ruling is 'entitled to deference,' but we review *de novo* 'any questions of law underlying the district court's decision.'"[23] We review any factual findings for clear error.[24] When reviewing the denial of a Rule 60(b)

---

[22] *Anderson v. City of New Orleans*, 38 F.4th 472, 479 (5th Cir. 2022).

[23] *Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015) (internal citation omitted).

[24] *Walker v. U.S. Dep't of Hous. & Urb. Dev.*, 912 F.2d 819, 825 (5th Cir. 1990); *see also Frew v. Janek*, 820 F.3d 715, 723 (5th Cir. 2016).

motion, "[i]t is not enough that the granting of relief might have been permissible, or even warranted—denial must have been so *unwarranted* as to constitute an abuse of discretion."[25] Moreover, "[t]he burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely."[26]

## IV.   ANALYSIS

The State contends that the district court abused its discretion in denying the motion to dissolve the Consent Judgment under the first and third clauses of Rule 60(b)(5) because (1) the State has substantially complied with the Consent Judgment for decades and the Consent Judgment's action items have been implemented, and (2) applying the Consent Judgment prospectively is inequitable because it has caused widespread malapportionment and constrained the Louisiana legislature. The State requests that we reverse the district court's judgment regarding the State's motion to dissolve and that we then completely dissolve the Consent Judgment.

Because the first and third clauses of Rule 60(b)(5) command different evidentiary burdens, we examine each separately to determine whether the

---

[25] *Cooper v. Noble*, 33 F.3d 540, 544 (5th Cir. 1994), *supplemented by Cooper v. Noble*, 41 F.3d 212 (5th Cir. 1994) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. Unit A Jan. 1981)).

[26] *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011) (citing *Rufo*, 502 U.S. at 384; *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 249 (1968)).

No. 22-30320

district court abused its discretion in denying the State's motion to dissolve. We begin first with a clarification of the Consent Judgment's "final remedy" under Louisiana's contract law, which the parties have hotly disputed throughout this matter and which is relevant to our jurisdiction as well as our Rule 60(b)(5) analysis. We next turn to the appropriate evidentiary burden under Rule 60(b)(5)'s first clause and whether the State met it through its motion to dissolve. Finally, we identify the appropriate evidentiary burden under Rule 60(b)(5)'s third clause and determine whether it was met by the State.

## A. *Whether the State met the requisite evidentiary burden under Rule 60(b)(5)'s first clause*

### i. **The Consent Judgment's final remedy**

"Consent judgments have elements of both contracts and judicial decrees."[27] Because of their hybrid nature, consent decrees are construed according to "general principles of contract interpretation."[28] Moreover, "[t]he primary concern of a court in construing a written contract is to ascertain the true intentions of the parties as expressed in the instrument."[29] Courts must therefore examine the "unambiguous language in a contract" and enforce "'the objective intent' evidenced by the language used."[30] This

---

[27] *Frew ex rel Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Firefighters v. Cleveland,* 478 U.S. 501, 519 (1986)).

[28] *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006).

[29] *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006).

[30] *Id.* at 407 (internal citation omitted).

analysis must include consideration of *all* the contractual terms because "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."[31]

Under Louisiana law, until the specified goal or "final remedy" of a consent decree has been achieved, the court overseeing the decree retains subject matter jurisdiction to interpret and enforce it.[32] The court overseeing a consent decree is the ultimate tribunal for determining compliance and deciding whether the decree should be dissolved or vacated.[33] However, a contract that resolves a lawsuit "extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication."[34]

Here, the district court applied Louisiana contract law when it analyzed the final remedy of the Consent Judgment and concluded that it

---

[31] *Id.* at 408.

[32] *La. State Conf. of the NAACP v. Louisiana*, 490 F. Supp. 3d 982, 1019–22 (M.D. La. 2000); *see also Nehmer v. U.S. Dep't of Veterans Affairs*, 494 F.3d 846, 856 (9th Cir. 2007).

[33] *La. State Conf. of the NAACP*, 490 F. Supp. at 1000 (citing *Dowell*, 498 U.S. at 247-50).

[34] *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100, p. 15 (La. 3/2/05); 894 So. 2d 1096, 1107 (citing La. Civ. Code art. 3073; *Ortego v. State, Dep't of Transp. & Dev.*, 96-1322, p. 7 (La. 2/25/97); 689 So. 2d 1358, 1363; *Brown v. Drillers, Inc.*, 93-1019, p.7 (La. 1/14/94); 630 So. 2d 741, 748; *see also* La. Civ. Code art. 3076 ("A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express.").

retained subject matter jurisdiction. The district court acknowledged that the Consent Judgment "implements specific remedies" but held that its final remedy had not yet been implemented. The court determined that the Consent Judgment is prospective in nature because it "repeatedly states its purpose is to ensure compliance with Section 2 of the VRA." The district court held that the State had not shown that it was well-positioned to ensure future compliance with the Section 2 of the VRA and thus denied its motion to dissolve.

The parties in this matter dispute the Consent Judgment's final remedy under Louisiana contract law. Relying on this circuit's dicta in *Allen*,[35] the State contends that the final remedy of the Consent Judgment was implemented when Chief Justice Johnson's tenure ended in 2020. The State asserts that enforcing the Consent Judgment beyond that event is inappropriate because there are no action items left for the State to fulfill. Intervenor Plaintiffs-Appellees, on the other hand, agree with the district court's assessment that the Consent Judgment is prospective in nature. They point out that the Consent Judgment "clearly contemplates future compliance as applied to Black voters in Orleans Parish."

There are several key clauses in the Consent Judgment that assist in identifying its final remedy. At its beginning, the Consent Judgment states that "[t]he relief contained in this consent judgment will ensure that the

---

[35] 14 F.4th at 374 ("In light of those developments, one might think the decree's final remedy has been implemented. But Louisiana has evidently never asked the Eastern District to vacate the decree.").

system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act." The Consent Judgment next details specific action items associated with this objective, including the establishment of the Chisom Seat, the enactment of Acts 776 and 512, and the creation of a new judicial district. In the language ordering the creation of District Seven, the Consent Judgment states that "[t]he reapportionment shall be effective on January 1, 2000, and future Supreme Court elections after the effective date shall take place in the newly reapportioned districts." The Consent Judgment concludes by stating, "[t]he Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished."

The district court correctly determined that the Consent Judgment's final remedy is the State's prospective compliance with Section 2 of the VRA. This circuit recently recognized that the Consent Judgment is an "institutional reform injunction" that contemplates future compliance.[36] When a consent decree contemplates future compliance, "the prospective provisions of the consent decree operate as an injunction."[37] As noted above, however, the Consent Judgment repeatedly states that its goal is to "ensure" that the Louisiana Supreme Court's election methods comply with the VRA. Each action item in the Consent Judgment is *in furtherance of* the ultimate

_____

[36] *Allen*, 14 F.4th at 373.

[37] *La. State Conf. of the NAACP*, 490 F. Supp. 3d at 999; *see also Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) (citing *Plummer v. Chemical Bank*, 668 F.2d 654, 659 (2d Cir. 1982); *Carson v. Am. Brands*, 450 U.S. 79, 84 n.9 (1981)).

remedy of ensuring compliance with the VRA. It is true that some of these action items have already been fulfilled. Whether the Consent Judgment's final remedy has been satisfied by the State is a separate question that is addressed in turn.

