# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2024

Lyle W. Cayce
Clerk

————————

No. 22-30320

————————

RONALD CHISOM; MARIE BOOKMAN, *also known as* GOVERNOR;
URBAN LEAGUE OF LOUISIANA,

*Plaintiffs—Appellees*,

UNITED STATES OF AMERICA; BERNETTE J. JOHNSON,

*Intervenor Plaintiffs—Appellees*,

*versus*

STATE OF LOUISIANA, *ex rel. Jeff Landry, Attorney General*,

*Defendant—Appellant.*

———————————————————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:86-CV-4075

———————————————————

Before RICHMAN, *Chief Judge*, JONES, SMITH, WIENER, STEWART,
ELROD, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT,
HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS and
RAMIREZ, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*, joined by RICHMAN, *Chief
Judge*, and JONES, SMITH, ELROD, SOUTHWICK, WILLETT, HO,
DUNCAN, OLDHAM, and WILSON, *Circuit Judges*:

No. 22-30320

The State of Louisiana sought dissolution of a consent decree it entered more than thirty years ago based on its satisfaction of each remedial action contained therein. When faced with the State's motion to dissolve, however, the district court declined to relinquish control over and dissolve the decree, finding that the State failed to meet its burden under Federal Rule of Civil Procedure 60(b)(5). Because the district court applied an incorrect legal standard, and because the State has in fact satisfied its obligations under the consent decree, we REVERSE and RENDER judgment in favor of the State.

### I. Factual and Procedural Background

The facts underlying this appeal have long been settled. In 1986, the original *Chisom* plaintiffs[1] filed a class action complaint against the State of Louisiana and several officials challenging the method for selecting Louisiana Supreme Court justices from the then-First Supreme Court District as violative of Section 2 of the Voting Rights Act of 1965 ("VRA"). Six years later, the parties entered into a Consent Judgment ("the Chisom Decree") "to resolve [the] extensive and costly litigation." The parties stated in Section B of the Decree: "The relief contained in this consent judgment will ensure that the system for electing the Louisiana Supreme Court is in compliance with Section 2 of the [VRA]."

In short, the Chisom Decree required the State to create (1) a new Louisiana Supreme Court district comprised solely of Orleans Parish and (2) a new Fourth Circuit Court of Appeal position. Requirement (2) also required assignment of the new Fourth Circuit judge to the Louisiana

---

[1] Ronald Chisom; Marie Bookman; Walter Willard; Marc Morial; Henry A. Dillon, III; and the Louisiana Voter Registration/Education Crusade. The United States later intervened as plaintiff in 1988. Justice Bernette Johnson—the first black female Louisiana Supreme Court justice—also intervened as plaintiff in 1997.

No. 22-30320

Supreme Court. The Louisiana Supreme Court was also (3) mandated to give that judge the same benefits and emoluments as any other Supreme Court Justice, including (4) the same equal rights to participate in cases. The Fourth Circuit position was (5) to expire once an election for the district described in requirement (1) took place, but should the Fourth Circuit position become vacant before expiration, (6) the Governor was to call an election to fill the position. If (7) a vacancy were to have opened up in the then-First Supreme Court District prior to January 1, 2000, it was to be filled by an election in the district described in requirement (1). Finally, the Chisom Decree required (8) the enactment of legislation in the 1998 regular session of the Louisiana Legislature providing for reapportionment of the seven Supreme Court electoral districts in keeping with the VRA and the Chisom Decree. In conclusion, the Chisom Decree states that the district court "shall retain jurisdiction over this case until the complete implementation of the final remedy has been accomplished."

As early as 2000, when the State passed Act 776 to reapportion the Supreme Court districts in accordance with the terms of the Chisom Decree, the State had completed each remedial action described above. The district court acknowledged as much, noting that the State had complied with the Chisom Decree's terms "by enacting Act 512 to create the temporary Chisom seat and Act 776 to create the current District Seven." At the very latest, the State fully satisfied the required remedial actions in 2012, when the Louisiana Supreme Court recognized Justice Bernette Johnson as Chief Justice. *See In re Off. of Chief Just., La. Sup. Ct.*, 2012-1342 (La. 10/16/12), 101 So. 3d 9.