We analyze whether the final remedy was implemented, mindful of the Consent Judgment's proper scope. Our precedent instructs us to avoid overreading consent decrees and adding "new requirement[s] to which the parties never agreed."[38] Moreover, "federalism is protected, not by overextending such injunctions, but by confining them to their proper scope."[39] In *Allen*, we clarified the scope of the Consent Judgment, holding that the Consent Judgment "aim[s] to remedy alleged vote dilution in one supreme court district, not to reform the whole system."[40] We therefore confine our analysis to the State's prospective compliance with Section 2 of the VRA through District Seven specifically.

### ii.    Determining the correct evidentiary burden

The parties disagree about the appropriate evidentiary burden for determining whether "the judgment has been satisfied, released, or discharged" under the first clause of Rule 60(b)(5).[41] The State advocates for a lenient "substantial compliance" standard, while the Chisom Plaintiffs and

---

[38] *Janek*, 780 F.3d at 328–29.

[39] *Allen*, 14 F.4th at 373 (quoting *Horne*, 557 U.S. at 448).

[40] *Id.* at 374.

[41] Fed. R. Civ. P. 60(b)(5).

No. 22-30320

Intervenor-Appellees advocate for the more demanding *Dowell* standard, which asks "whether the [State] had complied in good faith with the . . . decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."[42]

The district court applied the *Dowell* standard to determine whether dissolution of the Consent Judgment under Rule 60(b)(5)'s first clause is warranted. The court acknowledged that Louisiana contract law governs the Consent Judgment but noted that, because of its nature as an institutional reform decree, the Consent Judgment requires a "flexible standard" to determine whether dissolution is appropriate. In support, the court referenced *League of United Latin American Citizens, District 19 v. City of Boerne*, in which this circuit held that "[d]istrict courts must take a flexible approach to motions to modify consent decrees and to motions to modify or vacate institutional reform decrees."[43] The district court noted that, although *City of Boerne* interpreted Rule 60(b)(5)'s third clause rather than its first, the opinion references a passage in *Rufo* which discusses and approves of the *Dowell* standard.[44] The district court also noted that in *Frew v. Janek*, this circuit held that "motions under the first clause of Rule

---

[42] 498 U.S. at 250.

[43] 659 F.3d 421, 437–40 (5th Cir. 2011).

[44] *See* 502 U.S. at 380.

17

No. 22-30320

60(b)(5) are subject to the same flexible theme articulated by the Supreme Court in the context of the third clause."[45]

The district court further explained that, even though the Fifth Circuit has not directly addressed the applicability of *Dowell* to consent decrees outside the context of desegregation, it could draw on guidance from other circuits. The district court provided a survey of cases from the Sixth, Ninth, Eleventh, Fourth, Eighth, and First circuits in which *Dowell* was applied or cited in reference to motions to dissolve institutional reform decrees under Rule 60(b)(5), particularly in its first clause.[46] The court concluded that there is enough support from those other circuits to reliably apply *Dowell* to the present motion to dissolve. The court also noted that, in multiple cases, the Fifth Circuit had indirectly approved of *Dowell* by endorsing the "flexible approach" to resolving motions under Rule 60(b)(5).

The district court ultimately held that dissolution of the Consent Judgment under Rule 60(b)(5)'s first clause was inappropriate because the State had not met either of *Dowell*'s requirements. With regard to good faith, the court held that "although the State has complied with the terms of the Consent Judgment" by implementing various action items, it "has not shown

---

[45] *See* 780 F.3d 320 at 327.

[46] *See, e.g.*, *Johnson v. Heffron*, 88 F.3d 404, 405 n.1 (6th Cir. 1996); *Youngblood v. Dalzell*, 925 F.2d 954, 960–62 (6th Cir. 1991); *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011); *Alexander v. Britt*, 89 F.3d 194, 199–203 (4th Cir. 1996); *Allen v. Ala. State Bd. of Educ.*, 164 F.3d 1347, 1350–54 (11th Cir. 1999), *vacated*, 216 F.3d 1263 (11th Cir. 2000); *McDonald v. Carnahan*, 109 F.3d 1319, 1321–22 (8th Cir. 1997); *Inmates of Suffolk Cnty. Jail v. Rufo* (*Rufo II*), 12 F.3d 286, 288, 290, 292-94 n.3 (1st Cir. 1993).

that there is little or no likelihood the original violation will not be repeated when the Consent Judgment is lifted." The court stressed that "the good faith inquiry looks to both past compliance and future prospects."[47] The court further held that the State had not demonstrated that the vestiges of past discrimination had been nearly eliminated because it had not shown that "the purpose of the consent order has been fulfilled."

The State takes issue with the district court's application of the *Dowell* standard and contends that doing so constituted reversible error. It asserts that *Dowell* is wholly inapplicable to this case because the case (1) did not involve a motion under Rule 60(b)(5), and (2) arose in the context of school desegregation. The State contends that the district court should have instead applied the "substantial compliance" standard under Louisiana contract law. Substantial compliance does not require perfect compliance, says the State, because that standard "'excuses deviations from a contract's provisions that do not severely impair the contractual provision's purpose.'"[48] Referencing *Janek*, the State claims that this circuit "recently clarified" that a defendant "can obtain relief under prong 1 by demonstrating 'substantial compliance' with" a consent judgment.[49] The State asserts that, because the purpose of

---

[47] *See Johnson*, <u>88 F.3d at 405</u> n.1.

[48] *Janek*, <u>820 F.3d at 721</u> (quoting *Janek*, <u>780 F.3d at 330</u>).

[49] *Id.* The State also references a recent unpublished case from this circuit in support: *Frew v. Young*, No. 21-40028, <u>2022 WL 135126</u>, at *3 (5th Cir. Jan. 13, 2022). In that case, we applied the substantial compliance standard to relief sought under Rule 60(b)(5)'s first prong. However, that case involved a Texas consent decree and substantial

No. 22-30320

the Consent Judgment was fulfilled over the past thirty years, it has "substantially complied" with the terms of the agreement. Citing *Horne*, the State concludes that "continued enforcement of the order is not only unnecessary, but improper" because the objective of the Consent Judgment has been achieved.

"It is well-settled that a federal court has the inherent authority to enforce its own orders, including consent decrees agreed to by parties and approved by the Court."[50] "Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced."[51] In *Hawkins*, the U.S. Supreme Court held that the party seeking dissolution of a consent decree must "establish[] reason to modify the decree," and "where it has not done so . . . the decree should be enforced according to its terms."[52] The Court has also observed that a district court's experience with a consent decree and the passage of time puts that court in a unique position to observe compliance.[53]

---

compliance under Texas—not Louisiana—law. Moreover, it is not binding authority for this case.

[50] *La. State Conf. of the NAACP*, 490 F. Supp. at 999, *aff'd sub nom. Allen*, 14 F.4th at 366; *see also United States v. Alcoa, Inc.*, 533 F.3d 278, 287 (5th Cir. 2008).

[51] *Hawkins*, 540 U.S. at 442.

[52] *Id.*

[53] *Dowell*, 490 U.S. at 249.