In 2021, the State moved the district court to dissolve the Chisom Decree under Federal Rule of Civil Procedure 60(b)(5). This rule authorizes a court to relieve a party from a consent judgment if "[1] the judgment has been satisfied, released, or discharged; [2] it is based on an earlier judgment

that has been reversed or vacated; or [3] applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The State's principal argument arises under the first clause: it has satisfied the Chisom Decree by complying with all eight of the required remedial actions. Alternatively, under the third clause, the State contends the Chisom Decree should be dissolved because changing demographics have resulted in severe malapportionment within the voting districts.

The district court declined to dissolve the Chisom Decree, finding that the State failed to meet its burden under either prong of Rule 60(b)(5). A panel of our court affirmed the district court's order. *See Chisom v. Louisiana ex rel. Landry*, 85 F.4th 288 (5th Cir. 2023), *reh'g granted and opinion vacated*, No. 22-30320, 2024 WL 323496 (5th Cir. Jan. 29, 2024). Our court then granted rehearing en banc and held oral argument on May 16, 2024.

## II. Analysis

Before considering the merits of the State's arguments, we must first briefly address the impact on this appeal of the recent Louisiana legislative enactment of Act 7 on May 1, 2024. *See* S.B. 255, 2024 Leg., Reg. Sess. (La. 2024) ("Act 7"). Act 7 redraws Louisiana's Supreme Court districts so as to include two majority-minority voting districts. *See id.* In a Rule 28(j) letter filed shortly before oral argument, the plaintiffs informed this court that they had moved the district court for an indicative ruling based on "the change in factual circumstances presented by Act 7." The plaintiffs asserted that a remand to the district court "with instructions to decide" the State's motion to dissolve would resolve the case without need for an opinion from this court.

But Act 7 has no impact on our ability to hear this appeal, and no relevance as to the merits. First, as conceded by the parties at oral argument,

No. 22-30320

neither Act 7 nor its substance as to the drawing of districts is mentioned anywhere in the Chisom Decree. *See* Oral Argument[2] at 18:18–52 (State asserting that it did not agree to create two majority-minority districts in Chisom Decree, nor is there a judicial preclearance requirement in decree); 35:19–28 (plaintiffs agreeing there is no preclearance requirement); 43:15–28 (plaintiffs agreeing that Chisom Decree does not require creation of two majority-minority districts); 53:18–22 (United States agreeing there is no preclearance requirement); 58:14–24 (United States acknowledging Act 7 is not mentioned in the Chisom Decree). Act 7 was not enacted in furtherance of or to comply with the Chisom Decree itself, and it therefore does not inform our analysis of the satisfaction of the Chisom Decree's terms.

Second, the parties still vehemently disagree as to the appropriate legal standards that apply to their case, as well as to the district court's continued role regarding the Chisom Decree. While the plaintiffs now argue that remand is appropriate, the State argues in response that this court must correct the errors in the original district court order and, most importantly, return control of elections to the State, not a federal district court. *See, e.g.*, Oral Argument at 1:06:36–48. Thus, the controversy posed by the State's motion to dissolve the Chisom Decree remains "live" to the present day, and the State maintains a "personal stake" in the litigation's resolution. *See Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990); *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 403 (1980) ("The imperatives of a dispute capable of judicial resolution are sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions.").

---

[2]   *Chisom   v.   State   of   Louisiana*   (No.   22-30320), https://www.ca5.uscourts.gov/OralArgRecordings/22/22-30320_5-16-2024.mp3.

No. 22-30320

Third and finally, in its indicative ruling sought by the plaintiffs, the district court itself, contrary to indicating the matter might well be resolved, stated that the plaintiffs "have raised substantial issues regarding whether the Attorney General's Motion to Dissolve the Consent Decree should be granted." The district court did not indicate that it would *grant* the State's motion to dissolve, despite the movants' suggestion that this should be the result. Rather, the district court stated forthrightly that it was "not able to definitively determine that it would grant the Rule 60(b)(5) motion if the matter is remanded" and instead indicated that "extensive litigation," evidence-gathering, and analysis are necessary before dissolution—an outlook that is completely at odds with the State's argument here that the Chisom Decree can immediately be dissolved under the first prong of Rule 60(b)(5).

As a result, this appeal still presents significant issues regarding consent decrees and how they must be terminated, issues that directly affect the rights of the parties before us. *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (requiring suit to impact the legal relations of the parties via substantial controversy). The appeal is not moot, and we therefore proceed to the merits.