Because Rule 60(b)(5)'s first clause is rarely invoked in the context of consent decree dissolution, our jurisprudence is lacking.[54] The first clause of Rule 60(b)(5) is "almost never applied to consent decrees" and is typically reserved for disputes involving the amount of a judgment.[55] "The vast majority of motions for modification and termination of consent decrees, especially those involving institutional reform, invoke Rule 60(b)(5)'s third clause."[56] Although we have implicitly approved of *Dowell* and its applicability to motions to dissolve consent decrees, we have never explicitly applied it in this context. For example, in *City of Boerne* and in *Janek*, we endorsed a more "flexible standard [such as in *Dowell*]" for evaluating motions to modify or dissolve under the first clause of Rule 60(b)(5).[57] Moreover, in *Allen*, we discussed the applicability of *Dowell*'s holdings to consent decree disputes generally.[58]

Furthermore, as the district court noted, at least six other circuits have applied the *Dowell* standard to motions to dissolve consent decrees under Rule 60(b)(5).[59] The Sixth and Ninth Circuits have applied *Dowell* to Rule

---

[54] *Janek*, 780 F.3d at 327.

[55] *Id.*

[56] *Id.*

[57] *City of Boerne*, 659 F.3d at 43740; *Janek*, 780 F.3d at 323, 327.

[58] 14 F.4th at 373.

[59] *See Johnson*, 88 F.3d at 405 n.1; *Youngblood*, 925 F.2d at 960–62; *Jeff D.*, 643 F.3d at 283; *Alexander*, 89 F.3d at 199–203; *Allen*, 164 F.3d at 1350–54; *McDonald*, 109 F.3d at 1321–22 ; *Rufo II*, 12 F.3d at 288, 290, 292–94 n.3.

60(b)(5)'s first clause specifically.[60] Additionally, in *N.L.R.B. v. Harris Teeter Supermarkets*, the D.C. Circuit assessed a motion to dissolve under Rule 60(b)(5)'s first clause, indicating its approval of *Dowell*.[61] That circuit court held that "*Dowell* and *Rufo* must be read together" and that "while . . . good faith compliance certainly matters, extended compliance alone does not compel the modification of a consent decree."[62] Applying *Dowell* to the instant case comports with the same "flexible standard" endorsed by the U.S. Supreme Court in *Horne v. Flores*, in which it indicated that the *Rufo* and *Dowell* standards, while employing different factors, are of the "same theme" and allow district courts flexibility in the administration of institutional reform consent decrees.[63]

The State's reliance on *Janek* for the application of the substantial compliance standard is misplaced. First, *Janek* interpreted a consent decree that was governed by Texas contract law—not by Louisiana law.[64] Louisiana contract law recognizes the concept of substantial performance under Article 2014 of the Louisiana Civil Code, but it is rarely used outside of the context

---

[60] *See, e.g., Johnson*, 88 F.3d at 404, 405 n.1; *Jeff D.*, 643 F.3d at 283.

[61] 215 F.3d 32, 36 (D.C. Cir. 2000).

[62] *Id.*

[63] *Rufo*, 502 U.S. at 380; *see also Alexander*, 89 F.3d at 199–203; *Johnson*, 348 F.3d at 1342-44.

[64] *Janek*, 780 F.3d at 330.

of construction law.[65] The State has not cited any cases applying Article 2014 to a motion to dissolve a consent decree. Lastly, if the substantial compliance standard were applied in this case, it would produce absurd results in the context of the Consent Judgment, which includes action items such as the implementation of legislation and the creation of a Black opportunity voting district.

Second, the consent decree in *Janek* was not an institutional reform decree; it only aimed to improve Texas's one-time implementation of a Medicaid program.[66] That is quite different from the Consent Judgment, which aims to ensure prospective compliance with the VRA and the U.S. Constitution.[67] This classification matters. The Supreme Court has held that institutional reform decrees are treated differently than ordinary consent decrees "because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'"[68] As a result, "[d]istrict courts must take a flexible approach to . . . institutional reform decrees" because "[f]lexibility is 'often essential to achieving the goals of reform litigation.'"[69]

---

[65] *See Transier v. Barnes Bldg., LLC*, 14-1256 (La. App. 3 Cir. 6/10/15); 166 So. 3d 1249, 1260 (citing La. Civ. Code art. 2769 (2022)).

[66] 780 F.3d at 330.

[67] *Id.* at 323.

[68] *Rufo*, 502 U.S. at 381 (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

[69] *City of Boerne*, 659 F.3d at 437 (quoting *Rufo*, 502 U.S. at 381).

No. 22-30320

### iii.     Applying *Dowell* to this dispute

The State has not fulfilled *Dowell*'s good faith compliance prong. As discussed above, the final remedy contemplated by the Consent Judgment is prospective compliance with Section 2 of the VRA. The State correctly asserts that it has complied with the Consent Judgment for the past thirty years, but *Dowell*'s good faith inquiry examines both past compliance *and* "future prospects."[70] Although a history of compliance is evidence of good faith,[71] the court must also be satisfied that "there is relatively little or no likelihood that the original . . . violation will promptly be repeated when the decree is lifted."[72]

Here, the State provided no evidence, plans, or assurances of compliance with Section 2 of the VRA in the event that the Consent Judgment is terminated. The State's evidence focuses only on *past* compliance with the Consent Judgment. During oral argument on the motion to dissolve, the district court indicated an openness to amending the Consent Judgment to include a new redistricting plan that addresses compliance and assuages the State's concerns. The court noted that examples of future compliance may include a roadmap that demonstrates continued compliance

---

[70] *See Johnson*, <u>88 F.3d at 405</u> n.1 (emphasis added).

[71] *Anderson v. Sch. Bd. of Madison Cnty.*, <u>517 F.3d 292, 297</u> (5th Cir. 2008) (applying *Dowell* to a motion for declaratory judgment in a case involving a desegregation-related consent decree); *see also Harris Teeter*, <u>215 F.3d at 36</u> (holding that "compliance over an extended period of time is not in and of itself sufficient to warrant relief").

[72] *Rufo II*, <u>12 F.3d at 292</u> (citing *Dowell*, <u>498 U.S. at 247</u>).

or a redistricting plan. The State responded that it had not presented such a plan because "[t]o do something more in the Consent Decree would require a new agreement," notwithstanding the fact that the Consent Decree requires "future Supreme Court elections" to "take place in the newly reapportioned districts."

The State's position is thus the antithesis of *Dowell*'s requirement that it show "relatively little or no likelihood" of repeat violations once the Consent Judgment is terminated.[73] The State has refused to provide evidence, plans, or assurances of future compliance, instead maintaining that *Dowell* is inapplicable. The State merely contends that there is no danger of future VRA violations because the Louisiana legislature's recent bills[74] for Louisiana Supreme Court redistricting have all preserved District Seven. The State even conceded that, in the event the Consent Judgment is dissolved and the districts were redrawn in a manner that violates the VRA, a "suit would be filed. Facts would have to be alleged, and the case would go forward and be tried." Accordingly, the State has not met the good faith compliance prong under *Dowell*, and the inquiry would typically end there.

Even if it had met *Dowell*'s first prong, the State still fails to meet the second prong, which asks "whether the vestiges of past discrimination had been eliminated to the extent practicable."[75] This inquiry ultimately

---

[73] *Id.*

[74] These bills were not introduced into evidence but were instead only mentioned at oral argument on the motion to dissolve.