### a. Consent decrees generally

Our case law concerning consent decrees is understandably limited. *See Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (noting rarity of application of the first clause of Rule 60(b)(5) to consent decrees). However, our court, our sister circuits, and the United States Supreme Court have offered sufficient guidance to inform our analysis here.

At the outset, we note that "consent decrees are 'not intended to operate in perpetuity.'" *Guajardo v. Tex. Dep't of Crim. Just.*, 363 F.3d 392, 394 (5th Cir. 2004) (quoting *Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch.*

No. 22-30320

*Dist. No. 89, Okla. Cnty., Okla. v. Dowell*, 498 U.S. 237, 248 (1991)). This is because "case-by-case resolution and accountability is the norm from the perspective of our national Constitution." *Shakman v. Pritzker*, 43 F.4th 723, 731 (7th Cir. 2022). "Consent decrees are the rare exception, with long-running decrees being rarer still." *Id.* It follows then that a "federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004); *see also Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1192 (10th Cir. 2018) ("Importantly, federal consent decrees are temporary solutions that may be kept in place only as long as necessary to cure an unlawful condition."); *United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009) ("The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place only so long as the violation continued."). Thus, the starting point for courts in consent-decree cases is an understanding that the decree has an end, and it is the courts' duty to ensure that control is returned to the State when that end is reached.

What kind of "end" does a consent decree possess? A discrete one. "The Supreme Court has explained that remedies fashioned . . . to address constitutional infirmities 'must directly address and relate to the constitutional violation itself,' and 'federal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation.'" *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 271 (5th Cir. 2018) (quoting *Milliken v. Bradley*, 433 U.S. 267, 282 (1977)). Once the alleged constitutional deficiency has been remedied, it is the courts' duty to bring federal control over the issue to its proper end. And where can we find this end? The Supreme Court made clear

No. 22-30320

in *United States v. Armour & Co.*, 402 U.S. 673 (1971), "that it is the language of a consent decree that defines the obligations of the parties." *United States v. O'Rourke*, 943 F.2d 180, 186–87 (2d Cir. 1991). The next step for our courts, then, is to be cognizant of the clear limits of the consent decree, as expressed within the decree itself.

Finally, of paramount concern, courts assessing such cases must be ever mindful of the impact of consent decrees on the principles of federalism. Consent decrees that involve the State "often raise sensitive federalism concerns." *Horne v. Flores*, 557 U.S. 433, 448 (2009). "Such litigation commonly involves areas of core state responsibility, such as public education," or, as here, voting. *Id.* Thus, these decrees often "bind state and local officials to the policy preferences of their predecessors and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 449 (quoting *Frew*, 540 U.S. at 441); *see also Shakman*, 43 F.4th at 730 ("[C]ontinuing to hold the Governor to the 1972 decree . . . would affront principles of federalism and leave the district court playing a role at odds with the Case or Controversy limitation in Article III of the U.S. Constitution."). To prevent unnecessary imposition on the functioning of the States, federal courts must take an approach to consent decrees that guarantees power is returned to the State as promptly as possible. *See Horne*, 557 U.S. at 450; *see also Frew*, 540 U.S. at 442; *Johnson v. Heffron*, 88 F.3d 404, 407 (6th Cir. 1996) ("Judicial oversight over state institutions must, at some point, draw to a close.").

The safeguard that remains once the decree is dissolved is simply the law itself: "If the [S]tate again violates federal law, victims may file a new lawsuit to bring the [S]tate back into compliance. Elected officials may also be held accountable to the citizenry through the political process." *Jackson*, 880 F.3d at 1204. Courts overseeing consent decrees can rest easy knowing that, once the decree has been satisfied, federal law provides a remedy for any

later violation. *See Shakman*, 43 F.4th at 731 ("While extended federal judicial oversight might serve as an occasional backstop, absent extraordinary circumstances, it should not serve as a primary means of ensuring state officials comply with duties imposed by federal law.").

From an appellate point of view, our court serves as the check on district courts to ensure that the above principles are followed. Notably, in doing so, Supreme Court precedent instructs not only that heightened deference to the district court is unwarranted in cases like this but, if anything, that deference should be lessened relative to an ordinary case. In *Horne*, the Supreme Court critiqued the Ninth Circuit's application of a heightened standard of review of Rule 60(b)(5) motions: "Rather than applying a flexible standard that seeks to return control to state and local officials as soon as a violation of federal law has been remedied, the Court of Appeals used a heightened standard that paid insufficient attention to federalism concerns." 557 U.S. at 450–51. The Supreme Court held that institutional reform consent decrees require a "flexible approach" that "allows courts to ensure that 'responsibility for discharging the State's obligations is returned promptly to the State and its officials' when the circumstances warrant." *Id.* at 450 (quoting *Frew*, 540 U.S. at 442). Thus, the Supreme Court requires that we refrain from applying "a Rule 60(b)(5) standard that [is] too strict." *Id.* at 452.