[75] *Id.*

No. 22-30320

examines whether "the purpose of the consent order has been fulfilled."[76] In the context of this case, *Dowell* required the State and the district court to consider the existence (or absence) of voter dilution in Louisiana.[77]

On appeal, the State maintains that *Dowell* is inapplicable to this case and therefore does not address whether the vestiges of past discrimination have been eliminated to the extent practicable. The State instead contends that the election of three Black justices from District Seven shows that the Black voter dilution is no longer a problem.[78] This is insufficient under *Dowell*. While the election of a member of the minority group is one factor to consider,[79] this alone does not demonstrate that the vestiges of past discrimination have been eliminated to the extent practicable. In *City of Boerne*, we similarly held that "information regarding one candidate, who won as many competitive elections as she lost," was inadequate to show the "consent decree had failed to achieve its intended purpose" such that modification of the decree was warranted to better remedy vote dilution.[80]

---

[76] *Alexander*, 89 F.3d at 202; *see also McDonald*, 109 F.3d at 1321-22 (examining the "goals and terms" of the consent decree); *Johnson*, 88 F.3d at 406 (examining the "goal" of the consent decree).

[77] *See Sensley v. Albritton*, 385 F.3d 541, 595 (5th Cir. 2004); *Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).

[78] In support, the State produced the Secretary of State election rolls for Justices Ortique, Johnson, and Griffin.

[79] *See City of Boerne*, 659 F.3d, 659 F.3d at 439 (quoting 52 U.S.C. § 10301) ("[t]he extent to which members of a protected class have been elected to office" may be considered when examining impermissible vote dilution under the VRA).

[80] *Id.*

Here, too, the record cannot support a determination that the vestiges of past discrimination have been eliminated to the extent practicable, of which the election of Black justices is insufficient evidence.

In summary, the State has not shown that the Consent Judgment has been "satisfied, released, or discharged" under the first clause of Rule 60(b)(5). Therefore, the district court did not abuse its discretion in denying the State relief.

### B. *Whether the State met the requisite evidentiary burden under Rule 60(b)(5)'s third clause*

The State's secondary argument on appeal is that it has met the requirements of Rule 60(b)(5)'s third clause, which permits dissolution when the prospective application of a consent decree ceases to be equitable. The State acknowledges that the U.S. Supreme Court's two-part test in *Rufo* applies and alleges that it was satisfied here because (1) significant changes in factual or legal circumstances have occurred, and (2) continued enforcement of the Consent Judgment is detrimental to the public interest. The State asserts that "[t]hirty years of compliance with the consent judgment, widespread malapportionment, and Louisiana officials' concern for correcting malapportionment are each significant changes in fact or law that warrant dissolution under the third prong of Rule 60(b)(5)." The State contends that the Seventh District has shrunk significantly because of population shifts, giving Seventh District members extra voting power compared to members of the other six districts. Relying on *Horne*, the State

alleges that it has experienced "new policy insights" regarding malapportionment that require reexamination of the original judgment.[81]

The State also asserts that the Consent Judgment's alleged stranglehold over the Louisiana legislature is detrimental to the public interest under *Rufo*. It contends that continued enforcement of the Consent Judgment is "offensive to the State's sovereignty, democratic principles of republican government, and 'Our federalism'" because the State must operate in "the confines of a federal consent decree." The State asserts that the Consent Judgment "makes the redistricting process harder than necessary because it requires input from several unauthorized parties." This, according to the State, has effectively hamstrung the Louisiana legislature's efforts to address growing malapportionment in Louisiana's electoral districts.

The district court applied the two-part *Rufo* test in its analysis of Rule 60(b)(5)'s third clause. The district court applied the first prong of *Rufo* to determine whether the State had shown that a significant change in factual conditions or the law had taken place. The court reviewed the statistical analysis of malapportionment presented by the Chisom Plaintiffs and observed that the allegedly "severe malapportionment" identified by the State did not constitute a "significant change in circumstances" under *Rufo*. The court pointed out that malapportionment in Louisiana's supreme court districts had existed long before the current districts were drawn and that no

---

[81] *See* 557 U.S. at 448.

No. 22-30320

significant increase or decrease in malapportionment had occurred since the 2010 census.[82] The court further noted that "District Seven in particular has become less malapportioned, shifting from approximately 32.3% underpopulation after the 2010 census to approximately 28.4% underpopulation today." Thus, the district court concluded that the State had not shown that malapportionment in Louisiana's supreme court election districts constitutes the changed factual or legal conditions necessary to satisfy step one of *Rufo*.

Under *Rufo*, the moving party's failure to satisfy the first prong ends the inquiry.[83] Here, however, out of an abundance of caution, the district court also analyzed the second prong of *Rufo*. The second prong assesses whether the moving party's proposed modification, which in this case is termination, properly addresses the changed factual or legal circumstances. The court held that the State had not satisfied *Rufo* because "termination is far beyond what would be necessary to address malapportionment in the Louisiana Supreme Court districts." The district court observed that nothing in the Consent Judgment prohibits the State from reapportioning six of Louisiana's supreme court districts, and that the State is free to "propose a modification of District Seven's boundaries through amendment of the Consent Judgment, as the parties did in 1999." The court explained that

---

[82] "The Chisom Plaintiffs' analysis of this data shows the districts were malapportioned by approximately 18% after the 2000 census, approximately 54.5% after the 2010 census, and approximately 54.4% after the 2020 census."

[83] 502 U.S. at 391.

"modification rather than termination under the third clause of Rule 60(b)(5) is often a more appropriate remedy to cure hardships caused by changed circumstances."

Here, the district court did not abuse its discretion in holding that dissolution is inappropriate under Rule 60(b)(5)'s third clause. First, the State did not meet the evidentiary burden associated with *Rufo*'s first prong, which requires a showing of changed factual or legal circumstances that warrant reexamination of a consent decree.[84] The State only makes very general claims about malapportionment and asserts that "new policy concerns" have arisen which satisfy *Rufo*. But the State offers almost no evidentiary support for this argument.

As noted above, the State attached only eight exhibits to its motion to dissolve—most of which lend little support for dissolution under Rule 60(b)(5). The only exhibit that addresses malapportionment is a September 2021 presentation given at a Joint Governmental Affairs Committee Meeting. One slide in the presentation is a snapshot of malapportionment in Louisiana's seven supreme court election districts. That slide does not show that supreme court election district malapportionment is a new, changed circumstance. The Chisom Plaintiffs, on the other hand, demonstrated that (1) malapportionment in Louisiana's supreme court election district is not a new problem, (2) District Seven has grown less malapportioned over time, and (3) the remaining election districts have remained consistently

---

[84] *Rufo*, 502 U.S. at 391

No. 22-30320

malapportioned since the 2010 census. Accordingly, the State has not met the evidentiary burden associated with the first prong of *Rufo*'s test.

Moreover, the State's argument that continued enforcement of the Consent Judgment is detrimental to the public interest is unavailing. In *Allen*, this court clarified the scope of the Consent Judgment, holding that it applied only to redistricting matters concerning District Seven.[85] The Consent Judgment itself allows the State to reapportion the election districts as long it complies with the Consent Judgment. Moreover, Act 776, which was incorporated into the Consent Judgment in 2000, explicitly states that "[t]he legislature may redistrict the supreme court following the year in which the population of this state is reported to the president of the United States for each decennial federal census."[86] These facts significantly weaken the State's assertion that the Louisiana Legislature is hamstrung by the Consent Judgment in redistricting matters. The State has presented no other evidence to show that continued enforcement of the Consent Judgment is detrimental to the public interest.