### b. Identifying the correct legal standard

Armed with a complete understanding of the purpose and limits of consent decrees, how should a court analyze a request for one's dissolution? Consider first how such decrees come about: "Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms." *Armour & Co.*, 402 U.S. at 681. "Naturally, the agreement reached normally embodies a compromise; in exchange for the

saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Id.* Thus, "the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 682. "Because the defendant has, by the decree, waived his right to litigate the issues raised, . . . the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written." *Id.*; *see also Frew v. Janek*, 780 F.3d at 328 ("The whole point of negotiating and agreeing on a plethora of specific, highly detailed action plans was to establish a clearly defined roadmap for attempting to achieve the Decree's purpose."). Thus, while consent decrees have elements of judicial decrees, they are, at their core, contracts. *See Frew*, 540 U.S. at 437.

We interpret contracts by looking to "general principles of contract interpretation" as expressed in state law. *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *see also Frew v. Janek*, 780 F.3d at 327–28. Under Louisiana contract law, courts are to determine "the common intent of the parties" by looking to the contract's words. LA. CIV. CODE arts. 2045, 2046. "Furthermore, a contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions." *Baldwin v. Bd. of Supervisors for Univ. of La. Sys.*, 2014-0827, p.7 (La. 10/15/14), 156 So. 3d 33, 38 (citing LA. CIV. CODE art. 2050). Importantly, when a contract ends a lawsuit, it "extends only to those matters the parties intended to settle and the scope of the transaction cannot be extended by implication." *Trahan v. Coca Cola Bottling Co. United*, 2004-0100, p.15 (La. 3/2/05), 894 So. 2d 1096, 1107 (citing LA. CIV. CODE art. 3073).

As the State argued both at the district court and on appeal, the appropriate standard in assessing the satisfaction of contractual terms is "substantial compliance." This follows naturally from the principle under Louisiana law that "substantial performance of the contract is all that the law

No. 22-30320

requires." *Dugue v. Levy*, 37 So. 995, 996 (1904). Our court has sanctioned this approach repeatedly, noting that "[d]efendants can obtain relief under prong 1 [of Rule 60(b)(5)] by demonstrating 'substantial compliance' with . . . the consent decree." *Frew v. Janek*, 820 F.3d 715, 721 (5th Cir. 2016); *Frew v. Janek*, 780 F.3d at 330 (noting same standard under Texas law). The burden is, of course, on the party seeking dissolution of the consent decree to show substantial compliance with the contract's terms. *Frew v. Janek*, 820 F.3d at 721.

In its order denying the State's motion to dissolve, the district court erred by ignoring basic contract principles and instead imposing a new burden of proof on the State. When assessing the State's argument under the first prong of Rule 60(b)(5), the district court turned to *Dowell* for a "flexible standard"[3] that has previously been applied to institutional reform decrees. The *Dowell* standard requires proof that (1) the State has complied in "good faith" with the consent decree since its entry, and (2) "the vestiges of past discrimination [have] been eliminated to the extent practicable." 498 U.S. at 250. However, *Dowell* dealt with an institutional reform decree in a public school system as a method of remedying *de jure* segregation,[4] and tellingly, that opinion does not mention Rule 60(b)(5) at all. *See id.*; *see also Frew v. Janek*, 780 F.3d at 328 (distinguishing Ninth Circuit case law by highlighting unique issues inherent in school desegregation cases).

---

[3] *Dowell*'s "flexible standard," as used by the district court here, is distinct from *Horne*'s "flexible approach" mentioned above: the first deals with how to analyze a motion under Rule 60(b)(5), while the second deals with the standard of review used to assess how a district court analyzed a motion under Rule 60(b)(5).

[4] Notably, in agreeing to the terms of the Chisom Decree, the State did not admit wrongdoing, and no finding of intentional discrimination was ever made. Conversely, in *Dowell*, the decree at issue was specifically crafted "to remedy the effects of past intentional discrimination." 498 U.S. at 248.