In summary, the State has not demonstrated that applying the Consent Judgment prospectively is no longer equitable under the third clause of Rule 60(b)(5). The district court therefore did not abuse its discretion by denying relief under Rule 60(b)(5)'s third clause.

---

[85] 14 F.4th at 374.

[86] La. Sess. Law Serv. Act 776 (H.B. 581) (1992).

No. 22-30320

## C. *Flexibility and federalism concerns*

The State contends that "federalism concerns" require a standard of review more exacting than abuse of discretion, and the parties dispute what "flexibility" means in the context of consent decree litigation. The State contends that federalism concerns compel the district court to "apply[ ] a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied." The State asserts that any more deference to the district court is incompatible with *Horne*, in which the Supreme Court noted that federalism concerns are especially elevated when the decree involves "areas of core state responsibility" and state actors have taken contrary positions.[87] The State also points to *Allen*, in which this court remarked that "federal 'consent decrees are not intended to operate in perpetuity' and that the state does not champion 'federalism' by trying to consign its supreme court elections to perpetual federal supervision." [88]

The Tenth Circuit recently acknowledged the tension between *Horne*, *Rufo*, and *Dowell*, explaining that "when applying the flexible approach and evaluating whether a moving party implemented a durable remedy, a district court must consider the totality of the moving party's efforts to demonstrate sustained compliance with federal law."[89] That court held that there is "not a single path" to demonstrating future compliance, explaining that

---

[87] 557 U.S. at 451.

[88] 14 F.4th at 373 (quoting *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004)).

[89] *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1203 (10th Cir. 2018).

"[u]ltimately, the district court's wealth of experience overseeing the litigation should inform its assessment of whether the Defendants are now in compliance with federal law, and whether they are committed to remaining in compliance."[90] We agree.

Here, "flexibility" does not necessarily mean that the district court should divest itself of its authority over the Consent Judgment as soon as federalism concerns are raised. Rather, flexibility can also mean that the court requires *more* of the parties to show that dissolution is warranted because of its extensive experience with the decree.[91] Given its three decades of experience with the Consent Judgment, the district court is in the best position to determine whether the totality of the circumstances point toward dissolution.

As noted above, the federalism concerns set forth by the State are exaggerated because *Allen* recently clarified the proper scope of the Consent Judgment, and because there is little evidence that the Consent Judgment has significantly restricted the Louisiana legislature's redistricting efforts. Even so, the Consent Judgment—at least in its current form—is not designed to last forever. During oral argument on the motion to dissolve and in its order and reasons, the district court expressed its openness to modifying the Consent Judgment to address the concerns of the State. The district court

---

[90] *Id.*

[91] *City of Boerne*, 659 F.3d at 437–40 (quoting *Rufo*, 502 U.S. at 379–80); *see also Jackson*, 880 F.3d at 1203.

remarked that "modification rather than termination under the third clause of Rule 60(b)(5) is often a more appropriate remedy to cure hardships caused by changed circumstances."

At this juncture, the State has failed to show that termination—the most extreme option—is warranted under either the first or third clauses of Rule 60(b)(5). As the Chisom Plaintiffs pointed out, "determining whether the Decree has been 'satisfied'—or even 'substantially complied' with—thus requires some showing that its essential remedial promise . . . will continue to exist." The State has not set forth any positive evidence to demonstrate that "there is relatively little or no likelihood that the original . . . violation will promptly be repeated when the decree is lifted."[92] Furthermore, the State has not presented evidence demonstrating that the vestiges of past discrimination have been eliminated to the extent possible or that continued enforcement of the Consent Judgment is detrimental to the public interest. The record is thus inadequate to support dissolution under Rule 60(b)(5).

The dissent characterizes the majority opinion as an endorsement of "nearly unchecked judicial authority over fundamentally political activity." It is not. Where the plain, unambiguous terms of the consent decree mandate that "future Supreme Court elections . . . *shall* take place in the newly reapportioned districts," and the State fails to present any evidence whatsoever of the measures taken to ensure that the object of that mandate

---

[92] *Rufo II*, 12 F.3d at 292 (citing *Dowell*, 498 U.S. at 247).

will be achieved (or continue to be achieved), it cannot be said that the State has satisfied its burden under the first clause of Rule 60(b)(5)—regardless of the chosen standard.[93] The dissent asserts that the State has completed the eight concrete action items in the Consent Judgment and that any additional "final remedy" involving prospective relief is too vague to require continued enforcement. But if the State believes that the requirement of remedying "some undefined later breach" is too vague, then it should move to modify the Consent Judgment to create a more defined ultimate remedy. Our job is to enforce the Consent Judgment as written, not as the State wishes it had been written. Likewise, when—as here—the State has failed to present an adequate evidentiary basis for concluding that continued application of the Consent Judgment would be inequitable, it cannot be said that it has discharged its burden under the third clause of Rule 60(b)(5). While this court recognizes the State's federalism interests, those interests alone do not relieve the State of its evidentiary burdens.

## V.    CONCLUSION

The district court did not abuse its discretion in denying the dissolution motion, as the State has failed to meet its evidentiary burdens under both the first and third clauses of Rule 60(b)(5). We therefore

---

[93] The dissent's summary of Section C of the Consent Judgment fails to acknowledge that paragraph 8 expressly requires future Supreme Court elections "to take place in the newly reapportioned districts."

No. 22-30320

AFFIRM the district court's order denying the State's motion to dissolve the Consent Judgment.

No. 22-30320

KURT D. ENGELHARDT, *Circuit Judge*, dissenting:

Democracy can sometimes challenge the faint-hearted. Although the enduring constraints of the Constitution and federal laws such as the Voting Rights Act ("VRA") provide invaluable guiderails, we can only entrust our governance to a democratically-elected legislature with the expectation that it operates within those guiderails. Our nation has made the considered judgment to place power in the hands of the people. Today's majority decision rejects both this cherished principle and controlling jurisprudence in favor of nearly unchecked judicial authority over fundamentally political activity. So, I respectfully must dissent.

## I. Standard of Review and Federalism Concerns

Federal "consent decrees are 'not intended to operate in perpetuity.'" *Guajardo v. Texas Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (quoting *Bd. of Educ. v. Dowell*, 498 U.S. 237, 248 (1991)). "The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004). "In general, . . . institutional reform injunctions are disfavored, as they 'often raise sensitive federalism concerns.'" *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (quoting *Horne v. Flores*, 557 U.S. 433, 448 (2009)).

Appellees advocate for a heightened standard of deference to the district court's decision on the basis of *Cooper v. Noble*, in which this Court held that "our deference to the magistrate judge's exercise of his discretion

is heightened in cases such as the one before us, which involve consent decrees directed at institutional reform" on the grounds that "[w]e owe substantial deference to the magistrate judge's many years of experience with this matter." 33 F.3d 540, 543 (5th Cir. 1994). However, Supreme Court precedent instructs not only that heightened deference is unwarranted in cases like this but, if anything, that deference should be lessened relative to an ordinary case. In *Horne v. Flores*, the Supreme Court critiqued the Ninth Circuit's application of a heightened standard: "Rather than applying a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied, the Court of Appeals used a heightened standard that paid insufficient attention to federalism concerns." 557 U.S. at 450–51.[1] The Supreme Court held that institutional reform consent decrees require a "flexible approach" that "allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne*, 557 U.S. at 450 (quoting *Frew ex rel. Frew*, 540 U.S. at 442). Thus, the Supreme Court held, "a critical question in this Rule 60(b)(5) inquiry is whether the objective of the . . . order . . . has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." *Horne*, 557 U.S. at 450 (citations omitted).