No. 22-30320

The Chisom Decree is an entirely different creature from the type of reform at issue in *Dowell*, as evinced by the ramifications of applying *Dowell* here: imposing a future obligation[5] to eradicate all "vestiges of past discrimination" when such language does not appear in the Chisom Decree itself—and where neither the plaintiffs nor the district court could identify the "vestiges" for which the State is responsible—means that the State is left to guess at its obligations under its own contract. This cannot be the result that either party intended, and it flies in the face of our traditional methods of contract interpretation by expanding the agreement's scope beyond the document's four corners. *See Dean*, 438 F.3d at 682; *see also Frew v. Janek*, 780 F.3d at 328 (noting that where "Plaintiffs have not pointed to any discrete endpoint" for the decree, "they may *never* be satisfied with Defendants' . . . efforts"). Further, cases involving voting rights are unique: courts considering redistricting plans must devote heightened attention to principles of federalism and the State's ability to run its own elections. *See, e.g.*, *In re Landry*, 83 F.4th 300, 306–07 (5th Cir. 2023) (requiring courts to allow legislative bodies "the first opportunity to accomplish the difficult and politically fraught task of redistricting"). Interpreting a fully-fulfilled consent decree to operate in perpetuity violates the rule reiterated time and again in

---

[5] In imposing an intangible "future compliance" obligation on the State, the district court refused to consider—or even allow the parties to argue—the effect of our court's decision in *Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021), on the *Chisom* litigation. In *Allen*, we rejected the argument—based on the same Section C(8) language in the Chisom Decree used by the district court here—that the decree extended to "'all future elections' in all 'seven Louisiana Supreme Court districts.'" 14 F.4th at 373. We held that this argument "overreads the decree extravagantly." *Id.* Instead, the decree was "tailored" to remedy alleged vote dilution in one district, "not in the other five single-member districts or statewide." *Id.* We therefore rejected any notion that "the Chisom [D]ecree extends continuing federal judicial control over every election in every supreme court district." *Id.* The district court erred in dismissing entirely our court's jurisprudence interpreting this exact consent decree when ruling on the State's motion to dissolve.

12

No. 22-30320

our court and the Supreme Court that control of core legislative functions must be returned to the State as soon as possible. *See Frew*, 540 U.S. at 441.

We decline to extend the *Dowell* standard outside of the school desegregation context for the first time, and instead reaffirm the application of state contract law to motions to dissolve consent decrees under the first prong of Rule 60(b)(5).[6] *See Frew v. Janek*, 820 F.3d at 721; *Frew v. Janek*, 780 F.3d at 330; *see also Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) (questioning whether *Dowell* "can be extended from the school desegregation cases . . . to all other institutional reform decrees" and "whether there ought to be any difference in treatment between a litigated decree and a consent decree when it comes to standards for termination"). The district court erred in holding the State to an unexpected—and impossible to satisfy—burden.

### c. Application to the Chisom Decree

With the above roadmap for consent decrees as our guide, the resolution of this matter is plain. Everyone—the State, the plaintiffs, and the district court—agrees that the State has fully completed each of the eight

---

[6] It has been argued that two sister circuits correctly applied *Dowell* "to Rule 60(b)(5)'s first clause specifically." *Chisom*, 85 F.4th at 302 & n.60. The first case, *Johnson v. Heffron*, 88 F.3d 404, 405–06 (6th Cir. 1996), involved efforts to end a prison overcrowding consent decree. The decision did not specify whether it was applying the first or third prongs of Rule 60(b)(5), *see id.* at 405 n.1 (quoting both prongs), but its analysis involved a "flexible" standard from *Rufo*, which is more relevant to the third prong and by definition considers future compliance. *See id.* at 406 (citing *Rufo*, 12 F.3d at 292). The second case, *Jeff D. v. Otter*, 643 F.3d 278, 283 (9th Cir. 2011), reversed the vacatur, under Rule 60(b)(5)'s first prong, of a consent decree involving care for disabled children. While the *Jeff D.* court did consider the decree's larger goals in addition to its action items, our court has already declined to follow *Jeff D.*—specifically because its "reasoning rested on two school desegregation cases, which present unique issues in consent decree jurisprudence." *Frew v. Janek*, 780 F.3d at 329. In sum, these opinions offer no persuasive reason to transplant *Dowell* outside the desegregation context.