-------

[1] Appellees seem to dispute that *Horne* overruled *Cooper* but neglect to address this language, which directly rejects a "heightened standard" such as the one applied in *Cooper*. Indeed, the Supreme Court said bluntly that the Ninth Circuit applied "a Rule 60(b)(5) standard that was too strict." *Horne*, 557 U.S. at 452.

No. 22-30320

Moreover, *Horne* raises concerns about the arrangement of power in consent decrees. "[R]eview of the denial of Rule 60(b)(5) relief should generally be somewhat closer in the context of institutional injunctions against states due to federalism concerns." *Id.* at 451 (internal quotation marks and citation omitted). Consent decrees like the *Chisom* decree "often raise sensitive federalism concerns" because "[s]uch litigation commonly involves areas of core state responsibility." *Id.* at 448. Like this case, *Horne* involved competing positions from different state authorities.[2] "Precisely because different state actors have taken contrary positions in this litigation, federalism concerns are elevated." *Id.* at 452. The *Chisom* decree involves fundamental political elements of Louisiana state governance—elections and redistricting—that have been conditionally submitted to the discretion of an unelected federal judge. Undoubtedly, this raises significant federalism concerns. Thus, a decision to keep the decree in place requires close review.

In sum, in light of *Horne*'s admonition not to use a heightened standard, as well as the significant federalism concerns raised by consent decrees like the one at issue here, I believe that the "heightened deference" standard of review is inconsistent with Supreme Court precedent.

The majority does not explicitly employ a "heightened" level of deference to the district court's decision, but it purports to use *Horne*'s

---

[2] Here, the Governor's *amicus* brief is directly opposed to the position of the appellant, the Attorney General of Louisiana. The Governor recognized that "[t]he disagreement between the Governor and the Attorney General presents its own set of federalism concerns." Amicus Br. at 5.

No. 22-30320

"flexible approach" in a manner that is, by all accounts, highly deferential to the district court's assessment of the State's compliance with the Consent Judgment. The majority asserts that "[g]iven its three decades of experience with the Consent Judgment, the district court is in the best position to determine whether the totality of the circumstances point toward dissolution" and that "the federalism concerns set forth by the State are exaggerated." However, under any level of review, and considering the totality of the circumstances, it is clear that the district court abused its discretion in denying the State relief from the Consent Judgment.

## II. Federal Rule of Civil Procedure 60(b)(5)

The majority holds that the State cannot meet its evidentiary burden under either the first or third clause of Rule 60(b)(5) allowing for the dissolution or modification of final judgments.[3] However, even under the majority's chosen evidentiary standards, the State has met its burden, and thus, the district court should have dissolved the Consent Judgment.

As to the first clause, the parties dispute whether a "substantial compliance" standard or the *Dowell* standard should apply. The majority ultimately follows *Dowell*, joining the Sixth and Ninth Circuits in applying this standard to cases involving Rule 60(b)(5)'s first clause. The *Dowell* test requires proof that (1) the State has complied in "good faith" with the Consent Judgment since its entry and (2) "the vestiges of past discrimination

---

[3] Rule 60(b)(5) states that a court may relieve a party from a final judgment where "the judgment has been satisfied, released, or discharged" (clause one) or "applying it prospectively is no longer equitable" (clause three). Fed. R. Civ. P. 60(b)(5).

[have] been eliminated to the extent practicable." *Dowell*, [498 U.S. at 250](). The majority's detailed analysis of these competing standards is, ultimately, of no moment here: under either *Dowell* or the "substantial compliance" standard, the State clears its evidentiary hurdle.

As to the third clause, all parties agree that the Supreme Court's two-prong test in *Rufo v. Inmates of Suffolk Cnty. Jail* applies. [502 U.S. 367]() (1992). Under this test, the State must show that (1) "a significant change in circumstances warrants revision of the decree" and (2) "the proposed modification is suitably tailored to the changed circumstance." *Id.* at 383. The State argues that it satisfied both prongs of *Rufo* because it demonstrated that (1) significant changes in both factual and legal circumstances have occurred and (2) termination of the Consent Judgment best serves the public interest.

Because the State has shown entitlement to dissolution of the Consent Judgment under both the first and third clauses of Rule 60(b)(5), I would reverse the judgment of the district court finding otherwise.

### III. The Consent Judgment's "Final Remedy"[4]

The evidentiary burdens discussed above are considered in light of the terms of the specific Consent Judgment here. The majority recognized as much, noting that "a clarification of the Consent Judgment's 'final remedy' under Louisiana's contract law" is necessary to determine the Consent

---

[4] Consistent with the vagaries of its discernment of the Consent Judgment's end, the majority also refers to this as the "ultimate remedy."

No. 22-30320

Judgment's "proper scope." Thus, an analysis of what constitutes the "final remedy" of the Consent Judgment is a necessary prerequisite to a determination of the State's compliance.

Consent decrees, as the majority rightly points out, are interpreted according to the general principles of contract law. *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015). Under Louisiana law, courts seek the parties' common intent starting with the contract's words, which control if they are clear and lead to no absurdities. *See* La. Civ. Code arts. 2045, 2046. "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Baldwin v. Bd. of Supervisors for Univ. of La. Sys.*, 2014-0827 (La. 10/15/14), 156 So. 3d 33, 38 (citing La. Civ. Code art. 2050).

In the words of the Consent Judgment, "[t]he Court shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished"—and, by implication and indisputably, no later. The undisputed factual history here is set forth in the majority opinion, and the plain language of the Consent Judgment is clear: the "final remedy" contemplated therein is the implementation of the action items contained in Section C of the Consent Judgment. Because the "final remedy" has been implemented, the State's Rule 60(b)(5) motion for relief on the grounds that "the judgment has been satisfied" should have been granted by the district court.[5]

---

[5] This Court suggested as much in dicta in *Allen v. Louisiana* in addressing whether the Eastern District had exclusive jurisdiction over the election issues contemplated by the

No. 22-30320

Here, the purpose or goal of the Consent Judgment, as stated by the majority and the district court, is to "ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the Voting Rights Act." However, the "purpose" of the Consent Judgment, by definition, *cannot be* its remedy. A "remedy" is the *means* by which a purpose is achieved. *A remedy cannot be an end.* Both the legal definition of a remedy—that is, "the legal *means* to recover a right or to prevent or obtain redress for a wrong," *Booth v. Churner*, 532 U.S. 731, 737 (2001) (emphasis added) (citation omitted)[6]—and the plain English definition of a remedy—that is, "something that corrects or counteracts"[7]—demonstrate this plain principle. As a matter of clear, incontrovertible language, the "final remedy" of the Consent Judgment cannot be "the State's continued compliance with Section 2 of the VRA." It must instead be a course of action, a means of redress, or a corrective for the harm (i.e., existing non-compliance with the

_____

*Chisom* decree. 14 F.4th 366, 374 (5th Cir. 2021). Recognizing that Justice Bernette J. Johnson (a party to this case) had become Chief Justice and later retired, this Court stated: "In light of those developments, one might think the decree's final remedy has been implemented. But Louisiana has evidently never asked the Eastern District to vacate the decree." *Id.*

[6] Black's Law Dictionary similarly defines "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong." *Remedy*, Black's Law Dictionary (11th ed. 2019).