No. 22-30320

remedial action items listed in the Chisom Decree. Under the first prong of Rule 60(b)(5), and with an accurate understanding of the correct legal standard, the completion of these items means that "the judgment has been satisfied" and puts an end to the Chisom Decree. FED. R. CIV. P. 60(b)(5); *see Jackson*, 880 F.3d at 1201 ("With respect to the [first prong of Rule 60(b)(5)], it is appropriate for a court to focus on whether the movant has satisfied each obligation set forth in the consent decree."). We reverse the district court's decision denying the State's motion and hereby dissolve the Chisom Decree.

### III. Conclusion

For the foregoing reasons, we REVERSE and RENDER judgment in favor of the State.

No. 22-30320

Jacques L. Wiener, Jr., *Circuit Judge*, joined by Stewart, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

After the historic enactment of Louisiana Senate Bill 255, now Act No. 7, codified not one, but *two* majority-minority voting districts for the election of justices to the Louisiana Supreme Court, all parties to this litigation effectively agreed that the Chisom decree should be terminated. Nevertheless, the State (as well as the majority of this court) insists on adjudicating the merits of the State's pre-Act No. 7 motion to terminate the consent decree, a procedural posture that fails to take into account the fundamentally altered factual circumstances underpinning the parties' dispute. In reaching the merits, the majority rewrites a critical provision of the Chisom decree that establishes a future compliance obligation on the State. I respectfully dissent.

I

The lynchpin of the en banc majority's reasoning is that the Chisom decree, according to Louisiana's canons of contract interpretation, does not impose a future compliance obligation on the State. I disagree. Section C(8) articulates this obligation clearly, and, contrary to suggestions made at oral argument, was not written in "invisible ink":

> Legislation will be enacted in the 1998 regular session of the Louisiana Legislator which provides for the reapportionment of the seven districts of the Louisiana Supreme Court in a manner that complies with the applicable federal voting law, taking into account the most recent census data available. The reapportionment will provide for a single-member district that is majority black in voting age population that includes Orleans Parish in its entirety. The reapportionment shall be effective on January 1, 2000, and *future Supreme Court elections* after the effective date *shall take place* in the newly reapportioned districts.

15

No. 22-30320

In its oblique reckoning with Section C(8), the majority offers two discernable justifications for holding that the district court erred in imposing a future compliance obligation on the State. Both are unavailing, and neither magically excise the plain language of Section C(8) from the decree.

First, the majority—in its *only* actual acknowledgment of Section C(8)—claims that our decision in *Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) precluded the district court from holding that the Chisom decree imposed a future compliance obligation on the State. *See ante* at 12 n.5. It is unsurprising that this otherwise dispositive argument is relegated to a footnote in the majority's opinion, because it is a patent mischaracterization of our holding in *Allen*. At issue in *Allen* was whether the Chisom decree vested the district court overseeing it with exclusive jurisdiction over cases involving the seven Louisiana Supreme Court voting districts. 14 F.4th at 373–73. We held that it did not. *Id.* at 374–75. Indeed, we expressly disclaimed any "opinion on the merits of . . . any other matter pending before the district court," including the district court's ongoing supervision of the Chisom decree. *Id.* at 375. While the panel in *Allen* posited that "one might think the decree's final remedy has been implemented," by its own admission that issue was neither before this court nor resolved by it. To say that the district court here "dismiss[ed] entirely our court's jurisprudence interpreting this exact consent decree" is specious at best. *See ante* at 12 n.5.

Second, the majority opinion concludes that the district court erred in its extension of the standard set by the Supreme Court in *Board of Education of Oklahoma City Public Schools, Independent School District No. 89 v. Dowell*, 498 U.S. 237 (1991), to the Chisom decree. *See ante* at 13–14. The institutional consent reform decree in *Dowell* concerned the integration of racially segregated public schools. The issue was whether the board of education had "made a sufficient showing of constitutional compliance,"

meaning whether the "Board had complied in good faith with the desegregation decree since it was entered, and whether the *vestiges of past discrimination* had been eliminated to the extent practicable." 498 U.S. at 249–50 (emphasis added). With little guidance from the Supreme Court regarding the scope of institutional consent reform decrees, and even less in the context of motions to dissolve such decrees under Rule 60(b)(5), the original panel opinion in the instant appeal concluded that the district court did not err in applying *Dowell* to the Chisom decree in light of the language of Section C(8). *Chisom v. Louisiana ex rel. Landry*, 85 F.4th 288, 302–04 (5th Cir. 2023), *vacated on reh'g en banc*, 2024 WL 323496, at *1 (5th Cir. Jan. 29, 2024).