[7] Merriam Webster's second definition. https://www.merriam-webster.com/dictionary/remedy. The first definition is "a medicine, application, or treatment that relieves or cures a disease," which, though clearly not the intended meaning here, likewise refers to a means of correction rather than an end in itself.

No. 22-30320

VRA at the time the Consent Judgment was entered into) that it seeks to remediate.

What, then, is the *remedy* prescribed in the Consent Judgment to achieve the purpose of the decree?[8] Simple: the Consent Judgment itself explicitly identifies "remedial" actions and lists them in Section C. The plain language of the Consent Judgment makes this clear, providing that "the defendants shall take the following actions": eight specific and discrete items designed to *remedy* the identified wrong in furtherance of the purpose of compliance with the VRA.[9] The parties agreed these were "remedial"; and not surprisingly, the *final* one would be the last to be accomplished.

While the majority states that "*some* of these action items have already

---

[8] Notably, it is unclear whether the district court identified *anything* as the "final remedy."

[9] In short, the Consent Judgment required the State to (1) create a new Louisiana Supreme Court district comprised solely of Orleans Parish and (2) a new Fourth Circuit Court of Appeal position. Requirement (2) also required the La. Supreme Court to assign the new Fourth Circuit judge to the Supreme Court. The La. Supreme Court was also (3) mandated to give that judge the same benefits, emoluments, etc. as any other La. Supreme Court Justice, including (4) the same equal rights to participate in La. Supreme Court cases. The Fourth Circuit position was (5) to expire once an election for the district described in requirement (1) took place, but should the Fourth Circuit position become vacant before expiration, (6) the Governor was to call an election to fill the position. If (7) a vacancy were to have opened up in the then-First Supreme Court District prior to January 1, 2000, it was to be filled by an election in the district described in requirement (1). Finally, the Consent Judgment required (8) the enactment of legislation in the 1998 regular session of the Louisiana Legislature providing for reapportionment of the seven Supreme Court electoral districts in keeping with the VRA and the Consent Judgment. It appears that requirement (3) was the last outstanding remedial action item (thus, the "final remedy"), and with the retirement of Chief Justice Johnson, it too has been fulfilled. *See Allen*, 14 F.4th at 374.

No. 22-30320

been fulfilled," there is no actual dispute that the State has enacted *all* eight remedies.[10] And whichever of them was the eighth or *final* remedy to be fully implemented should have been the cue for the district court to recognize the end of its jurisdiction.[11] That the district court held otherwise is an abuse of discretion. *See Frew ex rel. Frew*, 540 U.S. at 442 ("The federal court *must* exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials.") (emphasis added).

The majority suggests that limiting the remedy to the State's

---

[10] Appellees conceded, both in briefing and at oral argument, that the State had in fact completed all eight action items. *See, for e.g.*, Pl.-Appellee's Br. at 25 (asserting that the State must "do *more* than simply accomplish the checklist" contained in the Consent Judgment) (emphasis added). The district court also admitted as much, stating that "the State has complied with the terms of the Consent Judgment by enacting Act 512 to create the temporary *Chisom* seat and Act 776 to create the current District Seven." *Chisom v. Edwards*, 342 F.R.D. 1, 12 (E.D. La. 2022). After so acknowledging the State's completion of its assigned remedial tasks, the district court and appellees pointed generally towards some "durable ongoing institutional reform" the State needed to implement, above and beyond the enumerated action items. Pl.-Appellee's Br. at 29.

[11] This is entirely consistent with Judge Morgan's decision in 2012, in which she then correctly wrote: "Because . . . the Consent Judgment calls for Justice Johnson's tenure . . . to be credited to her for all purposes under Louisiana law, the Court finds that the 'final remedy' in the Consent Judgment has not yet been implemented. By law and by the terms of the Consent Judgment, this Court expressly retains jurisdiction over this case until that final remedy is implemented." *Chisom v. Jindal*, 890 F. Supp. 2d 696, 711 (E.D. La. 2012). This requirement is found in Section C, Item 3 of the Consent Judgment. Thus, as of 2012, the "final remedy" had not yet been fully implemented. But ten years later, Judge Morgan's 2022 decision identifies no such remedial action item undone or lacking, nor do any of the parties to this case, nor does the majority opinion.

complete compliance with the eight remedial action items "would produce absurd results in the context of the Consent Judgment." Instead, the majority now proposes that the newly-discovered "final remedy" is "the State's *prospective* compliance with Section 2 of the VRA" (emphasis added). But where the State has fully complied with the remedial action items—and neither the courts nor the parties can identify a single, concrete step left to be taken—it is instead absurd to require the State to remedy some undefined future imaginary breach, policed by a federal judge. *See Janek*, 780 F.3d at 328 ("The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose."); *Trahan v. Coca Cola Bottling Co. United, Inc.*, 2004-0100 (La. 3/2/05), 894 So. 2d 1096, 1107 ("[A] compromise extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication."). Even the majority admits that its gain-of-function Consent Judgment needs to end at some point and that we must "avoid overreading consent decrees." Yet the majority does just that, reaching broadly into the future with no feasible end to judicial control in sight.

The majority also makes much of *Dowell*'s requirement that "the vestiges of past discrimination [have] been eliminated to the extent practicable." 498 U.S. at 250. But throughout its opinion, the majority fails

to identify[12] what might constitute "practicable" efforts by the State to eliminate the alleged discrimination, save the eight remedial actions already completed. The majority asserts that "the election of a member of the minority group is one factor to consider" in fulfilling the *Dowell* standard. What are the other factors? By failing to explain the limits of the Consent Judgment's requirements with any specificity, or when termination will be warranted, the majority seems to say, "We'll know it when we feel it." This not only shows an unwarranted and extraordinary mistrust of the State and its duly elected officials, but further perpetuates a scenario in which these parties will never agree—and, under the majority's holding, this disagreement will prevent the Consent Judgment from ever being satisfied. *See Janek*, 780 F.3d at 329 (emphasizing that where "Plaintiffs have not pointed to any discrete endpoint . . ., they may *never* be satisfied with Defendants' . . . efforts") (emphasis in original). The goal of *prospective* compliance with the VRA is unquantifiable and unworkable, and therefore, it constitutes no "remedy" at all.

## IV. The State's "Good Faith" Compliance

To extend the imposition of the federal judiciary's hands-on role in the State's future compliance with the VRA, the majority and the appellees assert that the State has failed to show evidence of its "good faith" in

---

[12] For that matter, the majority also fails to identify the particular "vestiges" for which the State will be held responsible.

complying with the Consent Judgment thus far.[13] When asked at oral argument what kind of evidence would demonstrate good faith, the appellees ultimately suggested that the State should have presented new electoral maps to the federal district judge for approval. But there is no judicial preclearance requirement[14] for future district maps in the Consent Judgment, and the State was correct to assume that this was simply unnecessary both under the terms of its Consent Judgment and under the VRA itself. To require the State to seek court approval of each subsequent redistricting map now and forever, when the Consent Judgment contains no such language, would expand and perpetuate the Consent Judgment in a manner entirely inconsistent with the parties' agreement as well as this Court's precedent. *See Guajardo*, 363 F.3d at 394; *Janek*, 780 F.3d at 328–29 (noting that inserting additional assessments by the court into a decree "would introduce a new requirement to which the parties never agreed"); Mots. Hr'g Tr. at 13:24–25 ("To do something more in the Consent Decree would require a new agreement.").