The en banc majority now reverses course, "declin[ing] to extend the *Dowell* standard outside of the school desegregation context for the first time." *Ante* at 13. But its only stated justification for refusing to extend *Dowell* is because "[t]he Chisom Decree is an entirely different creature."[1] *Ante* at 12. While it is true that *Dowell* involved an institutional reform consent decree in the public school system context, that distinguishing feature does not render obsolete the underlying understanding that the *purpose* of all institutional reform consent decrees is to address and remedy constitutional and federal statutory violations. *See Horne v. Flores*, 557 U.S. 433, 450 (2009) (observing, in the context of a district court's role overseeing institutional reform consent decrees, that "[i]t goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief"). Necessarily, a fundamental purpose of such consent

---

[1] It is notable that the majority is eager to rely on *Dowell* for the proposition that institutional reform consent decrees "are not intended to operate in perpetuity," *ante* at 7 (quoting *Dowell*, 498 U.S. at 248), but rejects other, nonconforming principles simply because *Dowell* concerned a consent decree that existed in a different institutional context.

decrees is to ensure that a "durable remedy" has been implemented so that a given protected right will not be subject to infringement immediately upon the dissolution of the decree. *Id.* In short, the majority offers no intelligible reason for declining to extend *Dowell* other than flatly asserting that the Chisom decree is "different," and it refuses to grapple with the principle that institutional reform consent decrees necessarily contemplate a remedy designed to outlast the life of the decree itself. *See Inmates of Suffolk Cnty. Jail v. Rufo*, 12 F.3d 286, 292 (1st Cir. 1993) (holding that "the district court, before terminating the decree entirely, [must] be satisfied that there is relatively little or no likelihood that the original constitutional violation will promptly be repeated when the decree is lifted"); *Horne*, 557 U.S. at 450 ("*If a durable remedy has been implemented*, continued enforcement of the order is not only unnecessary, but improper.") (emphasis added).

But, regardless of whether the majority is ultimately correct (if perhaps the Supreme Court decides to weigh in) that the *Dowell* standard should not be applied in the context of redistricting consent decrees, this reasoning fails to grapple with the plain language of Section C(8). So, even assuming that the district court erred in applying *Dowell*, the majority's reasoning fails according to canons of Louisiana contract interpretation because it ignores the plain language of Section C(8). *See Clovelly Oil Co. v. Midstates Petroleum Co.*, 2012-2055, p. 5 (La. 3/19/13), 112 So. 3d 187, 192 ("The reasonable intention of the parties to a contract is to be sought by examining the words of the contract, and not assumed."); *see also id.* ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."). Assuming, as the majority does, that "substantial compliance" is "the appropriate standard in assessing the satisfaction of contractual terms" under Louisiana law, *ante* at 11, the majority cites to no Louisiana authority for the proposition that it can disregard an entire contractual provision

No. 22-30320

embedded within Section C(8) in its effort to ascertain the intent of the parties. Indeed, we have previously held that substantial deviations do not constitute substantial compliance: "Substantial compliance excuses deviations from a contract's provisions *that do not severely impair* the contractual provision's purpose." *Frew v. Janek*, 780 F.3d 320, 330 (5th Cir. 2015) (*Frew II*) (emphasis added) (applying same standard under Texas law). Confounding the majority's line of reasoning is the reality that the "substantial compliance" test has rarely, if ever, been applied in Louisiana outside of the construction law context—an observation omitted from the majority's purportedly prosaic application of Louisiana law. Neither the State nor the majority identify any Louisiana authority that applies the "substantial compliance" test in a context remotely similar to consent decrees. *See Chisom*, 85 F.4th at 301–02 & n.65 (observing same). The majority's reasoning thus begs the question whether a proper *Erie* guess was made at all.

But again, regardless of the appropriate standard—*Dowell*, substantial compliance, etc.—the majority still gets it wrong because it only reaches its result by excising the plain language of Section C(8) from the Chisom decree. It simply cannot be said that "[t]he district court erred in holding the State to an unexpected—and impossible to satisfy—burden," *ante* at 14, when the burden to demonstrate future compliance with the Chisom decree was articulated in the plain language of Section C(8).