Appellees also ignore the plethora of evidence indicating that the State has indeed followed the *Chisom* decree in good faith for the past thirty years. It is undisputed that the State has fully complied with all eight remedial action

---

[13] Notably, the *Dowell* opinion cited by the majority does not articulate any clear standard or definition as to what may constitute "good faith." *See* 498 U.S. at 249–50. Nor do appellees or the majority define "bad faith" with any clarity, or cite to evidence of such.

[14] The only mention of a "preclearance" requirement in the Consent Judgment appears in Section D (and later referred to in Section I), requiring the State "to seek preclearance from the Attorney General" for the changes made in compliance with the Consent Judgment. Undisputedly, the State did so.

No. 22-30320

items in the Consent Judgment, and the majority opinion concedes that "a history of compliance is evidence of good faith."[15] In fact, even after Justice Bernette Johnson retired, Justice Piper Griffin was elected in her place, cementing the presence of a minority member of the Louisiana Supreme Court for another ten years and evincing the effectiveness of the State's fulfillment of the "final remedy."

To its credit, the State has also articulated specific concerns about malapportionment and the obstacles that the Consent Judgment imposes to solving that problem. These arguments are backed by concrete evidence.[16] The malapportionment in the election districts, the State argues, constitutes a significant change in circumstances that alone warrants dissolution of the Consent Judgment. Finally, and perhaps most telling, the State has watched the population of District Seven shrink over time and has seen those voters

---

[15] The majority takes issue with the fact that the State's evidence of good faith "focuses only on *past* compliance with the Consent Judgment." But this follows logically from the nature of the Consent Judgment—it was a deal, entered into by the parties, and when the obligations contained therein were fulfilled, the deal was completed. *See, for e.g.*, *Janek*, 780 F.3d at 328 ("In other words, the parties *already agreed* that substantial compliance with the roadmap would achieve their common goal.") (emphasis in original). The State's comparison of the Consent Judgment to a resolutory contract is a compelling one.

[16] The district court noted that "the districts were malapportioned by approximately 18% after the 2000 census, approximately 54.5% after the 2010 census, and approximately 54.4% after the 2020 census." *Chisom v. Edwards*, 342 F.R.D. 1, 15 (E.D. La. 2022).

No. 22-30320

thus gain "extra" power compared to those in the other six districts[17]—yet despite this disparity, the State made no effort to engage in redistricting to maintain the minority population's previous (lesser) voting strength. The State asked the district court to take judicial notice of the absence of any proposed legislation to reverse the effects of the Consent Judgment and to note the clear lack of effort to undermine minority voting power. This is hardly a "threadbare evidentiary record." The State has met its Rule 60(b)(5) evidentiary burden, even under the majority's demanding standards, through its clear showing of good faith compliance with the Consent Judgment's terms.

Further, where is the evidence of bad faith? The majority stresses that there must be "relatively little or no likelihood that the original…violation will promptly be repeated when the decree is lifted." *Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) (citing *Dowell*, 498 U.S. at 247). No evidence has been presented showing a "likelihood" of the State's future violation of the VRA, and general conjecture regarding the State's motives does not suffice. This Court's vague suspicions are insufficient to overcome the clear language of the Consent Judgment and the State's strong track record of compliance.

---

[17] The State, using U.S. census data, calculated that the majority-minority District Seven was 28.28% less populated than it should be. Appellant's Br. at 41. The result of such population shrinkage is that individuals in that district have much weightier votes—nearly double the weight of votes in other districts. *Id.*

No. 22-30320

Let us not forget that the Voting Rights Act remains in full force. Should the State of Louisiana perchance violate the VRA after the Consent Judgment is dissolved—as the majority, the district court, and the appellees imagine—the parties will have a well-known remedy. *See Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1204 (10th Cir. 2018) ("If the state again violates federal law, victims may file a new lawsuit to bring the state back into compliance."). The majority views with suspicion the State's concession as to its liability under the VRA should a violation occur in the future, but recognition of the controlling effect of the law is not bad faith—it is quite the opposite. This also demonstrates a fundamental difficulty with the position of the majority and the district court: under the theory that the "final remedy" of the Consent Judgment is merely "prospective compliance with the VRA," the Consent Judgment (1) adds nothing to the State's legal obligations and (2) represents a potentially endless[18] subordination of the State's political power to a single unelected federal judge. The majority and the district court both expect the State to *guarantee* future compliance with the VRA, but, as the Governor's *amicus* brief makes clear, "the State" is not a unified or unitary body that can make straightforward guarantees at will but is instead a political creature subject to frequent elections, legislative

_____

[18] "[T]his circuit…does not favor perpetual contracts. As we stated in *Besco*, 'the construction of a contract conferring indefinite duration is to be avoided *unless compelled by the unequivocal language of the contract*.'" *Delta Servs. & Equip., Inc. v. Ryko Mfg. Co.*, 908 F.2d 7, 9 (5th Cir. 1990) (emphasis in original) (quoting *Besco, Inc. v. Alpha Portland Cement Co.*, 619 F.2d 447, 449 (5th Cir. 1980)).

sessions, and political divisions. But the VRA itself is enduring, and as strong a prospective relief possible if that political creature violates the law in the future. *See Horne*, 557 U.S. at 450 ("If a federal consent decree is not limited to reasonable and necessary implementations of federal law, it may improperly deprive future officials of their designated legislative and executive powers.") (internal quotation marks and citation omitted).

The *Chisom* decree is not an injunction, issued by the district court to enjoin the State from ever violating the law again. Not only would this be an invalid and overbroad form of injunctive relief,[19] it simply is not what the Consent Judgment itself says. The Consent Judgment clearly provides that the court will have jurisdiction "until the complete implementation of the final remedy has been accomplished." Every remedial action item agreed to by all parties and listed in the Consent Judgment has been completely implemented. The district court therefore should have dissolved the Consent Judgment upon request of the State.

---

[19] Injunctions that require litigants to generally follow the law are consistently held to be overbroad. *See, for e.g.*, *Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law."); *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435 (1941) ("But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute."); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (noting that "the Supreme Court has denounced broad injunctions that merely instruct the enjoined party not to violate a statute"); *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014) (requiring relief "that is more specific than a bare injunction to follow the law").

## V. Conclusion

The majority opinion searches diligently for what it calls both the "final remedy" and "ultimate remedy," but fails to establish anything more than an illusory, unquantifiable aspiration that "the vestiges of past discrimination [be] eliminated to the extent practicable" at some undetermined time in the future. Although the State of Louisiana entered into the Consent Judgment in good faith, and by all accounts has performed each and every task set forth therein, this Court now not only moves the proverbial goal posts, it places them beyond sight. But the Voting Rights Act is truly "the law of the land." It can and will be invoked by anyone aggrieved by a perceived violation, and enforced by the Court.

Though the people of Louisiana, through their state Constitution, have placed authority in their elected representatives to draw up lawful and compliant Supreme Court election districts, they have been deprived of that governance for over thirty years—again, with no end in sight. Now, the people of Louisiana can only wait for a day in the future when the federal judiciary will relinquish its continued usurpation of their Constitution. To perpetuate this Consent Judgment prospectively, void of any demonstrable VRA violation, is an unwarranted affront to self-governance. Federalism demands a different result. Accordingly, I respectfully dissent.