## II

When—as the majority should have done—attempting to give effect to Section C(8), the question then becomes whether the State has met its burden of demonstrating entitlement to dissolution of the Chisom decree

No. 22-30320

under the first prong[2] of Rule 60(b)(5). As the party seeking dissolution, the State indisputably bears the burden. *Frew II*, 780 F.3d at 327; *see also League of United Latin Am. Citizens, Dist. 19 (LULAC) v. City of Boerne*, 659 F.3d 421, 438 (5th Cir. 2011) ("The burden is on the moving party to prove that modification is warranted, regardless of whether the party seeks to lessen its own responsibilities under the decree, impose a new and more effective remedy, or vacate the order entirely."). We review the district court's denial of Rule 60(b)(5) relief for abuse of discretion and its underlying legal conclusions de novo. *Frew II*, 780 F.3d at 326.

Under different circumstances—*e.g.*, had the State produced any evidence of compliance with the future elections provision of Section C(8)—the question of what evidence is sufficient for dissolution would be a thorny one. However, on the issue of compliance with this provision of Section C(8), the State entirely abdicated its evidentiary burden. In fact, before the district court, the State refused to commit to protecting a majority-minority voting district after dissolution of the Chisom decree. **ROA.2024–25.** It thus cannot be said that the district court abused its discretion in making the factual finding that the State offered no evidence of its compliance with the future-elections provision of Section C(8) and denying the State's motion for dissolution under the first prong of Rule 60(b)(5). To hold to the contrary, as the majority does, whittles the evidentiary burden imposed by Rule 60(b)(5)

---

[2] The majority astutely avoids any discussion of whether the State met its burden under prong three of Rule 60(b)(5). As the district court and the original panel opinion recognized, the State's assertion that "malapportionment" justified dissolution under the third prong was inapposite because, although there was malapportionment in District Seven, this was not a new issue (and indeed was sought to be addressed by the decree) and had been improving over time, rather than worsening.

No. 22-30320

to near-nonexistence and will only embolden future, meritless challenges to other existing consent decrees.

### III

The majority's opinion fails to reckon with the plain language of Section C(8) of the Chisom decree. When the Rule 60(b)(5) standard is correctly applied, it becomes clear that the State has not satisfied its evidentiary burden. I respectfully dissent.

No. 22-30320

Haynes, *Circuit Judge*, dissenting:

I adopt the first two sentences of the primary dissenting opinion (authored by Judge Wiener). In my view, because of the fact that all parties have now agreed that the Chisom decree should be terminated, I disagree with addressing the merits. Instead, we should rule that the Chisom decree is terminated and dismiss the rest of the case as moot.

Accordingly, I respectfully dissent from the majority opinion.

No. 22-30320

STEPHEN A. HIGGINSON, *Circuit Judge*, dissenting:

The district court determined that the State had not satisfied *Rufo*'s[1] two-part test because (1) after reviewing the statistical analysis of malapportionment presented by the Chisom Plaintiffs, the court observed that the allegedly "severe malapportionment" identified by the State did not constitute a "significant change in circumstances" under *Rufo*, 502 U.S. at 383; and (2) the State's proposed modification, which in this case is termination, did not properly address the changed factual or legal circumstances because "termination is far beyond what would be necessary to address malapportionment in the Louisiana Supreme Court districts." In the intervening time since the district court's decision—and indeed, since the panel's opinion was vacated—the Governor of Louisiana signed into law Senate Bill 255 (now Act 7), which redraws the Louisiana Supreme Court map, adding a second majority-minority juridical district. In light of the "change in facts" occasioned by Act 7, which was explicitly contemplated by the district court and the parties,[2] I would REMAND to the district court to determine, in the first instance, whether this changed circumstance constitutes a "significant" one under *Rufo* warranting termination of the consent decree. *Id.* at 393.

---

[1] *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992) (holding that "a party seeking modification of a consent decree must establish [1] that a significant change in facts or law warrants revision of the decree and [2] that the proposed modification is suitably tailored to the changed circumstance").

[2] At the March 24, 2022 hearing before the district court, the district court recognized that "it's up to the legislature to do this reapportionment," while the U.S. Government stated it was "absolutely . . . ready and willing to work with the State to try to reach a [legislative] resolution," and the Chisom Plaintiffs agreed that they were "open to seeing legislation," although "none of that [was] in the record" at the time.